Walter Stephen JACKSON, by his parents and next friends, Walter and Helen JACKSON, et al., Plaintiffs,

v.

FORT STANTON HOSPITAL AND TRAINING SCHOOL, et al., Defendants,

and

John E. and Iris Young, legal guardians and parents of Rita Kay Young, et al., Intervenors.

Civ. No. 87–839 JP.

United States District Court, D. New Mexico.

Dec. 28, 1990.

Paul L. Biderman, Santa Fe, N.M., Philip B. Davis, Robert Levy, Levy and Geer, P.A., Daniel W. Shapiro, Nancy Koenigsberg, Protection and Advocacy System, Albuquerque, N.M., for plaintiffs.

Vernon W. Salvador, Albuquerque, N.M., for intervenors.

Jerry A. Dickinson, Beth W. Schaefer, Patricia E. Bustamante, Sp. Asst. Attys. Gen., Hal Stratton, Atty. Gen., Chris Coppin, Santa Fe, N.M., Joel I. Klein, Paul M. Smith and Rebecca L. Brown, Onek, Klein & Farr, Washington, D.C., for State defendants.

Timothy M. Cook, Judith A. Gran, Frank Laski, The Public Interest Law Center of Philadelphia, Philadelphia, Pa.

Peter Cubra, Marlene Foster, Protection and Advocacy System for New Mexicans With Developmental Disabilities, Protection & Advocacy System, Albuquerque, N.M.

Ann Tilford Sims, Williams, Conroy & Sims, Belen, N.M.

Barbara Bergman, UNM School of Law, University of New Mexico, Albuquerque, N.M., Guardian Ad Litem, for Felicia Botello.

Kent Winchester, Albuquerque, N.M. (Roberta Beyer, Albuquerque, N.M., of counsel), for applicants-in-intervention plaintiffs.

## TABLE OF CONTENTS

Pages

Introduction ................................................... 1249

 I. Institutionalization and Community Services in New Mexico.............. 1250

II. History of Litigation ............................................... 1251
III. The Parties
 A. Plaintiffs ................................................... 1252
 1. Walter Stephen Jackson ............................... 1253
 2. Mildred Tsosie ....................................... 1253
 3. Clinton Heath ........................................ 1253
 4. Shawn Heath .......................................... 1253
 5. Steven Nunez ......................................... 1253
 6. Mary Katherine Nowak ................................. 1253
 7. Andra Martinez ....................................... 1254
 8. Lillian Willmon ...................................... 1254
 9. Joseph Gonzales ...................................... 1254
 10. Alfred Shirley ....................................... 1254
 11. James Fritche ........................................ 1254
 12. Sean McHenry ......................................... 1254
 13. Betty Young .......................................... 1254
 B. Intervenors .................................................. 1254
 C. Defendants ................................................... 1254
 D. The Class .................................................... 1257
IV. ICF/MR Surveys and Department of Justice Lawsuit ................... 1258
V. Findings of Fact .................................................. 1259
 A. Food ......................................................... 1259
 1. Nutritional Management ............................... 1259
 2. Food Temperatures .................................... 1259
 3. Food Handling Practices .............................. 1260
 B. Clothing ..................................................... 1260
 C. Environmental Conditions ..................................... 1260
 1. Living Areas ......................................... 1260
 2. Asbestos ............................................. 1260
 3. Pest Control ......................................... 1261
 4. Lighting and Ventilation ............................. 1261
 5. Fixtures ............................................. 1261
 6. Sanitation Practices ................................. 1261
 7. Fire Safety .......................................... 1261
 D. Medical Care ................................................. 1261
 1. Medical Staff ........................................ 1261
 2. Infectious Diseases and Mortality Rates .............. 1263
 3. Medications .......................................... 1263
 4. Dental Care .......................................... 1263
 5. Medical Records ...................................... 1263
 E. Habilitation/Active Treatment ................................ 1265
 1. Assessments .......................................... 1265
 2. Interdisciplinary Team ("IDT") ....................... 1266
 3. Individual Program Plan ("IPP") ...................... 1266
 4. Long-term View ....................................... 1267
 5. Discharge Plan ....................................... 1267
 6. Data Collection ...................................... 1268
 7. Qualified Mental Retardation ......................... 1268
 Professional ("QMRP")
 8. Active Treatment ..................................... 1269
 a. LLH & TS ......................................... 1269
 b. FSH & TS ......................................... 1270
 9. Behavior Management .................................. 1271
 a. LLH & TS ......................................... 1271
 b. FSH & TS ......................................... 1272
 F. Restraints ................................................... 1272
 1. Chemical Restraints .................................. 1272
 2. Physical Restraints .................................. 1273
 G. Regression ................................................... 1274
 H. Safety and Physical Harm ..................................... 1275

 1. Abuse ............................................................ 1275
 2. Accident and Injury ........................................... 1275
 3. Reports ........................................................ 1276
 I. Direct Care Staff ................................................ 1276
 1. Insufficient Staff and Inadequate Supervision................... 1277
 2. Staff Training................................................. 1277
 a. Preservice Training ........................................ 1277
 b. In–Service Training ........................................ 1278
 J. Professional Staff................................................ 1279
 1. Insufficient Staff............................................. 1279
 2. Professional Staff Training ................................... 1280
 3. Rehabilitation Services ....................................... 1280
 a. Physical Therapy ("PT") ................................... 1282
 i. Staffing................................................ 1282
 ii. Adequacy of Physical Therapy Services ................. 1282
 b. Occupational Therapy ("OT") .............................. 1283
 c. Assessments.............................................. 1284
 4. Speech and Language Services ("SPL") ......................... 1285
 5. Adaptive Equipment.......................................... 1285
 K. Education ....................................................... 1286
 1. School–Age Programs ......................................... 1286
 a. Public Schools ............................................ 1286
 b. Special Education Program at LLH & TS.................... 1287
 2. Adult Services Programs ...................................... 1287
 3. Adequacy of the Facilities' Programs ......................... 1288
 a. Functional and Chronologically Age Appropriate Programs ... 1288
 b. Coordination between Cottage and Education Programs....... 1289
 c. Space ..................................................... 1290
 L. Choice, Privacy, Access to Personal Property ...................... 1290
 1. Choice ........................................................ 1290
 2. Privacy ....................................................... 1290
 3. Access to Personal Property ................................... 1290
 4. Respect....................................................... 1290
 5. Access to the Community....................................... 1290
 M. Placements ..................................................... 1291
 1. LLH & TS .................................................... 1291
 2. FSH & TS .................................................... 1291
 3. Commitment Process ......................................... 1292
 N. Implementation of Recommendations for Community Placement ...... 1292
 1. IDT Recommendations........................................ 1292
 2. Recommendations Based on Availability ........................ 1293
 3. State Court Orders for Community Placement................... 1294
 4. Lack of Available Alternatives to Institutionalization............ 1294
VI. Conclusions of Law ................................................ 1296
 A. Statutory Claims................................................ 1296
 1. Rehabilitation Act ............................................ 1296
 a. Discrimination ............................................ 1298
 b. Segregation .............................................. 1299
 2. Social Security Act ........................................... 1299
 a. Deficiencies............................................... 1300
 b. Application of Title XIX ................................... 1301
 3. Education of the Handicapped Act ............................. 1302
 a. Exhaustion of Remedies ................................... 1303
 b. LLH & TS ................................................ 1304
 c. FSH & TS ................................................ 1304
 B. Constitutional Claims............................................ 1304
 1. Substantive Due Process ...................................... 1305
 a. Food, Shelter & Clothing................................... 1305
 b. Medical Care ............................................. 1306
 c. Reasonable Conditions of Safety............................ 1306
 i. Abuse .................................................. 1306

ii. Accident and Injury ..................................... 1306
d. Freedom from Unreasonable Restraints ...................... 1307
 i. Chemical Restraints ................................. 1307
 ii. Physical Restraints ................................ 1307
e. Minimally Adequate Training ............................. 1307
 i. IDT Process ........................................ 1307
 ii. IPPs .............................................. 1308
 iii. Training Programs ................................ 1308
 iv. Implementation of IPPs ............................ 1308
 v. Rehabilitation Services ............................ 1308
 vi. Professional Staff ................................ 1309
 vii. Behavior Management .............................. 1309
f. Regression ............................................. 1309
g. Community Placement .................................... 1310
 i. IDT Recommendations for Community Placement ......... 1310
 ii. IDT Determinations Based on Unavailability of Community
 Services .......................................... 1312
 iii. No IDT Recommendation for Community Placement ...... 1312
2. Procedural Due Process ..................................... 1313
3. Equal Protection Clause .................................... 1314
C. Claims for Attorneys' Fees ................................... 1314
VII. Relief .................................................... 1315

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

This is a civil rights action challenging the institutionalization of developmentally disabled[1] persons at Fort Stanton Hospital and Training School ("FSH & TS") and Los Lunas Hospital and Training School ("LLH & TS"), two state-supported institutions for the developmentally disabled in New Mexico. This litigation centers on the area of developing law concerning the rights of the developmentally disabled. It also concerns the constitutional powers of and constraints on federal courts that are asked to grant relief when political branches of state government are perceived as moving too slowly to improve the welfare of the developmentally disabled.

Plaintiffs seek declaratory and injunctive relief. The substantive relief sought arises in the context of the Constitution of the United States[2] and certain federal statutes, including the Rehabilitation Act of 1973, the Education of the Handicapped Act and the Social Security Act.[3]

1. "Developmental disability" refers to a general category of disorders usually first evident in infancy, childhood, or adolescence, including mental retardation. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 3–4 (3d ed. revised 1987). The New Mexico Developmental Disabilities Community Services Act defines "developmental disability" as a "severe chronic disability of a person which is attributable to a mental or physical impairment or a combination of mental and physical impairments; is manifested before the person attains age twenty-two; is likely to continue indefinitely; results in substantial functional limitations in areas of major life activity; and reflects the person's need for a combination and sequence of special interdisciplinary or generic care, treatment or other services which are individually planned and coordinated. Persons who are diagnosed as mentally retarded, cerebral palsied, epileptic or autistic and who have at least one functional limitation in an area of major life activity [are] considered developmentally disabled. Infants and preschool-aged children at risk of being developmentally disabled [are] also ... considered developmentally disabled." § 28–16–3(D) NMSA 1978 (1987 Repl.).

2. Plaintiffs and Intervenors claim that the actions complained of have deprived them of their rights under the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution.

3. After the close of trial, plaintiffs moved for leave to amend the complaint to allege claims arising under the Americans with Disabilities Act of 1990. The effective dates of the applicable sections of that Act range from eighteen to

In a trial of numerous weeks duration spread over two and one half years, which included several evidentiary hearings on plaintiffs' requests for expedited, extraordinary relief, plaintiffs challenged the conditions at the institutions. They adduced evidence on a number of specific programs and practices, and seriously called into question the validity of institutional life itself. To that end, plaintiffs offered the testimony of numerous experts on the issue of whether an individual's habilitation can ever be provided, in a constitutionally permissible manner, in the traditional institutional setting as opposed to a community setting.

The relief that plaintiffs ultimately seek is a determination that their right to habilitation necessarily requires their receiving habilitation in integrated community settings, because effective habilitation cannot be provided to persons with developmental disabilities unless they are permitted to live in the community with nondisabled persons. While the vast changes plaintiffs seek to make in the lives of the developmentally disabled in New Mexico are highly commendable, some of the relief sought is beyond this court's constitutional power to order and is being requested from the wrong branch of government.

This court has reviewed the volumes of depositions, exhibits and other evidence in an effort to arrive at a just resolution of the plaintiffs' claims. Institutional reform cases of this nature require courts to venture into areas foreign to their traditional expertise—including the fields of medicine, psychiatry and education—an excursion which this court takes with some trepidation.

### I. Institutionalization and Community Services in New Mexico

The rate of institutionalization in New Mexico is within the national norm. In 1977, an average of 67.42 persons per one hundred thousand resided in large state institutions for the developmentally disabled in the United States. By 1988, the national average was 37.2 individuals per one hundred thousand. By comparison, in 1977, the rate of institutionalization in New Mexico was 48 individuals per one hundred thousand. The rate of institutionalization decreased to 32.7 per hundred thousand in 1988. Tr. 4/10/90 at 59–61 (Sandler); Def. Exh. VVV.

The number of persons with developmental disabilities residing in state-operated institutional facilities across the nation has declined. Between 1984 and 1988, there was a 16.6% decrease in the population of state institutions nationwide. The national census of institutionalized developmentally disabled persons in 1987 dropped below 100,000 to 95,600 for the first time since 1940. In New Mexico, however, the institutional population increased by 1.6% during the same period. Pl.Exh. 365 at 13.

In 1984, New Mexico enacted legislation for the establishment of a system for community care of the developmentally disabled, the "Developmental Disabilities Community Services Act." § 28–16–1 *et seq.* NMSA 1978 (1987 Repl.). The Act contains a separate section which defines the legislative purpose for its enactment as follows:

> It is the purpose of the legislature in enacting the Developmental Disabilities Community Services Act ... to authorize the health and environment department to plan and coordinate developmental disabilities community services in the state and to declare that priority shall be given to the development and implementation of community-based services for developmentally disabled minors and adults, which will enable and encourage such individuals to achieve their greatest potential for independent and productive living, **which will enable them to live in their own homes and apartments or in facilities located within their own communities and which will assist clients to be diverted or be removed from unnecessary institutional placement.**

twenty-four months from the date of enactment, July 26, 1990. That Act imposes no present enforceable duties on defendants. Accordingly, plaintiffs' motion for leave to amend was denied.

§ 28–16–2 NMSA 1978 (1987 Repl.) (emphasis added).

The Developmental Disabilities Bureau of the New Mexico Health and Environment Department is the primary funding source for community programs serving persons with developmental disabilities. Def.Exh. CCC at 3. It contracts with approximately thirty-one private agencies to provide community based services to persons with developmental disabilities. Def. Exh. CCC at 4. During the 1989–90 fiscal year the state of New Mexico served approximately 480 persons in group homes, companion homes, and supported living environments. *Id.*

In each of the last several years, New Mexico has increased funding for community programs. Tr. 4/11/90 at 278 (Bergman). In fiscal year 1989, the Developmental Disabilities Bureau received approximately $11 million dollars in funds for community programs. Tr. 4/2/90 at 146 (Foley); Def.Exh. CCC at 68. This figure represents an increase by the legislature of thirty percent from the previous budget. Tr. 4/2/90 at 146 (Foley). Approximately, twenty five percent of the budget is earmarked for residential services. Def.Exh. CCC at 68. *Id.*

The funding for the two state institutions has also increased, although the rate of increase has been greater for community programs. Tr. 4/11/90 at 278 (Bergman).

The State of New Mexico continues to provide care in institutional settings for 345 residents of LLH & TS and 149 residents of FSH & TS notwithstanding the preference for community based care expressed by the legislature six years ago.

## II. History of Litigation

On July 8, 1987 twenty-one individual developmentally disabled citizens of New Mexico, on behalf of themselves and other similarly situated individuals, and the Supporters of Developmentally Disabled New Mexicans, Inc. commenced this lawsuit "to redress the unconstitutional and illegal conditions" at Fort Stanton Hospital and Training School and Los Lunas Hospital and Training School. *Jackson, et al. v.*
*Fort Stanton, et al.,* No 87–839, complaint at 1–2 (D.N.M. July 8, 1987).

On December 10, 1987, plaintiff Ronald Fuller applied for a temporary restraining order seeking to restrain defendants LLH & TS, Health and Environment Department, Department of Education, and various state officials from preventing plaintiff's enrollment in Los Lunas Public Schools and directing Los Lunas Public Schools to enroll plaintiff and immediately to devise an appropriate individual education program for him. I held hearings on the application for temporary restraining order on December 11, and December 28, 1987. I entered a restraining order on January 15, 1988 requiring that LLH & TS conduct a comprehensive evaluation and individual assessment of Mr. Fuller by qualified independent evaluators and that Los Lunas Public School District convene an Educational Appraisal and Review Committee meeting to consider whether and to what extent enrollment of Ronald Fuller in the Los Lunas Public Schools could be satisfactorily achieved. *Jackson, et al. v. Fort Stanton Hospital and Training School, et al.,* No. 87–839, slip op. at 15–16 (D.N.M. Jan. 15, 1988).

On February 4, 1988, the Los Lunas Public School District agreed by stipulation to integrate Ronald Fuller into the public school environment. *Jackson, et al. v. Fort Stanton Hospital and Training School, et al.,* No. 87–839, slip op. at 15–16 (D.N.M. Feb. 4, 1988). Ronald Fuller has since been discharged from LLH & TS and currently resides with his family in Hobbs, New Mexico. Motions for attorneys fees and costs relating to Ronald Fuller's quest for a public school education remain pending for later determination by this court.

On August 5, 1988, plaintiffs moved to amend the complaint to add the claims of twenty-three individuals who at the time were residents of Las Vegas Medical Center ("LVMC"), a state psychiatric institution. Those twenty-three plaintiffs alleged that they were both developmentally disabled and mentally ill and that LVMC provided for their mental illnesses, but did not provide habilitation and training services

for their developmental disabilities. I granted the motion and the names of the twenty-three individuals were added to the complaint. These plaintiffs are: Virgil Addison, Roberto Atilano, Felicia Botello, Joseph Baca, Melinda Conway, Daniel Garcia, Viola Gurule, Thomas Harkins, Robert Hynes, Damon Keeswood, Sharon Koons, Garry Martinez, Jose Martinez, Robert McHenry, Marcelino Moya, Ted Nichols, Margaret Romero, Loriann Strickland, Beth Thomas, Albert Vasquez, Edwin Vasquez, Benito Arguello, and Benjamin Romero.

Subsequently, plaintiffs applied for a temporary restraining order on behalf of those plaintiffs who were still housed at LVMC. Hearings were held on the plaintiffs' application for a TRO on August 8, 9, 10, 12, 13, and 15, 1988, and culminated in the entry of a preliminary injunction on September 23, 1988 requiring defendants within 30 days to perform assessments of all plaintiffs residing at LVMC and within 60 days to prepare individualized treatment plans for every plaintiff determined to be developmentally disabled. *Jackson, et al. v. Fort Stanton Hospital and Training School, et al.*, No. 87–839, slip op. at 15–16 (D.N.M. Sept. 23, 1988).

On November 11, 1988, plaintiffs filed a Motion for an Order to Show Cause and for Further Extraordinary Relief claiming that defendants had failed to comply with the order that had been entered September 23, 1988. After holding evidentiary hearings on December 22, 1988, January 16, 1989, and March 27 and 28, 1989, I denied the motion. *Jackson, et al. v. Fort Stanton Hospital and Training School, et al.*, No. 87–839, slip op. (D.N.M. May 23, 1989). Many of the twenty-three LVMC plaintiffs had been transferred to the New Mexico institutions or to out-of-state facilities for treatment under contractual arrangements with the state of New Mexico. Of the twenty-three plaintiffs who were residing at LVMC in August 1988, twelve have been transferred or otherwise discharged, one is deceased, and the remaining ten continue to reside at LVMC.[4] However, the ten remaining at LVMC have presented no further evidence nor have they requested further relief at subsequent hearings.

On October 16, 1989, the main trial on the merits commenced. The main trial was held over an eight week period and proceeded in trial segments as follows: October 16, 1989—October 19, 1989; October 30, 1989—November 3, 1989; November 13, 1989—November 16, 1989; December 12, 1989—December 15, 1989; January 2, 1990—January 5, 1990; April 2, 1990—April 27, 1990. In the course of the trial, numerous witnesses testified and over eight hundred exhibits were admitted as evidence. Over 10,000 pages of transcripts were recorded.

Following the trial, I toured LLH & TS and FSH & TS for the second time, from April 30, 1990 through May 4, 1990, with the court-appointed expert. I had visited the facilities for the first time in the early part of August 1989. In June 1990, I also visited and inspected a community program in Durango, Colorado, and a sheltered workshop and a specialized community behavior management program in Albuquerque, New Mexico.

### III. The Parties

#### A. *Plaintiffs*

Plaintiffs seek the expansion of community services for the developmentally disabled and the transfer of the residents of LLH & TS and FSH & TS to community residential settings. Evidence was presented on thirteen named plaintiffs who reside at LLH & TS and FSH & TS.[5] These thirteen named plaintiffs will be the representatives of the subclass certified on May 23, 1989 that seeks community placement. The backgrounds of the thirteen named plaintiffs are briefly summarized below.

---

**4.** The ten plaintiffs who continue to reside at LVMC are Virgil Addison, Felicia Botello, Joseph Baca, Viola Gurule, Damon Keeswood, Jose Martinez, Robert McHenry, Ted Nichols, Edwin Vasquez, and Benjamin Romero.

**5.** Another named plaintiff, Richard Stanfield, was discharged from FSH & TS on June 29, 1987 and no evidence was offered about him.

### 1. Walter Stephen Jackson

Walter Stephen Jackson, age 29, is profoundly retarded, has a seizure disorder, and suffers from spastic choreoathetoid quadriparesis. Pl.Exh. 18 at 1–2. Mr. Jackson receives anti-convulsant and anti-seizure medications. *Id.* at 2. Mr. Jackson was admitted to LLH & TS in 1967, at the age of 6, due to his mother's poor health and a lack of financial resources. Tr. 4/2/90 at 36. He currently resides in Cottage 2. Pl.Exh. at 1. Mr. Jackson's family would like for him to live in a community setting. Tr. 4/2/90 at 45–46 (Jackson). The interdisciplinary team,[6] however, has advised Mr. Jackson's family that because no suitable alternative exists, it has recommended that he remain at LLH & TS. Tr. 4/2/90 at 78–79 (Jackson).

### 2. Mildred Tsosie

Mildred Tsosie, age 25, is profoundly retarded, microcephalic, blind and nonambulatory. She has cerebral palsy, seizures, contractures, and a severe scoliosis with a windswept deformity of her legs and a severe supination of her forearms. Also, she does not speak and she has a moderate hearing loss. Ms. Tsosie is fed by a gastrostomy tube. Pl.Exh. 21 at 1, 2, 4, 8; Pl.Exh. 96 at 9–10. She was admitted to LLH & TS in 1973 and currently resides in the Chavez West Building. *Id.* at 1. The interdisciplinary team has recommended that other placement be explored for Ms. Tsosie that will meet her overall developmental and medical needs. Pl.Exh. 21 at 10.

### 3. Clinton Heath

Clinton Heath, age 28, was admitted to LLH & TS in 1971. He is profoundly retarded and nonambulatory, and he has Coffin–Lowry Syndrome[7] and a severe, fixed kyphoscoliosis of the spine. Pl.Exh. 16 at 1, 2, 4, 8, 10. Clinton Heath resides in Cottage 2. *Id.* at 2. His interdisciplinary team has not recommended Clinton Heath for community placement. The team determined that Clinton Heath "requires an ICF/MR facility that can meet his medical, self-care and active treatment needs and one that accepts clients who are in wheelchairs and are profoundly retarded." However, "there are no facilities available in New Mexico to meet his needs. If and when one should become available, Clinton would be considered for referral." Pl.Exh. 16, IPP of 1/5/89 at 16.

### 4. Shawn Heath

Shawn Heath, age 27, is Clinton Heath's brother. He is profoundly retarded and nonambulatory. Like his brother, Shawn Heath was diagnosed as having Coffin–Lowry Syndrome. He also suffers from recurrent conjunctivitis and chronic constipation. Pl.Exh. 17 at 1, 2, 4, 6, 10. Shawn Heath was admitted to LLH & TS with his brother in 1971 because his family was no longer able to care for the boys at home and the cost of outside care placed a financial strain on the family. *Id.* at 1. Shawn Heath also resides in Cottage 2. His interdisciplinary team has not recommended community placement. Pl.Exh. at 16.

### 5. Steven Nunez

Steven Nunez, age 25, was admitted to LLH & TS in 1973. He is profoundly retarded, and has spastic quadriparesis. In 1987, Mr. Nunez had orthopedic surgery to increase his potential for ambulation and he now ambulates with leg braces and a stride walker. He occasionally experiences problems with rumination, which is addressed in his programming. Pl.Exh. 19 at 1–2, 6–7, 9–10. Mr. Nunez resides in Cottage 2. He has been referred by his interdisciplinary team for community placement. *Id.* at 1, 18.

### 6. Mary Katherine Nowak

Mary Katherine Nowak, age 34, was first admitted to LLH & TS in 1964 at age

---

**6.** The interdisciplinary team process is described more fully below.

**7.** Coffin–Lowry Syndrome is a rare inherited disorder that has multiple congenital anomalies. Historically, there have only been approximately fifty diagnosed cases in the world. Tr. 4/4/90 at 97–98 (Crocker); Tr. 4/23/90 at 71–73 (Brown).

7. She was subsequently transferred to the Las Vegas Medical Center, a state mental hospital, where she remained until age 22 when she was readmitted to LLH & TS. She currently resides in Cottage 4. Ms. Nowak is moderately retarded with a psychiatric diagnosis of atypical psychosis. Pl. Exh. 20 at 1, 6, 7, 8. Her interdisciplinary team determined that Ms. Nowak is capable of doing very well in a group home. Pl.Exh. 20, IPP 7/24/89 at 12.

### 7. Andra Martinez

Andra Martinez, age 37, resided at the Las Vegas Medical Center from age eleven until her admission to LLH & TS in 1979. She currently resides in Cottage 6. Ms. Martinez is profoundly retarded, has autistic traits, and has a seizure disorder. Pl. Exh. 27 at 1, 2, 8. She has been referred by her interdisciplinary team to community residential programs "for possible future opportunity to live in a less restrictive environment as her skills improve." *Id.* at 8.

### 8. Lillian Willmon

Lillian Willmon, age 71, was admitted to LLH & TS in 1939. She is profoundly retarded and nonambulatory and she has spastic quadriplegia, kyphosis, arthritis and contractures of all extremities and trunk. Ms. Willmon is considered to be nonverbal although she can vocalize some words. Pl. Exh. 22 at 1, 2, 4, 6–10. She currently resides in Seligman Cottage. *Id.* at 1. The interdisciplinary team reviewed Ms. Willmon's current placement at LLH & TS and found it to be "the most appropriate available at this time." Pl.Exh. 22, IPP 7/12/89 at 17.

### 9. Joseph Gonzales

Joseph Gonzales, age 47, was admitted to FSH & TS in 1985. He was transferred from a group home in Roswell, New Mexico as a result of behavior problems. He is severely retarded and he has an atrophied left arm, cerebral palsy, foot arthrosis and infrequent uncooperative or aggressive reactions. Pl.Exh. 24 at 2. He currently resides in Sierra I Cottage. *Id.* Mr. Gonzales has been referred by his interdisciplinary team for community placement. *Id.* at 3d.

### 10. Alfred Shirley

Alfred Shirley, age 38, was admitted to FSH & TS in 1981. He is profoundly retarded and is nonambulatory. He has cerebral palsy and Bulbar palsy, a seizure condition. In addition he has a right hemiplegia which requires a leg brace. He is unable to feed himself and is not toilet trained. Pl.Exh. 26 at 2–3c. Mr. Shirley currently resides in Sierra I Cottage. *Id.* at 2. The interdisciplinary team determined that FSH & TS can best meet the conditions for his treatment and habilitation. However, Mr. Shirley has been referred to two community residential programs in accordance with the terms of a state court order. Pl.Exh. 26 at 7.

### 11. James Fritche

James Fritche, age 37, was admitted to FSH & TS in 1968. He is profoundly retarded and has cerebral palsy, enuresis, and a club foot. He is not toilet trained. His expressive language skills are nonfunctional. Pl.Exh. 23 at 1, 2, 2b, 2c. He is able to feed and dress himself independently. *Id.* at 2. Mr. Fritche currently resides in Eddy Cottage. *Id.* at 1. His interdisciplinary team has not recommended him for community placement. *Id.* at 6.

### 12. Sean McHenry

Sean McHenry, age 21, was admitted to FSH & TS in 1984 from Taos Residential Center. He is profoundly retarded and autistic. He has Hodgkins disease, a seizure disorder, and occasional incidents of fevers and elevated white blood cell count of undetermined origin. Pl.Exh. 25 at 1, 2a, 2c, 2d. His expressive language skills are nonfunctional. *Id.* at 2c. Mr. McHenry attends the Capitan Public Schools. Tr. 11/3/89 at 89–90 (Aldaz). He currently resides in Sierra I Cottage. *Id.* at 1. The interdisciplinary team determined that FSH & TS can best meet the conditions for his treatment and habilitation. Mr. McHenry has not been referred to any community residential

program outside FSH & TS. Pl.Exh. 25 at 6.

### 13. Betty Young

Betty Young, age 33, was admitted to FSH & TS in 1980. She was transferred from LLH & TS and had previously been a patient at LVMC. She is moderately retarded and has organic brain syndrome with hallucinosis and encephalopathy. She is hearing impaired and her expressive language skills are nonfunctional except for some basic sign language. Pl.Exh. 28 at 1, 2, 2a–2e. Ms. Young currently resides at Socorro Cottage. *Id.* at 1. The interdisciplinary team determined that FSH & TS best meets the conditions for her treatment and habilitation. However, she has been referred for placement in community residential programs in accordance with a state court order, but has not yet been placed. Pl.Exh. 28 at 6.

### B. *Intervenors*

Intervenors are parents and guardians of some of the residents of LLH & TS and FSH & TS. The parents and guardians intervened in the lawsuit seeking to require defendants to bring the institutions into compliance with constitutional and statutory mandates, but they oppose plaintiffs' efforts to close LLH & TS and FSH & TS and to force the transfer of residents of those institutions into community-based facilities. On June 27, 1988, I granted intervenors leave to intervene in this action. They filed their Complaint in Intervention on July 6, 1988.

### C. *Defendants*

Defendants Fort Stanton Hospital and Training School and Los Lunas Hospital and Training School are the only two state operated institutions which are classified as Intermediate Care Facilities for the Mentally Retarded ("ICFs/MR") under Title XIX of the Social Security Act, and receive federal funds under the act in New Mexico.

LLH & TS was established by act of the New Mexico Legislature on March 20, 1925 as a public residential facility for "any person mentally underdeveloped or faultily developed" who "requires supervision, care and control for his own welfare, or for the welfare of others, or for the welfare of the community." The institution was named "The Home and Training School for Mental Defectives." 1925 New Mexico Laws 254, Ch. 133, §§ 1, 2. LLH & TS is located in Los Lunas, New Mexico and currently serves 345 residents. Of those, 193 are in wheelchairs, 226 have a seizure disorder, 77 have a hearing impairment, 109 have a vision impairment, 40 have both a vision and hearing impairment and 72 are on psychoactive medication in conjunction with a behavioral problem. Approximately seventy-two percent (72%) of the population of LLH & TS are profoundly retarded and twenty-one percent (21%) are severely retarded. Tr. 4/27/90 at 17–18 (LaCourt).

FSH & TS is located in rural Lincoln County, New Mexico. It was originally established as a fort for the United States Cavalry in 1855. Some of the original buildings are still standing on the grounds of the institution. Near the end of the nineteenth century the United States Merchant Marines began using the facility as a hospital for the treatment of tuberculosis. Later it was converted to a state public health hospital which continued in the treatment of tuberculosis. In 1966, the facility began to serve the mentally retarded. FSH & TS currently serves 149 residents. Tr. 4/24/90 at 92 (Miller). The majority of the residents admitted to FSH & TS have behavior problems. Tr. 11/3/89 at 95, 129 (Aldaz); Pl.Exh. 327 at 98 (Aldaz). Residents are also admitted at FSH & TS through the criminal justice system. Pl.Exh. 327 at 60–61, 63–65. In 1987, approximately sixty-six percent (66%) of the population were severely and profoundly retarded. The remaining thirty-four percent (34%) of the population were moderately or mildly retarded or of borderline intellectual ability. Pl.Exh. 335 at 11.

In 1983, the New Mexico Health and Environment Department decided to phase out FSH & TS as a facility for persons with developmental disabilities and to transfer most of the residents to community-based programs. The Department imposed a

freeze on admissions to FSH & TS during the fall of 1983 and by 1984 the population of the facility was reduced to 111. Tr. 11/3/89 at 139 (Aldaz); Pl.Exh. 335 at 1–2. In 1984 the New Mexico legislature made the entire Health and Environment Department budget contingent upon full utilization of FSH & TS as a facility for persons with developmental disabilities. This decision by the legislature led to a reversal of the earlier announced decision to close FSH & TS. Tr. 11/3/89 at 141–142 (Aldaz); Pl. Exh. 335 at 1, 4.

Following the legislature's action in 1984, the Health and Environment Department appointed a task force consisting of parents, advocates, state legislators, and state agency personnel to examine the role and function of FSH & TS. The task force concluded that most of the residents at FSH & TS did not need to be there to receive the services that they required, and recommended the immediate development of a plan by the Health and Environment Department to facilitate the movement of residents of FSH & TS into community placements. The department did not implement the recommendations. Tr. 4/12/90 at 29 (Jackson).

In 1986, the governor of the state of New Mexico appointed the Developmental Disabilities Planning Council pursuant to the Developmental Disabilities Community Services Act.[8] The council commissioned a study of residential service needs in New Mexico for people with developmental disabilities and held public hearings throughout the state. The council recommended a phase out of FSH & TS, a reduction in the developmentally disabled population at LLH & TS, and a serious commitment to expansion of community-based residential options for persons with developmental dis-

abilities. The plan has not been implemented. Tr. 4/12/90 at 29–30 (Jackson).

Defendant David LaCourt is the administrator of LLH & TS.[9] Defendant Ervin Aldaz is the administrator of FSH & TS.[10] They are responsible for the operation, administration and supervision of the facilities, including the custody, care and treatment of all residents admitted, and for insuring compliance by the staff with applicable state and federal laws and regulations. They also have oversight responsibility for the process by which residents are discharged to community-based placements.

Defendant New Mexico Health and Environment Department ("HED") is the primary executive agency in New Mexico charged with the care and treatment of developmentally disabled persons in New Mexico. It is responsible for the administration, operation and oversight of LLH & TS and FSH & TS, and it contracts with private agencies to provide residential and other services to developmentally disabled persons in community-based settings. HED is also responsible for insuring that LLH & TS and FSH & TS comply with federal ICFs/MR regulations governing those facilities.

Defendant Dennis Boyd is the Secretary of the Health and Environment Department. He is responsible for insuring that LLH & TS and FSH & TS are operated in compliance with federal law, for monitoring and evaluating the professional and administrative activities of FSH & TS and LLH & TS, and for consulting with the administrators of those facilities. He has the responsibility of preparing, for submission to the legislature, budget requests sufficient to allow the facilities to carry out their functions in accordance with statutory and con-

---

8. The Act requires that the "developmental disabilities planning council ... conduct a needs assessment to determine the number of developmentally disabled persons resident in New Mexico, the range and degree of severity of their disabilities, their present placement and services being received, their needs for services and the extent to which their needs are unserved or underserved." § 28–16–4 NMSA 1978 (1987 Repl.)

9. Carolyn Klintworth was the administrator of LLH & TS at the time the complaint was filed in 1987. Miriam Brownstein later served as acting administrator from May 1989 to December 1989 until David LaCourt became the administrator in December 1989.

10. Ervin Aldaz considers himself a fourth generation employee of FSH & TS. His father was employed at the facility for 31 years.

stitutional mandates and sufficient to support community-based services.

Defendant New Mexico Department of Human Services is the state agency designated to be responsible for the receipt and appropriate disbursement of funds under Title XIX of the Social Security Act and for the enforcement of the provisions of that Act in New Mexico. The New Mexico Department of Human Services is also responsible for the administration and oversight of all programs to which the waiver of certain Medicaid requirements has been granted by the federal government, and for insuring that such programs comply with federal requirements and with the service plans submitted by the state.

Defendant Alex Valdez is the Secretary of the New Mexico Department of Human Services and as such is responsible for insuring that the department fulfills its obligations under Title XIX of the Social Security Act.

Defendant New Mexico Department of Education is responsible for maximizing the use of community resources in the provision of vocational rehabilitation services, as stipulated by the parties.[11]

Defendants New Mexico State Board of Education and its individual members are responsible for the formulation and adoption of curricula for the adequate education of all students in the public schools and for establishing and enforcing standards for the identification, evaluation, placement, and service programs of all handicapped children served in all public schools and state supported institutions. Additionally, the board is responsible for carrying out the provisions of the Education of the Handicapped Act within the state of New Mexico including assuring that handicapped students are educated with non-handicapped students to the maximum extent appropriate, as stipulated by the parties.[12]

Defendant Alan Morgan is the New Mexico Superintendent of Public Instruction and is responsible for assuring that the policies of the State Board of Education are implemented, applied and carried out. He is also responsible for supervising the Director of the Special Education Unit.

Defendant Jim Newby is the Director of the Special Education Unit within the State Department of Education. He is responsible for regularly monitoring all local public school districts and state supported schools in order to assure that their procedures, programs, and services are in compliance with standards set by the State Board of Education and with the requirements of the federal Education of the Handicapped Act. He is also responsible, with the advice of the State Advisory Panel, for the development and implementation of the state's plan for participation under the Education of the Handicapped Act.

## D. *The Class*

Following extensive briefing by the parties on the issue of class certification, on May 23, 1989 I certified a class consisting of all persons who are presently residing at FSH & TS or LLH & TS and have been residents since the date of the filing of the complaint in this action on July 8, 1987; all persons who became or will become residents of the institutions during the pendency of the action; and all persons who have been transferred from FSH & TS or LLH & TS to skilled nursing facilities, intermediate care facilities, homes for the aged and similar facilities, and whose services are funded in whole or in part by defendants.[13]

---

11. *See Jackson, et al. v. Fort Stanton, et al.*, No. 87–839, Joint Pretrial Order for Evidentiary Hearings of October 16–19 and October 30–November 3, 1989 at 4 (D.N.M. Oct. 19, 1989).

12. *See* footnote 11, *supra.*

13. Plaintiff Roseann Crockett is a thirty-three year old woman who resided at FSH & TS until she was transferred to a nursing home in Roswell, New Mexico in 1986. Although Ms. Crockett falls within the class of persons transferred from the institution into a nursing facility, no evidence was presented in support of her individual claim. Therefore, no relief may be afforded to her other than that relief afforded to the class.

The Third Amended Class Action Complaint also named Andre Armenta, Kelli Van Curen, Lacy Walker, Kim Lautenschlager, and Bill Thomas as representatives of a class of mentally and physically disabled individuals who reside at home with their families but are "at risk" of

*Jackson, et al. v. Fort Stanton Hospital and Training School, et al.*, No. 87–839, slip op. at 8 (D.N.M. May 23, 1989).

Pursuant to Federal Rule of Civil Procedure 23(c)(4)(B), the class was divided into two subclasses to reflect the different relief sought by plaintiffs and intervenors. Accordingly, the thirteen named plaintiffs, whose profiles have been set out above, represent the subclass that seeks community placement and closure of LLH & TS and FSH & TS. Intervenors represent the subclass that opposes closure of the institutions but seeks to upgrade the institutions. *Id.* at 7.

## IV. ICF/MR Surveys and Department of Justice Lawsuit

Since LLH & TS and FSH & TS receive federal funds under Title XIX of the Social Security Act, both are regularly surveyed by the Health Care Financing Administration ("HCFA") to determine whether federal funding should continue. *See e.g.* Pl. Exh. 5, 15; Def.Exh. F, EE. The purpose of the ICF/MR standards is to ensure minimally adequate services for residents. Tr. 4/3/90 at 199 (Franczak). The regulations consist of eight "conditions of participation" which cover such major areas as staffing, active treatment and health care services. The surveyors identify deficiencies under the eight "conditions of participation." Tr. 10/17/89 at 153–159 (Rowe). Each condition of participation has standards which the surveyors use to determine whether there is substantial compliance with the condition of participation. *Id.*[14] There are almost 500 standards. Whether a condition of participation is met depends on the severity of the standard-level deficiencies. Tr. 4/16/90 at 72 (Dalessandri). If the facility fails to comply with one or more of the eight conditions of partic-

ipation, the facility is given a deadline by which to come into compliance before funding is terminated. Tr. 4/16/90 at 72 (Dalessandri). HCFA has the power to terminate a facility's funding immediately if HCFA finds that the health and safety of the residents are in jeopardy. Tr. 10/17/89 at 158–159 (Rowe). After every survey, the facility drafts a plan of correction which is a statement of the action that the facility intends to undertake to correct the deficiencies. Tr. 10/17/89 at 163 (Rowe); Tr. 10/30/89 at 30 (Nunn).

Neither LLH & TS nor FSH & TS has been decertified. Pl.Exh. 15; Def.Exh. F, EE, EEE, FFF. However, surveys of LLH & TS in the spring of 1989 determined the facility to be ineligible for continued certification as an ICF/MR. The surveyors found numerous standard-level deficiencies and two condition-level deficiencies—in facility staffing and in active treatment. Def.Exh. F. HCFA set a funding cut-off date of June 15, 1989. Def.Exh. F at 3. Prior to that date the facility was evaluated again. Def.Exh. F at 1–2. LLH & TS was allowed to continue correcting existing deficiencies and developing new plans of correction outlining further steps toward full compliance, after findings by the surveyors that the facility had made progress in these areas and that the residents of the facility were not in imminent danger and their health and safety were not jeopardized. *Id.* HCFA extended the deadline for termination of the facility's funding to December 31, 1989. *Id;* Tr. 10/30/89 at 31 (Nunn). The surveyors returned to LLH & TS in December 1989 and found the facility had come into compliance with the conditions of participation. The funding cut-off date was revoked. Tr. 12/12/89 at 261 (Brownstein). The facility was again sur-

---

being institutionalized because of a lack of community-based services. In determining class certification, I found that these five named plaintiffs residing at home do not have the requisite constitutional standing to assert any claims against the state. *Jackson, et al. v. Fort Stanton, et al.*, No. 87–839, slip op. at 3 (D.N.M. May 23, 1989) and therefore, these five individuals do not form part of the class.

Plaintiffs also sought to certify as a subclass all persons residing at the Las Vegas Medical

Center who are developmentally disabled. However, I found that the proposed subclass failed to meet the numerosity requirement of Rule 23(a) of the Federal Rules of Civil Procedure. The residents of LVMC, therefore, do not form part of the class.

**14.** It is extremely unusual for a survey team to find no deficiencies throughout the course of a survey. Tr. 10/17/90 at 154 (Rowe); Tr. 4/16/90 at 72 (Dalessandri).

veyed in March 1990 and found to be in compliance with all conditions of participation. Def.Exh. FFF. Surveys of FSH & TS have also found deficiencies in the past. However, the FSH & TS has never been recommended for decertification. Tr. 10/17/89 at 157 (Rowe); Pl.Exh. 14, 93, 94.

On October 27, 1989, the United States Department of Justice instituted a suit against the State of New Mexico, LLH & TS and various other state defendants for violation of the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq. United States of America v. State of New Mexico, et al.,* No. 89–1165, complaint (D.N.M. Oct. 27, 1989). The parties entered into a Settlement Agreement, filed on February 2, 1990, which requires that LLH & TS conduct adequate evaluations and training for the residents; that seclusion and bodily restraints be administered only pursuant to the judgment of qualified professionals; that residents be provided medical care; that LLH & TS employ a sufficient number of physicians, registered nurses, licensed practical nurses, psychologists, physical therapists, occupational therapists, and direct care workers; that psychotropic medications be administered only pursuant to the exercise of professional judgment; that the staff be appropriately trained; and that the institution maintain an adequate recordkeeping system. *USA v. State of New Mexico,* No. 89–1165, Settlement Agreement (D.N.M. Feb. 2, 1989). The agreement contemplates that the state will implement all provisions of the agreement on or before December 31, 1990. *Id.* at 17.

As a result of this lawsuit and the ICF/MR survey inspections and the action instituted by the Department of Justice, LLH & TS has experienced significant changes. These substantial ongoing changes in the institution have made the decision-making process in this case difficult in that evidence presented over a protracted period has, to some extent, become outdated.

## V. Findings of Fact

### A. *Food*

The quality of the food served and the quantity provided to the residents of LLH & TS and FSH & TS are adequate.[15] Plaintiffs challenged, however, the adequacy of nutritional management, the appropriateness of food temperatures and food handling practices.

#### 1. Nutritional Management

Each resident's food or fluid intake is monitored. The dietician or the nurse is advised of any resident who consistently fails to eat all of his or her food. Pl.Exh. 308 at 27 (Cordova); Pl.Exh. 320 at 18 (Kearns); Pl.Exh. 318 at 27 (Chavez). In addition, the dietician at FSH & TS continuously circulates during meals to monitor the residents' diets and to get feedback on how residents are eating. Pl.Exh. 320 at 18. The dietician at LLH & TS observes meals in the cottages and classrooms to monitor feeding programs for the various residents. Tr. 4/18/90 at 99 (Gailbraith).

#### 2. Food Temperatures

Plaintiffs' environmental expert, Mr. Duel, identified problems in maintaining appropriate food temperatures, particularly at LLH & TS. Specifically, both Mr. Duel and the HCFA surveyors noted a failure to maintain food temperatures at levels sufficient to prevent the growth of harmful micro-organisms. Tr. 4/10/90 at 197–198 (Duel); Pl.Exh. 245 at 8. The dietician at LLH & TS had identified the same problem prior to Mr. Duel's survey and had already requested the purchase of new equipment to correct it. Tr. 4/10/90 at 198 (Duel). The new equipment has been installed and the quality assurance program confirms that the appropriate food temperatures are now being maintained. Tr. 4/18/90 at 96 (Gailbraith).

Plaintiffs' expert, Mr. Duel, also reported a failure to maintain refrigeration and freezer units at sufficiently low tempera-

---

**15.** Plaintiffs contention that the main course at an evening dinner at Fort Stanton was "unidentifiable," Plaintiffs' Proposed Findings of Fact at 102, does not rise to the level of a constitutional violation.

tures to safeguard food against spoilage. In addition, Mr. Duel noted a failure to ensure the presence of accurate procedures and equipment to measure those temperatures, particularly at the LLH & TS satellite feeding stations. Tr. 4/10/90 at 199–202 (Duel). The refrigeration units at LLH & TS have an inside thermometer and an outside thermometer gauge that is part of the unit itself. The temperatures are logged from the inside thermometer. Tr. 4/18/90 at 97 (Gailbraith). At the time of Mr. Duel's survey, the LLH & TS dietician had previously requested the purchase of air cooling equipment for the storage room and it has since been installed. Tr. 4/11/90 at 102 (Duel); Tr. 4/18/90 at 98 (Gailbraith). Mr. Duel found that the temperatures of refrigerators and freezers at FSH & TS were within the ranges recommended by the food service regulations and did not present a health hazard. Tr. 4/11/90 at 67–68 (Duel).

### 3. Food Handling Practices

The dietician at LLH & TS provides in-service training to the staff on infection control and handwashing practices relating to food service and food preparation. Tr. 4/18/90 at 98 (Gailbraith). The dietician also oversees a quality assurance program which involves randomly visiting the cottages and classrooms to observe meals. Approximately twenty meals are reviewed per week. Tr. 4/18/90 at 99–100 (Gailbraith).

### B. *Clothing*

The clothing provided to the residents of LLH & TS and FSH & TS is adequate. The clothing is clean, individualized, well-fitting and is not issued from a general clothing store. During my visits to LLH & TS and FSH & TS in May 1990, I observed that the clothing was varied, not uniform. I also observed several residents wearing new high top brand name athletic footwear. All parties also agreed that the residents of both facilities are well-groomed. Tr. 10/31/89 at 203–204 (Haywood); Tr. 4/17/90 at 37, 212 (Peets, Woodhouse); Tr. 4/4/90 at 169 (Crocker); Tr. 10/17/89 at 139 (Rowe).

### C. *Environmental Conditions*

Experts on all sides, who toured the facilities, agreed that both LLH & TS and FSH & TS are generally clean and well-maintained. Tr. 4/4/90 at 169–170 (Crocker); Tr. 10/17/89 at 94 (Rowe). Plaintiffs challenged, however, some specific aspects of the physical environments at both facilities.

### 1. Living Areas

LLH & TS and FSH & TS are licensed by the New Mexico Health and Environment Department to house the number of residents who reside at both facilities. Def. Exh. AP, AQ. The licenses state how many beds are allowed in each cottage area. Neither LLH & TS nor FSH & TS has exceeded the licensed capacity. Tr. 4/18/90 at 32–33 (Blount).

The bedroom size at LLH & TS and FSH & TS is adequate with each bedroom having four or fewer beds, some with individual beds and many with two beds per room. Tr. 10/17/89 at 140 (Rowe); Tr. 10/30/89 at 125 (Nunn). However, each unit for the medically fragile at LLH & TS—Chavez West, Chavez East and Bashein East— houses more than four residents. LLH & TS has received a waiver for the medically fragile units from the Title XIX authorities on the basis of medical need. Tr. 10/30/89 at 125 (Nunn).

The living areas at LLH & TS and FSH & TS are personalized. LLH & TS has a policy of allowing residents to maintain personal possessions in their living areas. Tr. 10/30/89 at 124 (Nunn). Residents have in their rooms personal possessions such as pictures, mirrors, televisions, and grooming items. Tr. 11/2/89 at 152–53 (Donovan). Residents at FSH & TS also have personal belongings in their rooms, including pictures, prints, rugs and mirrors. Tr. 10/31/89 at 161 (Haywood). The bedding is individualized. Tr. 10/17/89 at 140 (Rowe). Personal items are frequently replaced if damaged or destroyed by the residents. Tr. 10/31/89 at 162 (Haywood).

### 2. Asbestos

Some items stored at FSH & TS were previously thought to contain asbestos.

Further investigation proved, however, that most of those items did not in fact contain asbestos. The remaining items that contained asbestos were "abated." Tr. 11/3/89 at 154 (Aldaz).

### 3. Pest Control

Plaintiffs' expert, Mr. Duel, found evidence of vermin, mouse droppings and flies in food service areas at LLH & TS. Tr. 4/10/90 at 207–210 (Duel). He also found dead insects and mouse droppings in food service areas at FSH & TS. The presence of insects in the food service areas raises serious health concerns. *Id.* However, in the opinion of a defense expert witness, the pest control at LLH & TS and FSH & TS is adequate. Tr. 4/18/90 at 27–30 (Blount). LLH & TS and FSH & TS provide pest control services on a bimonthly basis in the food service areas. Def.Exh. AN, AO. LLH & TS also has an infection control committee which meets regularly. Tr. 4/11/90 at 103 (Duel). In addition, state inspection reports for the last two years at both facilities do not cite pest or vermin problems in the food service areas. Tr. 4/18/90 at 31 (Blount).

### 4. Lighting and Ventilation

Lighting in the food service areas, living areas and offices at both FSH & TS and LLH & TS is adequate. Tr. 4/18/90 at 25–27 (Blount). LLH & TS and FSH & TS comply with federal regulations on ventilation systems. Tr. 4/18/90 at 19–24 (Blount).

### 5. Fixtures

The system of providing and monitoring hot water at LLH & TS and FSH & TS is adequate. Both LLH & TS and FSH & TS supply and monitor hot water through systems of mixing valves, which mix hot and cold water to provide water of a certain temperature at the exit end. The valves are inspected on a regular basis. Tr. 4/18/90 at 54–56 (Blount).

### 6. Sanitation Practices

The waste disposal facilities at LLH & TS and FSH & TS are adequate. Tr. 4/18/90 at 30–31 (Blount). The garbage collection bin located near Hidalgo Cottage at FSH & TS is appropriate. Tr. 4/18/90 at 73–75 (Blount). FSH & TS's sewage treatment system meets federal requirements regarding the discharge of treated matter and poses no immediate threat to the health and safety of the residents. Tr. 4/11/90 at 47–53 (Duel).

A state agency regularly samples the water supply at FSH & TS for appropriate chlorine levels and has found it to be in compliance with applicable standards. Tr. 4/11/90 at 46–47 (Duel). The laundry facilities at LLH & TS and FSH & TS use a sanitizing soap that appropriately disinfects clothes. Tr. 4/18/90 at 36–37 (Blount); Def.Exh. AS.

### 7. Fire Safety

LLH & TS and FSH & TS are in compliance with the applicable fire safety standards. Tr. 4/18/90 at 42–54 (Blount). FSH & TS is equipped with both a sprinkler system and smoke detectors, although only one is required by fire safety regulations. Tr. 4/18/90 at 82 (Blount). The fire alarm system at FSH & TS is maintained on a regular basis by a contractor. Tr. 4/18/90 at 82 (Blount). Although many doors at both LLH & TS and FSH & TS have panic bars, panic bars are not required. Tr. 4/18/90 at 87–89, 93–94 (Blount).

### D. *Medical Care*

#### 1. Medical Staff

LLH & TS currently employs four full-time physicians. Tr. 4/23/90 at 15 (Brown).[16] There is regular interaction between the LLH & TS medical staff and the University of New Mexico Medical School. Three out of the four staff physicians at

---

**16.** Defendants note that the number of physicians employed at LLH & TS exceeds the requirements of the Department of Justice Settlement Agreement and that the number of hours of psychiatric consultation at LLH & TS conforms with the settlement. Compliance with the settlement agreement, however, does not place defendants' conduct outside the purview of this court's authority.

LLH & TS currently hold appointments at the University of New Mexico Medical School. Dr. Ball has an appointment in the family practice department and Drs. Brown and Witemeyer have appointments in the pediatric department. The fourth physician was recently hired and is expected to receive an appointment to the pediatric department. Tr. 4/23/90 at 29–31 (Brown). Plaintiffs' expert found the physicians to be generally competent. Tr. 4/4/90 at 169 (Crocker). All four physicians are on-call on a rotating basis so that there is a physician on call 24 hours a day, every day of the week. Tr. 4/23/90 at 15 (Brown). Three of the four physicians reside on the LLH & TS campus while they are on call. The fourth resides in Los Lunas, approximately five minutes from the facility. Tr. 4/23/90 at 17 (Brown). There are also five nursing stations on site at LLH & TS. Tr. 4/23/90 at 17 (Brown). Each resident of LLH & TS receives a physical examination at least every six months. Tr. 4/23/90 at 16 (Brown); Tr. 12/15/89 at 8 (Witemeyer).

Dr. Witemeyer is the staff physician responsible for the medically fragile residents at LLH & TS. Dr. Witemeyer visits her patients virtually daily. Tr. 12/15/89 at 8–9 (Witemeyer). In addition, a nurse is present during mealtimes in the medically fragile unit at LLH & TS because of the risk of aspiration. Tr. 12/15/89 at 87 (Witemeyer).

LLH & TS also makes regular use of medical consultants including specialists in the areas of orthopedics, pulmonary disease, ophthalmology, psychiatry, neurology, dermatology, and gynecology. Tr. 4/23/90 at 22–26 (Brown). LLH & TS contracts with three psychiatrists for approximately 20 hours per week of psychiatric consultation. Tr. 4/23/90 at 22 (Brown). The contract neurologist provides regular on-site neurological consultations as well as off-site evaluations where appropriate, particularly of residents with intractable seizure disorders. Tr. 4/23/90 at 22, 24–25 (Brown). The orthopedist holds an orthopedic clinic at LLH & TS on a monthly basis. Patients are referred to the orthopedist by members of the medical or therapeutic staff. Approximately ten to four-

teen cases are presented at each clinic session. 12/15/89 at 106–107 (Sherman). The orthopedist also sees LLH & TS residents regularly on an outpatient basis either to treat fractures or injuries or to perform evaluations, or as inpatients to perform various surgical procedures. 12/15/89 at 108 (Sherman); 4/23/90 at 24 (Brown). Every new resident at LLH & TS who is medically fragile or multiple-handicapped is referred to the Orthopedic Clinic, Neurology Clinic, Eye Clinic, Rehabilitation Services and the Speech, Language and Hearing Departments. Tr. 12/15/89 at 7–8 (Witemeyer).

LLH & TS also provides a number of services on site including x-rays, laboratory tests, electrocardiograms and a pharmacy. Tr. 4/23/90 at 18–21. The laboratory employs two full-time technicians who perform microbiology cultures, hematologic studies, and other procedures. A consulting pathologist supervises the lab and promotes quality assurance. Tr. 4/23/90 at 19 (Brown).

The pharmacy is staffed by two full-time pharmacists. The pharmacists review and fill prescriptions, and monitor medication side effects. Tr. 4/23/90 at 19–21 (Brown). In addition, the pharmacists prepare quarterly reports on medication which advise the interdisciplinary teams of all medications prescribed and indicate possible side effects of the medication. The reports are included in the Individual Program Plans ("IPP"). Tr. 4/23/90 at 19–21.

Plaintiffs' medical expert testified generally that the medical and health services provided at LLH & TS are in accordance with professional standards. Tr. 4/4/90 at 172–73 (Crocker).

FSH & TS employs two full-time resident physicians, who plaintiffs' expert found to be generally competent. Tr. 4/4/90 at 169 (Crocker). FSH & TS also has regularly scheduled consultations in both psychiatry and neurology. Other medical consultants are available as needed. Def.Exh. P at 4. In addition, FSH & TS provides a number of services at the facility including x-rays, laboratory tests, EKG testing and a phar-

macy. Tr. 4/4/90 at 172–173 (Crocker). The nursing services at FSH & TS comport with professional standards. Tr. 4/4/90 at 171 (Crocker).

### 2. Infectious Diseases and Mortality Rates

Although plaintiffs' presented evidence of a lack of general medical care in the past, plaintiffs' medical expert found that the incidence of infectious diseases at LLH & TS and FSH & TS falls within generally accepted ranges, Tr. 4/4/90 at 176–77 (Crocker), and that the mortality rates at both institutions are also within the expected general range for the populations they serve. Tr. 4/4/90 at 176 (Crocker).

### 3. Medications

Residents of LLH & TS are regularly monitored for neuromotor side effects of psychoactive medication. Tr. 4/23/90 at 56–58 (Brown). The nurses perform monthly evaluations using a tardive dyskinesia monitoring scale. These evaluations are performed weekly when the client is first introduced to the medication. Tr. 4/23/90 at 57 (Brown). In addition, the nursing staff performs a quarterly physical examination to screen for possible side effects. Tr. 4/23/90 at 58 (Brown). Plaintiffs' expert reviewed the thirteen named plaintiffs and found no evidence of tardive dyskinesia or other neuroleptic related movement disorders. Tr. 4/4/90 at 175 (Crocker).

Nationwide, thorazine is a commonly used psychoactive medication. Tr. 4/24/90 at 80 (Brown). Thorazine can cause hyperpigmentation, a slate-gray darkening of skin color, and corneal deposits. Tr. 4/24/90 at 43, 59 (Brown). Defendants' expert testified that hyperpigmentation is reversible once the medication is discontinued. Tr. 4/24/90 at 45 (Brown). For many years, a number of residents of LLH & TS had been prescribed thorazine, and many developed hyperpigmentation and corneal deposits. Tr. 4/24/90 at 44, 79–80 (Brown). The medical staff at LLH & TS had discussed the appropriateness of the thorazine and had accepted the recommendation for its continued use made by a consulting psychiatrist who believed that the risks associated with changing the medication outweighed the possible benefit of reversing the hyperpigmentation. Tr. 4/24/90 at 46–47 (Brown); Tr. 4/23/90 at 114 (Brown). It was only after a different consultant, Dr. Gualtieri, later recommended that thorazine be discontinued that the residents' thorazine medication was changed to another psychoactive medication that had the same behavioral effects but did not have the side effect of hyperpigmentation. Tr. 4/24/90 at 45–46 (Brown); Tr. 4/23/90 at 114 (Brown). At the end of trial in April 1990, the hyperpigmentation among residents had not completely reversed although there had been improvement. Tr. 4/24/90 at 45 (Brown).

A limited number of residents at FSH & TS are receiving psychoactive medication. Both the staff physicians and the consulting psychiatrist regularly review medication decisions. There appears to be a policy to use such medication at the lowest effective dose. Def.Exh. P at 5. A number of residents at FSH & TS are also receiving seizure medication. Dosages are lowered and even discontinued after a specified period during which no seizures are observed. Def.Exh. P at 5.

### 4. Dental Care

The dental services at LLH & TS and FSH & TS are more than adequate. Tr. 4/4/90 at 172 (Crocker). LLH & TS employs a full-time dentist, Dr. Ray Lyons. Tr. 4/24/90 at 258. Generally, Dr. Lyons conducts clinical examinations, including cleanings, for each resident every six months at LLH & TS. Tr. 4/26/90 at 272 (Lyons). Oral hygiene is assessed on a monthly basis in the cottage living areas. Tr. 4/26/90 at 271; Def.Exh. FO at 12–13. Also, Dr. Lyons has performed an oral function assessment on each named plaintiff at LLH & TS. Def.Exh. FO at 8.

### 5. Medical Records

Plaintiffs' medical expert found that the medical records at FSH & TS and LLH & TS are inadequate. The medical records

are sparse and nonanalytical; they tend to deal with the more immediate or obvious elements. Tr. 4/4/90 at 93 (Crocker). The records lack a broad description of clinical status. *Id.* at 93–95. They often reflect "automatic thinking", i.e. medical entries are made without investigation or reflection, and contain repetitive listings which suggest insufficient analysis. *Id.* at 95–96. These matters affect residents' health and their long-range outlook. *Id.* at 95.

The following are examples of inadequate medical analysis. Plaintiff Walter Stephen Jackson's IPP of August 8, 1989 indicates that his last seizure occurred in March 1987. Pl.Exh. 180; Tr. 4/4/90 at 118 (Crocker). Plaintiffs' medical expert noted, however, that Mr. Jackson was on multiple anti-convulsant medications. Tr. 4/4/90 at 119 (Crocker). Subsequently, a consulting neurologist recommended a gradual reduction followed by discontinuation of the medication. Tr. 4/4/90 at 120; Pl.Exh. 181.

Plaintiffs Clinton and Shawn Heath were diagnosed as having Coffin–Lowry Syndrome. Their medical records, however, lack any discussion of or supporting data for the diagnoses. Tr. 4/4/90 at 98–102 (Crocker).[17] The medical records of Clinton Heath for December 1986, January 1987, June 1987, December 1987 and June 1989 also contained a diagnosis of spastic quadriparesis, a central nervous system disorder. Tr. 4/4/90 at 102–110 (Crocker); Pl. Exh. 176. In October 1989, however, shortly after plaintiffs' medical expert had questioned the accuracy of this diagnosis in a deposition, the physician's progress notes indicated that no spasticity was noted and that the diagnosis of spastic quadriparesis would be removed. Pl.Exh. 176 at 7; Tr. 4/4/90 at 109 (Crocker).

Clinton Heath was also diagnosed as having spina bifida, an incomplete fusion of portions of a bone spine. Tr. 4/4/90 at 110 (Crocker); Pl.Exh. 176. Plaintiffs' medical expert questioned the diagnosis after reviewing a normal x-ray report of his spine.

*Id.* at 111, 113; Pl.Exh. 177. A radiology report of December 1989 identifies spina bifida occulta, a minor variation in the integrity of the formation of the spinal arch, which carries an insinuation of low importance. Tr. 4/4/90 at 114–115 (Crocker); Pl.Exh. 178.

The medical records of plaintiff Mildred Tsosie show a progressive loss of movement between 1973 and 1987. Plaintiffs' medical expert found that the documentation was inadequate in that it lacked discussion, explanation or analysis of the condition by the medical staff. Tr. 4/4/90 at 122–127 (Crocker); Pl.Exh. 183. The medical records of plaintiff Lillian Willmon also document a loss of movement. In 1980, Ms. Willmon walked fairly well with her walker. Tr. 4/4/90 at 127 (Crocker). Between 1980 and 1989, Ms. Willmon developed progressively worsening contractures which impaired her walking ability and ranges of motion in her joints. Ultimately, Ms. Willmon lost the ability to walk. Tr. 4/4/90 at 127–135 (Crocker). Plaintiffs' medical expert again found that the records failed to adequately discuss or analyze Ms. Willmon's condition. Tr. 4/4/90 *Id.* Plaintiff Alfred Shirley's medical records also reflect the loss of his ability to walk at some undefined point between 1981, when he was admitted, and 1988. The cause for the regression is unknown. Tr. 4/4/90 at 138–144 (Crocker); Pl.Exh. 188, 189.

The HCFA surveyors found that the individual resident records were not functionally accurate representations of a resident's current status. The LLH & TS' plan of correction indicates that the facility will be taking a number of steps to assure a recordkeeping system that results in a functionally accurate representation of each resident's current status, including more frequent audits of the resident's records and an eleven month schedule for chart and quality assurance reviews. *Id.*

---

**17.** The rare incidence of the disease should mandate a full explanation of the bases for the diagnoses.

## E. *Habilitation/Active Treatment*

Habilitation or active treatment generally refers to programs for the mentally retarded which focus primarily on training and the development of needed skills. *Youngberg v. Romeo,* 457 U.S. 307, 309 n. 1, 102 S.Ct. 2452, 2454 n. 1, 73 L.Ed.2d 28 (1982). ICF/MR regulations require, as a condition of participation, that "each [resident] receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services ... that is directed toward the acquisition of the behaviors necessary for the [resident] to function with as much self-determination and independence as possible and the prevention or deceleration of regression or loss of current optimal functional status." 42 C.F.R. § 483.440(a); Pl.Exh. 15, Tag # 196.

Each resident must have an individual program plan ("IPP") developed by an interdisciplinary team ("IDT") based on an assessment of the individual needs of the resident. 42 C.F.R. § 483.440(c)(3). The plan must identify the specific objectives necessary to meet the resident's needs and a planned sequence for dealing with the objectives, and must be implemented by all staff who work with the resident. 42 C.F.R. § 483.440(c)(4), (d)(3).

### 1. Assessments

The ICF/MR standards require that the facility conduct a comprehensive functional assessment of the resident's abilities across many areas of the resident's life and in the appropriate environment. Pl.Exh. 15, Tag ## 211–225, 249. Defendants testified that prior to the annual interdisciplinary team meeting, the appropriate professionals at each facility assess the residents in the following areas: health and nutritional status; physical development; affective development; auditory functioning; sensory and motor development; communication; cognitive development; social skills; recreational skills; vocational skills; self-care skills; and other independent living skills.

Tr. 10/30/89 at 36–40 (Nunn); Tr. 4/3/90 at 195–197 (Franczak).

Every resident of LLH & TS is evaluated using the Comprehensive Functional Assessment ("CFA"). Tr. 10/30/89 at 34–35 (Nunn); Def.Exh. G. The CFA's individual sections are completed by all appropriate professionals as well as by direct care staff. Tr. 10/30/89 at 37–39 (Nunn); Tr. 4/26/90 at 187 (Nunn). Plaintiffs' expert testified that if the CFA were competently and accurately performed, the CFA would meet professional standards. Tr. 10/17/89 at 226–227 (Rowe).

However, at LLH & TS in May 1989 the surveyors reviewed seventeen charts and found that comprehensive functional assessments contained only reports of scores of functional age levels and lacked descriptions of specific developmental strengths and needs. Seven of the seventeen charts reviewed stated that some assessments were "not available at this time." Four records lacked assessments of physical development and health. Five of the comprehensive functional assessments lacked nutritional status, and two of the remaining twelve lacked up-to-date assessments to reflect the residents' current needs. Eight comprehensive assessments lacked assessments of sensory motor development. All seventeen records lacked developmental assessments and an assessment in vocational skills. Pl.Exh. 5 at 29–32.

In June 1989 the surveyors found that the "comprehensive assessments lack salient information in all areas and did not reflect how all pieces relate or build on each other." They do not identify all of the residents' specific developmental strengths. In accordance with the plan of correction, LLH & TS completed comprehensive functional assessments for all residents on August 25, 1989. Def.Exh. F at 34–36; Tr. 10/30/89 at 40 (Nunn). *See also* McAllister Depos. at 10–11.

FSH & TS uses different assessment tools to evaluate residents, including the Functional Skill Screening Inventory. Pl. Exh. 310 at 48–49.

### 2. Interdisciplinary Team ("IDT")

Adequate habilitation requires interdisciplinary team planning of the overall services provided to persons with developmental disabilities. ICF/MR standards require that an IDT represent the professions, disciplines or services relevant to identifying the residents' needs and to designing programs that meet those needs. Pl.Exh. 15, Tag # 206. Accordingly, the professional program staff must participate as members of the IDT in relevant aspects of the active treatment process. Pl.Exh. 15, Tag # 168. The appropriate facility staff must also participate in the IDT meetings. Pl.Exh. 15, Tag # 207. However, "[t]here is no correct number of individuals who comprise the interdisciplinary team." Pl.Exh. 15, Tag # 206, Guidelines. Participation by the resident and the resident's parent or guardian is required unless the participation is unobtainable or inappropriate. Pl.Exh. 15, Tag # 209.

LLH & TS and FSH & TS use an interdisciplinary team approach to program planning. Tr. 11/3/89 at 90–91 (Aldaz); Tr. 10/30/89 at 36–40 (Nunn). Physicians are members of the IDT. They, together with the nurse and pharmacist, provide health care information at the IDT meetings. Tr. 4/23/90 at 33 (Brown); Def.Exh. P at 4–5. The physicians generally attend IDT meetings unless a medical emergency or other circumstance prevents their attendance. Physicians at LLH & TS attend IDT meetings approximately 90 to 95% of the time. Tr. 4/23/90 at 32–33 (Brown). Other professional staff, including teachers, therapists and nurses participate in the IDT meetings. Def.Exh. P at 12; Tr. 12/14/89 at 48 (Attermeier).

Residents and their families and/or guardians are encouraged to attend the team meetings and to participate in the IDT process. Tr. 4/3/90 at 187 (Nunn); Tr. 4/3/90 at 236 (Franczak); Tr. 10/17/89 at 141 (Rowe). *See e.g.* Tr. 4/13/90 at 188–189 (Downey). In addition, each resident is represented at the team meeting by the resident's qualified mental retardation professional ("QMRP"). Tr. 4/26/90 at 187–188 (Nunn); Tr. 10/17/89 at 141 (Rowe).

### 3. Individual Program Plan ("IPP")

ICF/MR standards require that the IDT prepare for each resident an individual program plan within 30 days after admission. Pl.Exh. 15, Tag # 226. The IPP must set forth measurable objectives for habilitation necessary to meet the resident's needs as identified by the comprehensive assessment and a planned sequence of interventions for meeting those objectives. Pl.Exh. 15 at 227–228; Tr. 4/4/90 at 72 (Crocker). The objectives must be expressed in behavioral terms that provide measurable indices of performance and must be assigned a projected completion date. The "projected date of completion" for an IPP objective should not be the same as the annual review date. Pl.Exh. 15, Tag # 230, 231, Guidelines.

The members of the IDT review the assessments of a resident and derive from them a list of the resident's particular strengths and needs. From the strengths and needs, the team determines the resident's prioritized goals and an IPP is developed. Tr. 10/30/89 at 34 (Nunn); Tr. 4/26/90 at 186 (Nunn); Tr. 4/3/90 at 196 (Franczak). Each resident's IDT reviews the IPP at least annually. The plan is revised as needed, for example, if there is an indication that the plan is not working, or if the client has had a change in his or her status. Tr. 10/30/89 at 120 (Nunn); Tr. 11/3/89 at 90–91 (Aldaz); Tr. 4/3/90 at 288–289 (Franczak). In addition, LLH & TS uses a quality assurance audit system to review each IPP for appropriateness. Tr. 10/30/89 at 41, 46, 97; Def.Exh. J.

In 1989, the surveyors found that the IPPs at LLH & TS failed to specify the interventions needed to support the person toward independence; to provide training in personal skills; to identify the mechanical supports needed to achieve proper body position, balance or alignment as well as the reasons for each support; and also failed to include opportunities for resident choice and self-management. Def.Exh. F at 51–55; Pl.Exh. 5 at 31–32; Tr. 10/16/89

at 178 (Rowe). In reviewing forty-two IPPs, the surveyors found that the stated completion date for objectives was "within one year," or "by the next annual review." Pl.Exh. 5 at 32; Tr. 10/16/89 at 225–226 (Rowe). *See e.g.* Pl.Exh. 293, IPP 7/27/89 at 14.

In addition, the surveyors also observed that the "IPPs had a predictable sameness about them." Pl.Exh. 14 at 14. IPP objectives for residents of LLH & TS are not individualized. For example, many of the residents in Cottage 9 have the same objective and written training program for recreation and leisure skills. Pl.Exh. 293, IPP 7/27/89, Objective # 5; Pl.Exh. 296, IPP 8/11/89, Objective # 5; Pl.Exh. 297, IPP 8/25/89, Objective # 5; Pl.Exh. 298, IPP 8/1/89, Objective # 4; Pl.Exh. 299, IPP 2/7/90, Objective # 7, IPP 8/23/89, Objective # 7; Tr. 4/16/90 at 147, 151, 154 (Thompson).[18]

LLH & TS' plan of correction indicated that new individual program plans would be developed and implemented for all residents of the facility, which would include relevant interventions to support the individual toward independent functioning, and appropriate objectives in personal skills development, and would identify any needed mechanical supports and specify the situations in which those supports are to be applied. Def.Exh. F at 51–54. In addition, new policies and procedures were implemented to address the support of individual resident interventions toward independence and to provide for resident choice and self-management. Def.Exh. F at 55. In accordance with the plan of correction, new IPPs were formulated for all residents of LLH & TS by September 30, 1989. Def. Exh. F at 49; Tr. 10/30/89 at 97 (Nunn).

### 4. Long-term View

ICF/MR regulations require that the program plan objectives "[b]e organized to reflect a developmental progression appropriate to the individual." The guidelines to surveyors provide that the facility "consider the outcome it. projects the individual will be able to accomplish in the long-term." Pl.Exh. 15, Tag # 232. The ICF/MR regulations do not define "long-term." Tr. 4/5/90 at 187 (Foster). The program plans are developed for a twelve month period. Tr. 4/5/90 at 187 (Foster).

Plaintiffs' experts found that there is no explicit long-term view of what would be achieved for the residents of FSH & TS and LLH & TS in the next three to five years. Tr. 10/17/89 at 6 (Rowe); Tr. 4/6/90 at 35 (Franczak). However, plaintiffs' experts also recognized that the ICF/MR regulations do not require that the residents' IPPs have a three to five year view. Tr. 4/3/90 at 198 (Franczak).[19]

### 5. Discharge Plan

The program plans developed at LLH & TS in the summer of 1989 do not have a discharge plan. The IPPs lack a projected discharge date and there are no established criteria for discharge. A new IPP format was developed in the fall of 1989 which includes a discharge transfer plan, with a projected date of discharge. Tr. 10/30/89 at 136–138 (Nunn).

A formal discharge plan format exists for residents of FSH & TS. However, a typical discharge plan requires that the resident meet numerous goals in the IPP, including such goals as increasing attention span, before the resident can move to another setting. *See* Pl.Exh. 24, IPP 1/31/89 at 7; Pl.Exh. 25, IPP 6/30/89 at 6; Pl.Exh. 26, IPP 11/17/88 at 7. For example, plaintiff James Fritche's IDT determined that "[t]he criteria for [Mr. Fritche's] release to a less restrictive setting for treatment or habilitation is that [he] meet his goals for improving ADL skills, fine motor skills, pre-academics, socialization skills, RLS, and

---

**18.** Plaintiffs also note that the IPPs contain goals to develop skills which the residents have already mastered. Ogle Depos. at 25. However, plaintiffs' expert testified that it is consistent with ICF/MR regulations to implement goals for maintenance of the residents' physical status. Tr. 4/19/90 at 42 (Foster).

**19.** Beginning on January 19, 1990, the IPPs of the residents of LLH & TS have included an express consideration of long-term view. Tr. 4/27/90 at 156 (LaCourt).

improving attention span, receptive language skills, reducing tactile defensiveness and drooling, increasing range of motion, balance, and coordination, the guardian approve of the placement, and the program meets the needs listed above." Pl.Exh. 23, IPP 5/30/89 at 6.

Despite the lengthy criteria, however, a representative of FSH & TS testified that the residents of FSH & TS are not required to meet all of their programmatic goals listed in the discharge plans before the interdisciplinary teams at FSH & TS will recommend placement in an alternative setting. The criteria are merely "suggested" criteria. Tr. 4/25/90 at 142 (Dooley).

### 6. Data Collection

Proper habilitation requires the collection of data adequate to measure an individual's progress toward the stated objectives. ICF/MR standards require collection of data with sufficient frequency and content to measure appropriately a resident's progress toward the targeted IPP objective. Pl.Exh. 15, Tag # 237, Guidelines. Data showing progress, regression or no change are vital and necessary information for staff to be responsive to the changing needs of individuals with developmental disabilities. Pl.Exh. 15, Tag # 111, Guidelines.

Direct care staff at both facilities take data on the resident's goals. Staff receive training on how to collect and chart data at the new employee orientation program as well as during in-service training. Then qualified mental retardation professionals review the data to determine whether changes in the IPPs should be recommended. Pl.Exh. 318 at 42–43; Pl.Exh. 315 at 29–31, 88–91; Pl.Exh. 320 at 66–67, 74.

In May 1989 the surveyors found that although LLH & TS had data collection methods in place, there was no assurance that the data was collected. During interviews the direct care staff indicated that they were unsure of how to collect the data. Pl.Exh. 5 at 32. In June 1989, the surveyors concluded that the IPPs at LLH & TS did not contain objectives expressed in behavioral terms that provide measurable indices of performance, and did not specify the type of data and frequency of data collection necessary to assess progress toward the desired objectives. Def.Exh. F at 49–50. *See also* Tr. 11/13/89 at 174 (Cox).

The plan of correction for LLH & TS indicates that the residents' objectives would be expressed in behavioral terms that provide measurable indices of performance, and that living unit personnel and other program staff would receive training in writing objectives. In addition, staff training was implemented to ensure that all staff gather data with sufficient frequency and content to measure progress towards each objective. Def.Exh. F at 49–50.

At FSH & TS the assessment data varies with the person gathering the data. Pl. Exh. 320 at 70–72. In addition, plaintiffs presented testimony that the occupational therapist at FSH & TS does not collect baseline data, without which progress, regression or change cannot be monitored. Tr. 11/16/89, Vol. I at 93 (Spencer).

### 7. Qualified Mental Retardation Professional ("QMRP")

ICF/MR standards require that each resident's active treatment program must be integrated, coordinated and monitored by a qualified mental retardation professional. Pl.Exh. 15, Tag # 159. In June 1989, the surveyors found that QMRPs were not monitoring the delivery of services to residents of LLH & TS. For example, a resident was fed breakfast by the staff in less than four minutes. Another resident who was "to eat slowly and put his spoon down after bites," ate his breakfast in 2.5 minutes. Methods to achieve objectives for the residents of Woolston adult services were not provided to the staff. A resident was observed outside without his communication board. The communication board was in the office area of the cottage. Def.Exh. F at 11–14.

In December 1989, the surveyors found that the QMRP notes in one resident's records indicated that the resident had achieved a 75% to 100% level of success on

each objective, indicating successful completion of all her objectives. However, the record lacked recommendations that the plan be continued, discontinued or changed, or that new objectives be developed. Def. Exh. EEE at 4 ¶ 2.

The plan of correction for LLH & TS indicates that the facility had revised the functions of the QMRP by placing new emphasis on the role of the QMRP in integrating, coordinating and monitoring each resident's active treatment program. In addition, QMRPs received training in the IDT process, CFAs, behavioral objectives and the implementation of active treatment. Def.Exh. F at 11; Tr. 10/30/89 at 53 (Nunn).

At FSH & TS, serving as a QMRP is not a primary duty assignment. Pl.Exh. 228 at 169.

### 8. Active Treatment

Adequate habilitation requires that the programs, plans and professional recommendations developed for a person actually be implemented. ICF/MR standards require that as soon as the IDT has formulated a resident's IPP, the resident must receive a continuous active treatment program consisting of needed interventions and services in sufficient number and with appropriate frequency to support the achievement of the objectives identified in the IPP. Pl.Exh. 15, Tag # 249.

The reports of the state surveyors show that LLH & TS and FSH & TS have failed to provide continuous active treatment programs.

#### a. *LLH & TS*

Surveys of LLH & TS in February, May and June 1989 found the facility ineligible for certification as an ICF/MR because the surveyors found, among other things, a condition-level deficiency in active treatment. Def.Exh. F at 3; Pl.Exh. 5.

Residents spend long periods of time self-stimulating (typically rocking or finger-tapping), waiting to go from one activity to another, or simply doing nothing. Staff fail to interact with residents and to administer active treatment. On February 8, 1989, the surveyors observed no interaction between staff and residents for a thirty-five minute period. Again on February 14, 1989 the surveyors observed, for twenty-five minutes, eleven residents in wheelchairs in a room. One resident was in a bed. One staff member was on the phone. She stated that she was on the switch board during break. One staff member was in the kitchen, and one staff member was in the laundry room. There was no interaction with residents. Pl.Exh. 5 at 23 ¶¶ B, C; *See also* Pl.Exh. 5 at 23 ¶ A, 24 ¶ D, 26 ¶ 1, 27 ¶¶ 4, 6.

IPPs are not implemented. In reviewing a psychology assessment for one resident, the surveyors noted that he needed improved socialization capability. On February 8, 1989 the resident was observed in his cottage rocking back and forth. The following day he was observed in the gym, sitting alone and rocking back and forth. On both occasions there was no interaction with staff. Pl.Exh. 5 at 21 ¶ E; *See also* Pl.Exh. 5 at 23 ¶¶ F, G, H, 25 ¶¶ D, F.

In May 1989, the surveyors found that one resident's IPP dated 4/5/89 had not been implemented in adult services as of 5/5/89. Pl.Exh. 5 at 27 ¶ 5. Another resident in Cottage 5 who had an IPP dated 4/5/89 had an objective to sort laundry and to prepare Sunday breakfast, but the program had not begun as of 5/5/89. The IDT had also recommended a vision exam, but none was scheduled. The same resident was to receive active treatment for socialization at supper, but none was observed. Pl.Exh. 5 at 26 ¶ 2. A resident in Cottage 8 had no schedule of daily activities. His staffing summary specified a low bed with a mat beside it, but no mat was observed. His diet included six teaspoons of polyglucose with meals, but this was not provided until the surveyor inquired about it. Pl.Exh. 5 at 26 ¶ 3. A certain resident's IDT strongly recommended individual speech therapy; however, the resident was receiving therapy only in a group setting. Pl.Exh. 5 at 14 ¶ A. Another resident's IDT recommended that the speech language therapist administer diagnostic therapy for a three to six month period; but the surveyors found no documentation

that this was being done. This client's record indicated a one year regression in her communication skills. The IDT stated that a specific communication goal was not recommended because the resident's daily routine would focus on strongly reinforcing appropriate speech. It was observed throughout the survey, however, that this resident did not receive speech reinforcement according to her IPP. Pl.Exh. 5 at 14 ¶ B.

On May 4, 1989, the surveyors observed ten residents in adult services with two staff from 9:45 a.m. to 10:30 a.m. The residents were running around the room, self-stimulating, screaming, and hitting each other. One blind resident sat on the floor the entire time self-stimulating. Pl. Exh. 5 at 27 ¶ 6.

In June 1989, the surveyors observed one blind resident sitting at a table while the other residents were playing bingo. There was no staff intervention or contact with the resident for over 20 minutes, and he was offered no alternative activity. The same blind resident was observed the following evening. He sat outside for 25 minutes at a picnic table while the other residents and staff were playing baseball. The staff did not interact with the resident or provide active treatment. Def.Exh. F at 28–29 ¶ 1; See also Def.Exh. F at 8, 11, 14, 29 ¶¶ 2, 3, 4, 5. HCFA surveyors also observed a female resident in adult services standing and leaning over the back of a wheelchair for fourteen minutes. The staff stated that the program plan was gross motor skills and then went on to say that in this instance the resident was engaged in an extra leisure skill of standing. In fact, the program plan objective was walking. Def.Exh. F at 30, ¶ 8; See also Def.Exh. F at 30 ¶¶ 6, 7, 31 ¶ 11.

In December 1989, the surveyors reviewed a resident's record which indicated that the resident was to receive individual speech therapy beginning in May 1989. There was no documentation in the record indicating that the resident had received speech therapy since the time it was recommended. Def.Exh. EEE at 4. A resident was observed flicking his fingers and rocking back and forth. Staff did not redirect the resident as indicated by the IPP. Def. Exh. EEE at 12 ¶ 2. See also Def.Exh. EEE at 11, 12, 13.

The LLH & TS dietician recommended as part of a resident's nutritional assessment that he be fed smaller meals more frequently, i.e. that he be given half of his regular portion at mealtime, the remainder two hours later, and a supplement two hours after that. The resident has a gastric reflux problem. As of January 1990, the recommendation had not been implemented and the resident was still being fed his entire meal at the regular mealtime. Ogle Depos. at 10–13 and Ogle Depos.Exh. 2; Def.Exh. AW, IPP 7/25/89 at 6.

In March 1990, the surveyors found that the deficiency for program implementation continued. They observed five residents and two staff members in a day room. One resident was engaged in a project on the sofa and two residents were being attended by the staff on a floor mat. One resident stood on one side of the room, rocking back and forth and flicking his fingers. Six other residents and two staff members returned from an activity away from the cottage, and then interacted with the other residents except for the resident who was rocking back and forth. The self-stimulating resident did not receive the attention and interventions appropriate to address his needs. Def.Exh. FFF at 11.

b. *FSH & TS*

Similarly, at FSH & TS the surveyors have found deficiencies in active treatment at least since 1984 and 1985, although the HCFA surveyors have never recommended FSH & TS for decertification. Tr. 11/3/89 at 123–126 (Aldaz); Pl.Exh. 14, 93, 94. The surveyors found throughout FSH & TS, both in the living units and day programs, that consistent and continuous provision of functional activities and competent interactions was not taking place. Specifically, surveyors found groups of residents sitting in the living units with no staff attending them. Pl.Exh. 14 at 11 ¶ A. In another instance, residents sat without any competent, consistent interaction with others and/or staff. When the staff was asked

about this, they indicated that it was not active treatment time. Pl.Exh. 14 at 13 ¶ G. During mealtimes, the surveyors noted that there "was no observable active treatment taking place." Pl.Exh. 14 at 8 ¶ B, 11 ¶ A(2), 42 ¶ A(2). Quite to the contrary, the surveyors observed that staff did not demonstrate skills and techniques to promote socialization; residents were not encouraged, permitted and reinforced to be independent during meals; residents were rushed through meals; and the eating programs were not being implemented. Pl. Exh. 14 at 24, ¶¶ A, B, C, D. Plaintiffs' and defendants' experts also observed almost no training during meals. Tr. 10/18/89 at 109–110 (Brown); Tr. 4/20/90 at 47 (Reid). The surveyors also tracked fifteen residents and found that the tasks being done during the scheduled active treatment time did not follow the residents' IPPs. Pl.Exh. 14 at 12 ¶ B. The staff could not identify the objective for any activity as it related to a certain resident's IPP. Pl.Exh. 14 at 32.

### 9. Behavior Management
#### a. *LLH & TS*

Every resident of LLH & TS receives an annual psychological assessment. In addition, psychological evaluations [20] are conducted every three years on residents under the age of 18, and every five years on residents age 18 or older. Tr. 4/27/90 at 28–30 (LaCourt). Behavior management programs at LLH & TS focus on the reduction of maladaptive behavior through a positive intervention approach such as positive reinforcement, rather than punitive or aversive intervention. Tr. 4/20/90 at 78, 90–92 (Reid).

ICF/MR standards require that staff be able to demonstrate the skills and techniques necessary to administer interventions to manage the inappropriate behavior of residents. Pl.Exh. 15, Tag # 193. Psychologists train direct care staff at LLH & TS and FSH & TS in the implementation of individual behavior management programs.

Pl.Exh. 310 at 140; Tr. 10/30/89 at 77–78 (Nunn).

However, in March 1988, defendants' expert, Dr. Haywood, found that the behaviorist system at LLH & TS "needed review and fine tuning." Dr. Haywood testified that the behavioral data charts he reviewed at LLH & TS were not instructive because the categories of behavior reported in the charts were quite gross. For example, the chart for one resident merely described high frequencies of "inappropriate behavior" during February and March. Defendants' expert testified that staff efforts to apply behavioral programs to such generally described behaviors would be ineffective because so many different acts can be included in this broad category. Def.Exh. P at 13. In April 1990, another defense expert testified that a resident's behavior program indicated that data should be collected without further detail or specification. Tr. 4/26/90 at 11 (Reid).

Defendants' expert, Dr. Haywood, also found that staff relied on "contingent reinforcement" techniques of behavior management. Although the techniques are immediately effective, Dr. Haywood saw little effort expended toward generalizing the immediate effects of reward or punishment. The pressing situation was met but staff members did not seem to be concerned with or to know how to accomplish a longer-term and nonsituational generalization of acceptable and appropriate behavior. Def.Exh. P at 16.

Defendants' expert also testified that there seemed to be a reluctance to change behavioral programs once they were established. He recommended that an attitude be fostered of constant monitoring and revision where necessary and useful. Dr. Haywood further testified that often behavioral programs are established on an empirical basis, which to be successful require staff members to be willing and able to change the programs when they are not yielding the results they were intended to

---

**20.** Psychological evaluations at LLH & TS are more complete than assessments. Evaluations include a formal cognitive or developmental assessment measure and a formal adaptive as-

sessment measure. The annual assessments include only the adaptive assessment measures. Tr. 4/27/90 at 28 (LaCourt).

achieve. Def.Exh. P at 15. Plaintiffs' expert, Dr. Franczak, also found that behavioral programs are not changed as conditions require. Tr. 4/2/90 at 258 (Franczak).

In March 1990, the administrator of LLH & TS testified that his observations were consistent with those of the surveyors in that direct care staff did not consistently and effectively intervene in instances of inappropriate behavior. Tr. 4/27/90 at 157–158 (LaCourt).

In April 1990, Dr. LaCourt testified that LLH & TS is progressing in a continuum toward implementation of behavior management plans in a consistent manner. Tr. 4/27/90 at 158–159 (LaCourt). However, Dr. LaCourt had observed only one instance of a behavior management plan being implemented from beginning to end. Tr. 4/27/90 at 159–160 (LaCourt).

#### b. *FSH & TS*

Behavior modification programs at FSH & TS are developed through the IDT process. Pl.Exh. 310 at 139–140. Before designing a behavior modification program, the psychology staff at FSH & TS reviews the type of behavior, frequency of behavior, duration and intensity of behavior, as well as any relevant environmental factors. Pl.Exh. 315 at 76. The psychologists work together with the consulting psychiatrist at FSH & TS to evaluate, plan and implement appropriate behavior modification plans and to discuss, recommend and prescribe appropriate medications. Pl.Exh. 315 at 92–93. In the fall of 1989, FSH & TS began a peer review system for behavior management plans. Pl.Exh. 315 at 70, 72. As part of the peer review, the staff psychologists meet once a month to review three to five behavior plans. Pl.Exh. 315 at 74.

Defendants' expert, Dr. Haywood, testified that the behavior management programs at FSH & TS contain the requisite components for effective behavior management programming. These basic components include investigating the etiology of residents' behavior problems, collecting data to evaluate the occurrence or nonoccurrence of the problem and the intervention, and intervening in a manner that does not rely heavily on aversive procedures. Behavior management programs at FSH & TS rely a positive intervention approach. Tr. 4/20/90 at 89–91 (Reid).

However, defendants' expert, Dr. Reid, found that although the basic components of a behavior management program were in place, the facility needed considerable improvement to bring behavior management programs up to state of the art. Tr. 4/20/90 at 91 (Reid).

### F. *Restraints*

#### 1. Chemical Restraints

Chemical restraints generally refer to the administration of medication solely for the purpose of tranquilizing or rendering an individual more manageable. Tr. 4/23/90 at 38–39 (Brown). Psychoactive medication is medication prescribed and administered for the purpose of affecting behavior, or alleviating symptoms of psychiatric illness. Def.Exh. BX at 1.

There are seventy-two residents at LLH & TS on psychoactive medication. Tr. 4/27/90 at 31. Defendants' expert testified that the medication is prescribed pursuant to consultation with a psychiatrist, Tr. 4/23/90 at 23 (Brown), that each resident on psychoactive medication has a psychiatric diagnosis, Tr. 4/23/90 at 41 (Brown), and that each resident on psychoactive medication has a behavior management plan. *Id.*

LLH & TS has written and implemented policies and procedures pertaining to the use of psychoactive medication which proscribe the use of such medication for punishment, or for the convenience of staff, or as a substitute for habilitative programs. Def.Exh. BX at 1. LLH & TS policy also requires that the informed consent of the resident's guardian be obtained prior to the administration of psychoactive medication. Def.Exh. BX at 3, 6–7.

The review mechanism in place at LLH & TS for the use of psychoactive medication is twofold. First, the IDT of each resident reviews the use of psychoactive medication at least annually. Tr. 4/23/90 at 44–45

(Brown). Part of the IDT, described as "the core", which includes the Qualified Mental Retardation Professional ("QMRP"), a psychologist, a nurse, and a physician, reviews the psychoactive medication regime at least quarterly. Tr. 4/23/90 at 45 (Brown). At these quarterly reviews, the psychologist provides data summaries of selected targeted behaviors over the preceding three months and the QMRP provides an overview of the client's progress and behavior. Tr. 4/23/90 at 46 (Brown). Reduction of psychoactive medication is regularly considered on an individualized basis in consultation with the psychiatrist, the primary physician and other observers. Tr. 4/23/90 at 53–54 (Brown); Def.Exh. BX at 3.

There are additional reviews by two review boards; the Technical Review Board ("TRB") and the Institutional Review Board ("IRB"). Def.Exh. BX at 2; Def. Exh. BY. The TRB consists of representatives of each of the pertinent disciplines, including a social worker, psychologist, cottage supervisor, QMRP, nurse, special education teacher, chaplain and physician. The TRB reviews aversive behavior programs and the use of psychoactive medication at least every six months. Tr. 4/23/90 at 48–49 (Brown).

The IRB members include an attorney, the head of the parents committee, a clinical psychologist, a chaplain and the medical director. Tr. 4/23/90 at 50 (Brown). The IRB reviews any proposed treatment program involving the use of psychoactive medications, physical restraints or time out procedures. Tr. 4/23/90 at 50 (Brown); Def.Exh. BY at 6. The IRB reviews are conducted prior to the implementation of the program and at least every six months thereafter. Def.Exh. BY at 6.

At FSH & TS, the Behavioral Review Committee, which consists of the psychology staff, medical staff and consulting psychiatrist, reviews the use of psychoactive medications and behavior modification programs. Pl.Exh. 315 at 70–75. In addition, all behavior modification programs at FSH & TS are reviewed by the Human Rights Committee, whose members include an attorney, a diagnostician and a priest. Pl. Exh. 327 at 95.

As a general matter, plaintiffs' medical expert did not find any inappropriate chemical restraints at either FSH & TS or LLH & TS. Tr. 4/4/90 at 174 (Crocker). He found the use of psychoactive medication at the facilities to be strikingly low for the population served. He did not find any evidence of inappropriate polypharmacy being practiced in regard to the thirteen named plaintiffs. Tr. 4/4/90 at 173–174 (Crocker); Pl.Exh. 168 at 2.

2. Physical Restraints

Aversive programming is the use of unpleasant stimuli to decrease behavior that is undesirable. Tr. 10/31/89 at 190–191 (Haywood). In May 1988, 39 residents at LLH & TS were on a list of those receiving aversive programming. Def.Exh. P at 17. Of the 39 residents so listed, only two actually received aversive stimulation: one was exposed to ammonia odor and the other was exposed to water mist. Def.Exh. P at 17. The other 37 residents on the list were subject to the use of mechanical restraining devices, including the papoose board, exclusionary time out, the camisole or straight jacket, the Mandt hold, a wheelchair, and certain protective devices such as mittens and helmets. Def.Exh. P at 17.

The most frequently used restraint in May 1988 was the papoose board. This is a restraining device that consists of a flat board with velcro-closing fabric "arms" on which residents are placed with their extremities immobilized. Def.Exh. P at 17. The use of a restraint for a long period of time results in an imbalance of muscle development. Tr. 4/27/90 at 58 (LaCourt). Defendants' expert, Dr. Haywood, found that time out was used as punishment rather than as a training mechanism, and that papoose boards were an unnecessary restraint. Tr. 10/31/89 at 190 (Haywood).

In March 1990, LLH & TS dismantled all time out rooms. Tr. 4/27/90 at 33 (LaCourt). LLH & TS has also eliminated the use of aversive stimuli, Tr. 10/30/89 at 201 (Haywood), and there are no residents at LLH & TS who have four- or five-point

restraint as part of their behavioral programs. Only one resident at LLH & TS has the use of a camisole or straight jacket as part of his program. Tr. 4/27/90 at 33–34 (LaCourt). The use of the camisole with this resident has been reviewed and a professional determination made that it is appropriate. Tr. 4/27/90 at 34 (LaCourt).

LLH & TS has also eliminated papoose boards as a component of behavioral programming. However, papoose boards continue to be used in connection with dental treatment. Tr. 10/31/89 at 201 (Haywood). ICF/MR standards require that facilities "employ physical restraint only as a health-related protection prescribed by a physician, but only if absolutely necessary during the conduct of a specific medical or surgical procedure, or only if absolutely necessary for client protection during the time that a medical condition exists." Pl. Exh. 15, Tag # 297. The dentist at LLH & TS, Dr. Lyons, testified that the papoose board is employed pursuant to an individual determination that a restraint is the least restrictive means available to ensure the safety of the client. The dentist's recommendation concerning the use of the papoose board is reviewed by the IDT and is present in the IPP of a resident when it is required. Tr. 4/26/90 at 260 (Lyons); Tr. 4/3/90 at 43–44 (Franczak).[21]

Plaintiffs' expert in behavioral psychology testified that the use of a papoose board for dental care is unnecessarily restrictive and violates ICF/MR standards. Tr. 4/3/90 at 43 (Franczak). Plaintiffs' expert conceded, however, that he is not an expert in dental techniques, that he did not speak with any dentists at the facility, and that he had no knowledge of desensitization techniques employed by the dental staff. Tr. 4/4/90 at 8–9 (Franczak).

Evidence was presented concerning the use of restraints which are not part of a resident's IPP. A report of uncorrected deficiencies noted that on February 17, 1989, the HCFA surveyors observed five residents of LLH & TS seat-belted (restrained) to toilets. This was not part of toilet training programs set forth in their IPPs. Pl.Exh. 5 at 5. On May 3, 1989, the surveyors again observed residents of LLH & TS seat-belted to toilets because only one staff member was available to assist six residents.[22] Id.

FSH & TS has never used physical restraints as part of a behavioral program and has used them less than five times on an emergency basis. Tr. 4/24/90 at 153 (Miller); Tr. 4/20/90 at 143 (Reid). There has never been a time out room at FSH & TS. Tr. 4/24/90 at 151 (Miller); Tr. 4/20/90 at 143 (Reid). There is no evidence of the use of aversive programming at FSH & TS.

G. *Regression*

Plaintiffs' medical expert, Dr. Crocker, found the residents whose records he reviewed to be medically stable, with no notable deterioration in their conditions. Although Dr. Crocker believed that more analysis should have been given to the cases of plaintiffs such as Ms. Willmon, Ms. Tsosie and Mr. Shirley, he testified that he could not say that the therapeutic outcome would have been different. Tr. 4/4/90 at 209–210 (Crocker); *see also* Tr. 12/14/89 at 74–75 (Attermeier). Inadequate documentation and the absence of baseline data make it impossible in many instances to determine whether residents of LLH & TS and FSH & TS have progressed, regressed or experienced no change. Tr. 11/16/89, Vol. I at 93, 96–97, Vol. II at 128–129 (Spencer); Tr. 12/12/89 at 139 (Beckman); Tr. 11/13/89 at 157 (Cox); Tr. 12/14/89 at 170–174 (Attermeier).

---

21. Pursuant to the terms of the Settlement Agreement, LLH & TS is required to discontinue the use of papoose boards, except as may be medically required based on the exercise of professional judgment, to administer dental or medical treatment. *USA v. State of New Mexico*, No. 89–1165, Settlement Agreement at 7 (D.N.M. Feb. 2, 1989).

22. Plaintiffs' expert observed a resident of LLH & TS with his left hand tied down. 11/13/89 at 135 (Cox). However, the parties presented no additional evidence regarding Ms. Cox's observation. In the absence of additional evidence, I am unable to determine whether the restraint was part of the resident's program.

## H. *Safety and Physical Harm*

ICF/MR regulations require a facility to ensure that residents are not subjected to physical, verbal, sexual or psychological abuse. Pl.Exh. 15, Tag # 127. Plaintiffs' experts determined that there are no life threatening conditions or situations at either LLH & TS or FSH & TS. Tr. 4/4/90 at 168 (Crocker); Tr. 10/17/89 at 107 (Rowe); Def.Exh. F at 1–3. However, a record review shows that residents of both facilities have been victims of abuse and injury.

### 1. Abuse

The threat of abuse for the residents of LLH & TS and FSH & TS as compared to other segments of society is increased to the extent that there are a large number of people in those institutions with dependent needs. Tr. 4/20/90 at 53 (Reid). In 1986, four residents of Bashein Cottage at LLH & TS suffered abrasions and puncture wounds to the head. Another resident was sexually assaulted and died two days later. These acts of abuse and/or neglect were unexplained and unaccounted for by the institution. Pl.Exh. 85. More recently, an employee of LLH & TS, who abused a resident by repeatedly kicking him, was merely suspended, although staff are frequently dismissed for excessive absenteeism. Pl.Exh. 328 at 187–191 (Brownstein).

### 2. Accident and Injury

It is not uncommon for persons with developmental disabilities, such as those at FSH & TS and LLH & TS, to sustain injuries. Many of the residents' injuries result from seizures which cause them to fall and injure themselves. Physical disabilities that diminish motor skills often cause residents to fall and stumble. In addition, in congregate care settings such as LLH & TS and FSH & TS residents with maladaptive behavior will injure other residents. Tr. 4/20/90 at 53–56 (Reid). Defendants' expert found 57 residents of FSH & TS with at least a moderately serious propensity for hurting others. Tr. 11/1/89 at 103 (Haywood).

The records show that residents of LLH & TS and FSH & TS have sustained injuries. On October 5, 1985, plaintiffs Clinton Heath and Walter Stephen Jackson ingested oven cleaner from a juice cup and each suffered severe burns of his esophagus. Tr. 4/4/90 at 117 (Crocker); Pl.Exh. 179. The medical records for Clinton Heath document approximately one half-dozen lacerations per year between 1984 and 1987. Tr. 4/4/90 at 116 (Crocker). The medical records also indicate that plaintiff Walter Stephen Jackson's left arm was fractured in 1976 and again in 1980, the last fracture requiring internal fixation with a plate. Tr. 4/4/90 at 120–122; Pl. Exh. 182.

More recently, at LLH & TS plaintiffs' expert found that thirty injuries—many from human bites—were reported for a single resident "R" between 12/4/88 and 2/27/90. Forty injuries were reported for resident John from 7/10/89 to 2/2/90. Sixty-five accidents were reported for resident George for the period of 2/16/89 to 2/10/90. Tr. 4/2/90 at 253–254 (Franczak). *See also* Tr. 4/16/90 at 132 (Sullivan); Pl. Exh. 332.[23] Over the three month period from September to November 1989, George's behavioral episodes escalated and included hitting, kicking, slapping, property destruction, noncompliance and inappropriate sexual behavior. In December 1989, George committed two rapes. The administrator of LLH & TS testified that George's behavior demonstrated a need for additional intervention. In January 1990, a staff person was assigned to George on a one-to-one basis. Tr. 4/27/90 at 144–145 (LaCourt).

At FSH & TS, 47 incident reports were filed relating to 20 individuals who lived in Socorro Cottage between July and December 1989. Of those incident reports, 33 were filed between October 9 and November 1, 1989. One resident inflicted 747 batteries in a six month period. Tr. 4/2/90

**23.** Plaintiffs' expert did not determine how many of the injuries he reviewed were caused by the injured residents' own physical or psychiatric disabilities instead of by other persons or situations. Tr. 4/3/90 at 258–259 (Franczak).

at 254 (Franczak). The medical staff at FSH & TS treats residents for lacerations, human bites, bruises, wounds requiring sutures, and broken bones. In 1989, Patricia L. had the following visits to the infirmary: two for self-abusive behavior; nine for human bites; three for battery by others; two for mashed fingers; and one admission overnight because another resident had sprayed deodorant in her eyes. Pl.Exh. 332.

Plaintiffs presented no evidence that the rate of injury at either LLH & TS or FSH & TS is excessive for the population they serve or that the residents experience a higher rate of injuries and accidents than do persons who reside at other facilities or in non-institutional environments. Tr. 4/3/90 at 245–247 (Franczak); Tr. 4/4/90 at 205–206 (Crocker). The question, however, is not whether other facilities or non-institutional environments would be safer, but whether the state facilities in this case have unsafe conditions. Plaintiffs' expert testified that there are a number of injuries occurring repeatedly with no attempt by the IDTs to make any changes in the plans to prevent further injuries. Descriptions of the causes of injuries are confusing. Most were described as being "witnessed by staff" but of "unknown cause." Generally, descriptions of the incidents were vague, not identifying the individuals involved or the places the incidents occurred. Even when specific information is available there is no attempted pattern analysis. Tr. 4/2/90 at 255–256 (Franczak).

For at least the last three years, the Director of Nursing at LLH & TS collected the information and looked for trends or unusual constellations of injuries associated with a particular time, place or resident. Tr. 4/23/90 at 60–62 (Brown); Tr. 4/27/90 at 138 (LaCourt). This was a hand-generated system in which the Director of Nursing entered the information on a graph which was kept on a legal-size piece of paper. Tr. 4/27/90 at 138 (LaCourt). A computerized system of pattern analysis was not instituted at LLH & TS until April 1990. Tr. 4/27/90 at 137–139 (LaCourt).

3. Reports

The ICF/MR standards require facilities to ensure that all allegations of mistreatment, neglect, abuse and injuries of unknown sources are reported immediately to the administrator and are thoroughly investigated; and that investigation results are reported to the proper authorities within five working days of the incident. Pl.Exh. 15, Tag ## 153, 154, 156.

LLH & TS has established policies and procedures for documenting all injuries suffered by residents. Tr. 4/23/90 at 60–61 (Brown); Def.Exh. BZ. Direct care staff investigate the circumstances of an injury. All injuries are then reported to the nurse assigned to the cottage in which the resident lives and also to the resident's physician. Tr. 4/23/90 at 60–62 (Brown).

The staff at FSH & TS complete incident/accident reports and abuse, neglect and mistreatment reports and maintain behavioral summaries of all behavioral incidents. Tr. 4/24/90 at 102–103 (Miller); Tr. 4/20/90 at 69–70 (Reid); Def.Exh. BU, EO, EP. In addition, all allegations or suspected incidents of abuse or neglect at FSH & TS are reported to the New Mexico Human Rights Service Department. Pl.Exh. 327 at 97–98.[24]

### I. *Direct Care Staff*

The ICF/MR standards require that each staff member be trained in, and able to demonstrate the competencies, skills and techniques necessary to implement the IPPs of the residents for whom that member is responsible. Pl.Exh. 15, Tag

---

**24.** Plaintiffs' expert concluded that at FSH & TS many accidents of unknown cause are not investigated, accident reporting is inconsistent and staff use their own discretion as to whether to report alleged abuse. Tr. 4/2/90 at 262–265 (Franczak). However, Dr. Franczak did not review FSH & TS's abuse reporting forms or behavioral summaries, which contain information about incidents and outbursts. Tr. 4/3/90 at 216–217, 223–224 (Franczak). With the exception of two separate instances involving individuals with challenging behavior, plaintiffs offered no evidence that either institution had failed to investigate allegations of abuse. Tr. 4/3/90 at 259–261 (Franczak).

# 189–194. The evidence presented showed that there is not enough direct care personnel, that staff supervision is inadequate, and that existing staff members lack sufficient training.

The experts agreed that the staff members at LLH & TS and FSH & TS are caring, dedicated and sincere in their efforts to provide the best care possible under the circumstances that exist at the institutions. Tr. 4/4/90 at 168 (Crocker); Tr. 10/17/89 at 135, 137 (Rowe); Tr. 4/3/90 at 235 (Franczak); Tr. 4/17/90 at 166–167 (Romero). However, even the most well-meaning care providers cannot be expected to perform adequately when they are insufficient in number, poorly trained and supervised, and unfamiliar with the plans developed for the residents.

### 1. Insufficient Staff and Inadequate Supervision

The HCFA surveyors found there were insufficient numbers of direct care staff and inadequate staff supervision of FSH & TS and LLH & TS residents.

Defendants' expert, Dr. Haywood, recommended the addition of direct care staff at FSH & TS. Tr. 10/31/89 at 164 (Haywood). The surveyors have found numerous deficiencies in facility staffing at FSH & TS, although the HCFA surveyors have never recommended FSH & TS for decertification. Pl.Exh. 14, 93, 94. Most recently, the surveyors found the number of staff too few to provide the assistance and training that the residents require, particularly residents who are severely and profoundly retarded. Also, the staff was too small to manage and supervise residents in accordance with their IPPs; to afford the residents choices during their recreation; to provide supervision, individualized assistance and personal care training in privacy; or to implement successfully the program plans in the living units for the severely and profoundly retarded residents. Def. Exh. EE at 3–5, 18; *see also* Pl.Exh. 14 at

**25.** In February of 1990, LLH & TS expanded preservice training to three days. Tr. 4/4/90 at

8, 10; Tr. 10/17/89 at 71 (Rowe); Def.Exh. EEE at 6.

FSH & TS has added sixteen direct care staff positions and was authorized to add four more. Tr. 10/31/89 at 164–165 (Haywood). In addition, the defendants' plan of correction indicates that the residential service director will hire ten additional staff and that the administrator of the facility will present to the Health and Environment Department a request for additional staff to be hired in phases. Def.Exh. EE at 4.

Surveys of LLH & TS in February, May and June 1989 found the facility ineligible for certification as an ICF/MR in part because of insufficient staffing. Def.Exh. F at 3; Pl.Exh. 5. Specifically, the surveyors found that staff in the cottages and in adult services did not adequately provide supervision, assistance and training to the residents. The surveyors observed residents seat-belted to toilets because only one staff member was available to assist six residents. Some residents urinated and defecated in their pants while waiting their turn. At the gym the surveyors observed two female staff members sitting at a table talking to each other for ten minutes while five other staff members attended to thirty-six residents in various activities. In adult services, surveyors saw residents self-stimulating, running around the room, screaming and hitting each other, when there were ten residents but only two staff members present. Pl.Exh. 5 at 5, 11, 27. By the time of trial, LLH & TS had added eighty-eight positions for direct care staff and sixty-one additional support personnel since the HCFA surveys found deficiencies. Tr. 10/30/89 at 51–52, 213 (Nunn).

### 2. Staff Training
#### a. *Preservice Training*

A significant number of direct care staff presently employed at LLH & TS and FSH & TS received only two days of preservice training. Tr. 10/30/89 at 83 (Nunn); Tr. 10/16/89 at 179–180 (Rowe); Tr. 4/4/90 at 275–276 (Beauregard).[25] As of April 1989,

276 (Beauregard).

newly hired direct care staff personnel LLH & TS received two weeks of employee orientation. Tr. 4/4/90 at 274–275 (Beauregard). However, in mid-1989 employee orientation was reduced from two weeks to two days to accommodate the increase in new hires. *Id.* at 276. Over two hundred employees received the two day training session between May 1989 and January 1990. *Id.* at 282.

The staff development director at LLH & TS testified that in the course of the two-day orientation, new employees underwent training in behavior management techniques, restraint practices, data collection procedures, active treatment, the individual program plan process, physical management and positioning of residents, handling residents with seizure disorders, feeding residents who need assistance, infection control, fire safety, and incident reporting. They also received an introduction to developmental disabilities. In addition they received information concerning employee insurance benefits, parking at the facility, personnel rules and institutional policies and procedures. Tr. 4/4/90 at 276–278 (Beauregard). Direct care staff are not provided instruction in first aid, CPR, or mandt training.[26] Tr. 4/4/90 at 278–279 (Beauregard). Plaintiffs' expert, Dr. Rowe, testified that the two-day training is inadequate, particularly for individuals without prior training or experience in developing services for and providing services to people who are developmentally disabled. Tr. 10/16/89 at 180 (Rowe).

At the conclusion of the two-day training session, the employees were tested. If an employee did poorly in a particular area, that person would receive additional training in that area, after beginning work. Tr. 4/4/90 at 281–282 (Beauregard). The staff development director could not recall any instance where an individual who had received the two days of training did so poorly on the test that LLH & TS refused employment. Tr. 4/4/90 at 282 (Beauregard).

### b. *In–Service Training*

Staff at LLH & TS and FSH & TS receive ongoing training. Tr. 10/30/89 at 60–63 (Nunn); Def.Exh. K; Pl.Exh. 310 at 38; Tr. 4/19/90 at 243 (Reid). Defendants testified that the professional staff at LLH & TS train the direct care staff on implementation of the program plans. Tr. 10/30/89 at 52, 77, 85 (Nunn). However, direct care staff are not adequately trained to implement the residents' individual program plans.

Staff are assigned to work with residents who have complex needs prior to receiving training in the residents' programs. Plaintiffs presented the testimony of a direct care staff member at LLH & TS who had been employed at the facility for a year and a half. She was transferred from Chavez East to Cottage 2, where she had been working for eleven days at the time she testified. The residents of Cottage 2 were a new group of residents. Tr. 4/13/90 at 214 (Gutierrez). The staff member testified that she participated in the feeding of the residents of Cottage 2 and that some of the residents experienced difficulty swallowing and keeping down food. She said, however, that she was waiting for a supervisor to begin her in-service training on feeding the residents of that cottage. Tr. 4/13/90 at 216–217 (Gutierrez).

Direct care staff at LLH & TS are not familiar with the residents' IPPs. In February 1989, after observing various activities throughout the facility, the surveyors found that the staff could not identify the objective for a particular activity as it related to each individual's IPP. Pl.Exh. 14 at 14. The surveyors interviewed two staff members who were responsible for sixteen residents. When the staff members were asked about the residents' IPPs, a staff member responded "Don't ask me, I don't know." One staff member indicated that she had been employed for two weeks; the other staff member had been employed for approximately two months. Pl.Exh. 5 at

---

**26.** Mandt training is a technique used to deal with either aggressive or non-aggressive residents in order to prevent injury either to the resident or to the person dealing with the resi-

dent. Mandt is used at LLH & TS only when a resident becomes violent and needs to be restrained by using some kind of physical force. Tr. 4/4/90 at 279 (Beauregard).

21, ¶ C. The surveyors also observed staff placing a resident on a papoose board. That resident's behavior modification program required staff to ignore the resident's tantrums, but the staff was unaware that this was part of the program. Pl.Exh. 5 at 20, ¶ A. In another instance, a resident's physician instructed that the resident wear a cap due to the side effects of a medication. This instruction was not followed. Pl.Exh. 5 at 20, ¶ B. *See also* Tr. 4/13/90 at 196 (Baca).

The Adult Service Program Specialist at LLH & TS testified that she routinely teaches sign language classes at the training school in a formal manner. Tr. 11/2/89 at 20 (Donovan). However, in June 1989, the surveyors observed two residents in adult services who had a verbal and signing program that had not been implemented because the staff did not know sign language and was not familiar with this IPP objective. In another instance, staff members stated that they were not familiar with the residents' IPP objectives and methods. Def.Exh. F at 15, 17. A resident was observed merely sitting in a chair for fifteen minutes in front of a wooden stand from which bells were hanging on three different colored strings. The resident's IPP stated that in this exercise she was to choose an item presented to her within five seconds. Not only was this not occurring, when asked what the resident was supposed to be doing, the staff gave a nonsensical explanation that the resident was working on expressive language. Def.Exh. F at 31 ¶ 8; *See also* Def.Exh. F at 31 ¶ 10, 32 ¶ 12.

In November 1989, the surveyors observed a resident who had turned away from leisure time activity and was chewing on the back of her chair. A staff member was asked what objective was being worked on for this resident and the staff member responded "I don't know." The staff member continued to work with other residents without redirecting the resident. Def.Exh. EEE at 8.

In March 1990, the surveyors found that the deficiencies in staff training continued. They observed a resident, in a group of six residents and two staff members, who had removed the shoelace from one of his shoes and was repeatedly putting the shoelace entirely into his mouth, chewing on it, removing it and chewing it again. Staff did not redirect the resident from this behavior, nor did they appear even to notice the resident's behavior. Def.Exh. FFF at 7. *See also* Def.Exh. EEE at 8–9.

Direct care providers at LLH & TS testified regarding their training and interaction with residents. One staff member testified that she had been trained on a resident's behavior modification program by the psychologist technician. She was not aware, however, that the resident's IPP asked that environmental conditions be assessed to determine if they contributed to the resident's inappropriate behavior. Tr. 4/16/90 at 145–146 (Thompson); Pl.Exh. 299, IPP 3/14/90 at 27. *See also* Tr. 4/16/90 at 152 (Thompson).

### J. *Professional Staff*

A foundation of competent professional knowledge is necessary to provide adequate habilitation. ICF/MR standards require that each resident receive the professional program services needed to implement the active treatment program defined by the resident's IPP. Pl.Exh. 15, Tag #164, Guidelines. A facility must have available enough qualified professional staff to carry out and monitor the various professional interventions in accordance with the stated goals and objectives of every IPP. Pl.Exh. 15, Tag #167.

#### 1. Insufficient Staff

Since May 1988, FSH & TS has added two master level psychologists and has begun the recruiting process for an additional Ph.D. psychologist. Tr. 10/31/89 at 163–164 (Haywood). FSH & TS also employs a full-time chief psychologist, Dr. Ortega. Pl.Exh. 315 at 2. Defendants' expert, Dr. Reid, concluded the number of psychologists on staff at FSH & TS is appropriate to provide professionally adequate services. Tr. 4/20/90 at 151 (Reid).

However, at LLH & TS there were a number of professional staff vacancies at

the time of trial. In 1988, defendants' expert, Dr. Haywood, recommended that LLH & TS add a clinical psychologist as chief psychologist to supervise and train the existing staff in assessment and treatment strategies. Def.Exh. P at 16. The chief psychologist position was also required by the Settlement Agreement with the Department of Justice. The position, however, is still vacant. The administrator of the facility is serving as chief psychologist until the position is filled. There are a number of additional vacancies in psychological services. In April 1990, 3 out of the 10 psychology positions at LLH & TS remained vacant. Tr. 10/30/89 at 54, 213 (Nunn); Tr. 4/27/90 at 21, 37 (LaCourt).

In addition, defendant's expert, Dr. Haywood, found that LLH & TS did not have a "psychologist capable of the most up-to-date and sophisticated psychoeducational and behavioral pediatric assessments" and that there were "no psychologists who [were] competent in psychological treatment modes beyond behaviorism such as cognitive and/or psychodynamic approaches to treatment of the psychological problems of retarded persons." Tr. 10/31/89 at 187–188 (Haywood); Def.Exh. P at 16.

### 2. Professional Staff Training

ICF/MR standards require that professional staff work directly with residents and with paraprofessional, nonprofessional and other professional staff who work with residents. Pl.Exh. 15, Tag # 165, 166. The surveyors found that the professional staff at LLH & TS fail to work with paraprofessional and nonprofessional staff to implement each resident's active treatment program. Def.Exh. F at 15, 17. *See also* Pl.Exh. 318 at 44 (Chavez).

As part of the plan of correction, LLH & TS requires that psychologists, social workers and speech pathologists provide direct services to residents and direct care staff in the living units and program areas for fifty percent of their work time. Professional staff are also required to provide on-site training and demonstration for direct service workers in the implementation of the programs and the collection of data. Def.Exh. F at 15, 17; Tr. 10/30/89 at 52, 205 (Nunn).

### 3. Rehabilitation Services

A person with a severe developmental disability, who does not have the opportunity to move, may become worse without intervention. Tr. 12/14/89 at 135–136 (Attermeier). The inability to move normally associated with developmental disability can cause risks to health and development, including osteoporosis, contractures, kidney stones, digestive difficulties, circulatory problems, respiratory problems and lack of normal function, growth, and sensory development. Tr. 12/14/89 at 131–136 (Attermeier); Tr. 11/3/89 at 13 (Cox); Tr. 12/15/89 at 55 (Witemeyer). The influence of gravity on an immobile body can also cause deformities. Tr. 11/3/89 at 17 (Cox); Tr. 12/14/89 at 142 (Attermeier). Developmentally disabled persons need physical therapy and the need is even greater for persons who are severely retarded. Tr. 4/4/90 at 222–223 (Crocker); Pl.Exh. 319 at 33; Tr. 11/3/89 at 20 (Cox).

For almost three of the last six years, no physical therapists were employed at LLH & TS. In November and December 1988, LLH & TS provided only 39 hours of physical therapy time under contract. No physical therapy treatment was being conducted. The 39 hours were spent performing evaluations and paperwork. Tr. 12/15/89 at 55–56 (Witemeyer); Tr. 11/13/89 at 42 (Cox). In addition, LLH & TS had no physical therapy aides. Tr. 11/13/89 at 17 (Cox).

In September 1989, only seven residents of LLH & TS were receiving direct physical therapy treatment. Direct care staff were providing indirect therapy services such as positioning and ambulation programs. Tr. 12/14/89 at 15–16 (Attermeier). The therapists were spending most of their time performing evaluations, doing in-services for the staff and working on wheelchair adaptations. Tr. 12/14/89 at 149–151 (Attermeier); Tr. 11/13/89 at 118–121 (Cox); Tr. 12/12/89 at 212 (Brownstein). In August 1989, there were two occupational thera-

pists at LLH & TS. Tr. 11/16/89, Vol. II at 105–106.

There are currently over five full-time equivalent ("FTE") physical therapists [27] and five full-time equivalent occupational therapists. Tr. 12/12/89 at 213 (Brownstein); Tr. 11/13/89 at 116 (Cox); Pl.Exh. 313 at 7; Tr. 12/13/89 at 144 (Hacker). LLH & TS has been authorized to employ five OT/PT aides, three of whom have been hired. Tr. 12/12/89 at 214 (Brownstein). Maintenance of wheelchairs is performed by the adaptive equipment specialist, a full-time staff position at LLH & TS. Pl.Exh. 316 at 33.

LLH & TS now assigns every resident of the facility a physical therapist and an occupational therapist. Each cottage has a physical therapist or an occupational therapist assigned to it as the primary therapist. If the cottage has a physical therapist as the primary therapist, the occupational therapist serves as the secondary therapist, and vice versa, but the physical therapist still addresses the physical therapy needs for each resident and the occupational therapist addresses the occupational therapy needs. Tr. 12/12/89 at 209 (Brownstein); Tr. 12/13/89 at 144–45 (Hacker); Pl.Exh. 313 at 7–8.

Since May 1989, LLH & TS has required that all occupational and physical therapists spend at least fifty percent of their time working directly with the residents or training staff to perform indirect rehabilitation services. The therapists at LLH & TS are also required to perform assessments, to make recommendations for rehabilitation services to every resident's IDT, and to develop a written plan to address those recommendations. The therapists are then required to train staff on the written training plan. Tr. 12/12/89 at 209–210 (Brownstein); Pl.Exh. 313 at 8. In addition, therapists monitor the rehabilitation programs by observing at least monthly the staff responsible for carrying out the plan. Pl.Exh. 313 at 8–9, 22.

LLH & TS provides ambulation programs and positioning programs for those residents who need them. As a general rule, residents including those positioned in foam inserts, are repositioned at least once every two hours. Tr. 12/15/89 at 9, 14 (Witemeyer); Pl.Exh. 313 at 10; Pl.Exh. 319 at 30–31; Pl.Exh. 316 at 91–93. When a physician writes an order for 24–hour positioning, the rehabilitation staff will provide in-service training to the direct care staff on the program plan. Pl.Exh. 313 at 9. Direct care staff are also trained to recognize skin breakdown in residents resulting from improper positioning. Pl.Exh. 308 at 80–81.

LLH & TS also operates an orthopedic clinic and a wheelchair clinic. Tr. 12/12/89 at 216 (Brownstein); Tr. 11/13/89 at 157–158 (Cox). The orthopedic consultant at LLH & TS regularly prescribes physical therapy services to selected residents of LLH & TS, including range of motion, seating devices, orthotics, ambulation, and gait training. Tr. 12/15/89 at 108 (Sherman). The rehabilitation staff consults with the orthopedic surgeon on an as-needed basis concerning the use of foam inserts for the wheelchairs. Pl.Exh. 316 at 91.

In addition to the rehabilitation department, LLH & TS has various other means of addressing gross motor needs of the residents. Many residents have an adaptive physical education program which includes aquatics and whirlpool; the recreation and education departments offer gross motor activities such as swimming and dancing. Tr. 12/15/89 at 9 (Witemeyer).

FSH & TS currently employs one physical therapist and was in the process of hiring a therapy aide in July 1989. Pl.Exh. 314 at 8. The physical therapist has been trained in the physical therapy needs of the developmentally disabled and has experience working with the developmentally disabled outside FSH & TS. Pl.Exh. 314 at 5–6. She also conducts in-service training for the staff. Pl.Exh. 314 at 10.

---

**27.** Defendants' expert, Dr. Attermeier, found that the physical therapy staff is competent. A number of therapists have four or five years of experience with the developmentally disabled population. Tr. 12/14/89 at 36–36 (Attermeier).

In August 1989, FSH & TS had one part-time occupational therapist on staff. Def.Exh. QQ. The occupational therapist was working only 16 hours a week. Tr. 12/13/89 at 155 (Hacker). There were no occupational therapy aides. Pl.Exh. 317 at 15.

### a. *Physical Therapy ("PT")*

#### i. Staffing

Plaintiffs' experts presented conflicting testimony on the number of physical therapists needed to adequately serve the residents at LLH & TS. Plaintiffs' expert, Eileen Cox, expressed her opinion that the number of FTE physical therapists is inadequate to serve the population. She testified that the professionally accepted ratio of physical therapists to nonambulatory persons is 1 to 24. Applying this ratio to the population of approximately 250 wheelchair users at LLH & TS would indicate that at least ten physical therapists are required. She also opined that at present physical therapy caseloads are unacceptably large. Tr. 11/13/89 at 115–117, 155 (Cox). Plaintiffs' expert, also testified that a ratio of one physical therapist to two physical therapy aides is appropriate for the severely disabled, and she believed approximately sixteen physical therapy aides are needed for the LLH & TS residents who use wheelchairs. Tr. 11/13/89 at 117–118 (Cox).

Plaintiffs' expert, Allen Crocker, testified that in order to provide adequate physical therapy services at the institutions, there should be a ratio of one to one-and-a-half physical therapists per one hundred individuals. Based on a population of 350 individuals, this suggests that LLH & TS should have a staff of at least five or six physical therapists. Dr. Crocker thought that additional support staff such as adaptive physical education and physical therapy aides are also needed. Tr. 4/4/90 at 179 (Crocker).

Defendants' experts found that the number of rehabilitation professionals at LLH & TS, including OTs, PTs and OT/PT aides is adequate to provide professionally acceptable services. Tr. 12/13/89 at 149 (Hacker); Tr. 12/14/89 at 38–39 (Attermeier).

#### ii. Adequacy of Physical Therapy Services

Plaintiffs' and defendants' experts also presented conflicting testimony concerning the adequacy of physical therapy services at the institutions. Plaintiffs' physical therapy expert, Eileen Cox, testified that the physical therapy services at LLH & TS are inadequate. She found, among other things, that there is little individualized positioning equipment available for residents of LLH & TS, that residents are not appropriately positioned in wheelchairs, and that foam inserts hold residents in deformed positions. Tr. 11/13/89 at 44–49, 81–82, 129, 138–139 (Cox).

She also testified that persons with physical disabilities will regress without active intervention to help them use the skills they have and that everyone, regardless of the level of disability, can make progress. Tr. 11/13/89 at 20, 28–29 (Cox). She stated, for example, that wheelchair inserts and other therapeutic equipment should be used to correct spinal deformities. Tr. 11/13/89 at 22–23 (Cox). However, plaintiffs' experts recognized that there are some conditions which are progressive and will result in a loss of function which is not necessarily attributable to a deficiency in the care the resident receives. Tr. 11/14/89 at 81–82 (Cox); Tr. 1/5/90 at 163 (Klein).

Defendants' expert, Dr. Attermeier, determined that the physical therapy services provided at LLH & TS conform to professionally acceptable standards and are adequate to prevent regression or deterioration insofar as it is possible to do so. Tr. 12/14/89 at 20–22 (Attermeier). She believed that the supply of positioning equipment at LLH & TS, including sidelyers, wedges, walkers, crutches, foam inserts and wheelchairs is adequate. Tr. 12/14/89 at 48–49 (Attermeier). She testified that she did not see anyone who she thought was "really poorly positioned" in a wheelchair. Tr. 12/14/89 at 50 (Attermeier).

Defendants' experts further testified that physical deformities, such as a fixed

scoliosis, are not amenable to correction by physical therapy and that the use of adaptive equipment to correct deformities is not only ineffectual but could be potentially dangerous. Tr. 12/15/89 at 11–12 (Witemeyer); Tr. 12/15/89 at 113 (Sherman).

With respect to FSH & TS, plaintiffs' physical therapy expert testified that she did not see enough of the facility to form a general opinion about the quality of physical therapy services at FSH & TS. Tr. 11/14/89 at 53 (Cox). However, she found that Alfred Shirley, Joe Gonzales and James Fritche are not receiving enough physical therapy to meet the objectives set forth in their IPPs. Pl.Exh. 96 at 12–13, 14, 15.

Defendants' expert concluded that the physical therapy services at FSH & TS are adequate and appropriate. FSH & TS does not have many residents with very serious neuro-medical problems. Tr. 12/14/89 at 121–123 (Attermeier). Alfred Shirley, Joe Gonzales and James Fritche have been evaluated by a physical therapist and they receive direct physical therapy services recommended by that therapist. Pl.Exh. 314 at 19, 24–28, 30–31, 37–38, 40–41.

b. *Occupational Therapy ("OT")*

Occupational therapy encompasses a therapeutic approach to improving function or skill through activity. Occupational therapists assist people with disabilities to master the functional activities of everyday living and to meet the demands of their environment. The three major role areas that concern occupational therapists are work or school, recreation and leisure, and self-care. Tr. 11/16/89, Vol. I at 55–56; Tr. 12/13/89 at 106–107 (Hacker).

For the developmentally disabled population, there is considerable overlap between the rehabilitation services provided by the occupational therapists and the physical therapists, Tr. 12/14/89 at 30–31 (Attermeier); Tr. 11/16/89, Vol. I at 55–56, Vol. II at 61–62 (Spencer). This is particularly so at LLH & TS where many of the residents are nonambulatory and have significant physical impairments. Defendants' experts felt that the overlap of occupational and physi-

cal therapy services at LLH & TS is appropriate. Tr. 12/14/89 at 31 (Attermeier); Tr. 12/13/89 155–156 (Hacker).

Plaintiffs' expert, Karen Spencer, concluded that the occupational therapists at LLH & TS were competent. Tr. 11/16/89, Vol. II at 105 (Spencer). The occupational therapists have educational backgrounds and experience in the delivery of occupational therapy services to the developmentally disabled. Pl.Exh. 319 at 3–4. The occupational therapists perform evaluations, implement IPPs, fill wheelchair prescriptions and adaptations, and give in-service training to staff. Pl.Exh. 309 at 14–15.

Defendants' expert, Bonnie Hacker, testified that in 1988, LLH & TS was not providing minimally acceptable professional OT services to the residents. There were only two occupational therapists on staff. Tr. 12/13/89 at 250 (Hacker). The occupational therapists were not involved in helping residents with their daily living skills or providing vocational training. Tr. 12/13/89 at 251–252 (Hacker). They were not sufficiently involved in the feeding program or the augmentative communication field. Tr. 12/13/89 at 253 (Hacker).

Prior to August 1989, LLH & TS had begun to fill some of the staff needs by hiring contract staff. In August 1989, the therapists were spending most of their time completing comprehensive functional assessments for all of the residents, which defendants' expert found to be an appropriate use of their time and a way to lay a foundation for intervention. Tr. 12/13/89 at 248 (Hacker).

At the time of trial, defendants' expert testified that the OT services provided at LLH & TS were more than adequate. Tr. 12/13/89 at 251, 254 (Hacker). The comprehensive functional assessments met basic standards of adequacy. Tr. 12/13/89 at 203 (Hacker).

In the summer of 1989, defendants' expert found that the OT services at FSH & TS did not rise to acceptable levels. Tr. 12/13/89 at 246 (Hacker). The residents at FSH & TS were receiving training in self-

help skills and vocational training. Tr. 12/13/89 at 245–46 (Hacker). The occupational therapist was evaluating all residents, providing direct therapy services, training staff, and monitoring all programs. Pl.Exh. 17 at 15, 25–26. She also worked with residents on feeding programs and ordered adaptive equipment as appropriate. Pl.Exh. 317 at 23–25; Pl.Exh. 320 at 60, 64, 65, 75–76.

However, defendants' expert concluded that the range of OT services at FSH & TS was limited and she made several recommendations for improvement. Tr. 12/13/89 at 246 (Hacker).

First, defendants' OT expert recommended that the occupational therapy staff be increased to at least one full-time occupational therapist and one full-time certified occupational therapy assistant to enhance and expand the services of the occupational therapist. Tr. 12/13/89 at 155–156 (Hacker). HED has authorized one full-time occupational therapist and one full-time certified occupational therapist assistant for FSH & TS. At the time of trial, FSH & TS had begun the recruiting process to fill these positions. Tr. 12/13/89 at 156–157 (Hacker); Def.Exh. QQ.

Second, defendants' expert expressed concerns about the vibration programs at FSH & TS and suggested that they be carefully reevaluated. The occupational therapist at FSH & TS began the vibration therapy program in June 1989. Pl.Exh. 317 at 18. Plaintiffs' expert believed the use of vibration therapy to be extremely unprofessional. Plaintiffs' expert testified that it appeared to be applied randomly and globally to the residents of FSH & TS. The persons who administered the therapy did not have the ability to evaluate it, or to monitor the residents' responses to it or to determine whether it was making any difference. Tr. 11/16/89, Vol. I at 60–61 (Spencer). Subsequently, the vibration therapy was canceled for all residents. In the future, if a resident is to receive vibration therapy, the therapy will be administered only after the resident has been reevaluated and will only be administered by an occupational therapist or certified occupational therapist assistant. Def.Exh. QQ; Tr. 12/13/89 at 156 (Hacker).

Third, defendants' expert recommended that the records more carefully reflect the reasons for selecting and instituting programs for certain residents, the manner by which residents had been evaluated and the purpose of the programs. This is now being done at FSH & TS. Tr. 12/13/89 at 156 (Hacker).

Finally, defendants' expert recommended that FSH & TS use interdisciplinary clinics, particularly in the areas of feeding and oral motor skills, and augmentative communication. These are existing needs that should be addressed. Tr. 12/13/89 at 157 (Hacker).

These recommendations have been accepted by FSH & TS. Tr. 12/13/89 at 247 (Hacker). Defendants' expert testified that the program that should develop as a result of her recommendations would be adequate. Tr. 12/13/89 at 158 (Hacker).

### c. *Assessments*

During the summer of 1989, the rehabilitation professionals at LLH & TS assessed the OT and PT needs of every resident with the Comprehensive Functional Assessment. Tr. 4/27/90 at 163 (LaCourt); Def.Exh. G; Tr. 12/14/89 at 13 (Attermeier). Prior to the summer of 1989, comprehensive functional assessments had not been performed. Tr. 12/13/89 at 248 (Hacker). The relevant portions of the CFA were subsequently revised in the fall of 1989 and have been in place since January 1990. Tr. 12/12/90 at 210–212 (Brownstein).

All residents will have been reevaluated with the new rehabilitation assessment instrument by June 30, 1990. Tr. 4/27/90 at 164–165 (LaCourt); Tr. 12/12/89 at 210–212 (Brownstein); Tr. 12/14/89 at 150–151 (Attermeier); Tr. 12/13/89 at 200 (Hacker); Def.Exh. NN. The assessments have been scheduled to allow the therapy staff to conform to the requirement that they spend fifty percent of their time either directly performing services or training staff to perform those services. Tr. 12/12/89 at 212–213 (Brownstein).

Defendants' PT expert, Dr. Attermeier, thought the original rehabilitation section of the CFA was "ridiculous and not helpful." Def.Exh. UU at 2; Tr. 12/14/89 at 25 (Attermeier). However, she felt that the CFA, as subsequently revised, was professionally adequate to monitor either the progress or deterioration in residents at LLH & TS and to evaluate generally the PT needs of LLH & TS residents. Tr. 12/14/89 at 26 (Attermeier); Def.Exh. NN.

### 4. Speech and Language Services ("SPL")

Communication services are an important component of active treatment. There are currently eight full-time equivalent speech and language therapists at LLH & TS. Tr. 12/12/89 at 223 (Brownstein).[28] The duties of the speech and language therapists are similar to those of the physical and occupational therapists. SPL therapists are required to spend at least fifty-percent of their time working directly with the residents or training staff to perform rehabilitation services. They are required to complete assessments, participate in the IDT process, complete IPP objectives, and train staff on any written training plans they formulate. Tr. 12/12/89 at 216 (Brownstein).

LLH & TS operates a dysphagia clinic and feeding programs that consult a dietician, SPL, direct care staff, physicians and dentist. Tr. 12/15/89 at 75-76 (Witemeyer); Tr. 12/12/89 at 216 (Brownstein). Plaintiffs' experts decided that the dysphagia clinic was professionally appropriate. Tr. 12/12/89 at 135-136 (Beckman); Tr. 12/13/89 at 149 (Hacker).

Prior to December 1989, there was one full-time speech and language pathologist on staff at FSH & TS. FSH & TS subsequently hired an additional part-time speech and language pathologist. Def.

Exh. QQ.[29] FSH & TS operates a feeding program for residents who have difficulty eating. Pl.Exh. 317 at 25-26.

While plaintiffs' expert was highly critical of past practices, neither plaintiffs nor intervenors presented evidence that the current speech and language services provided to the residents at either LLH & TS or FSH & TS are inadequate. Plaintiffs' expert visited LLH & TS in August 1989. She did not review the comprehensive functional assessments or current IPPs of any resident, with the exception of Andra Martinez. Tr. 12/12/89 at 180-183 (Beckman).

### 5. Adaptive Equipment

Adaptive equipment is an important area for occupational therapists, physical therapists and speech and language pathologists. Adaptive equipment can facilitate a developmentally disabled person's mobility, communication and self-care skills. Tr. 11/16/89, Vol. I at 106-107 (Spencer); Tr. 12/13/89 at 150 (Hacker). To utilize effectively adaptive equipment, a resident must be able to exercise some control over a body movement and to understand the effect of the movement. Tr. 11/2/89 at 158 (Donovan); Tr. 12/13/89 at 153-154 (Hacker).

Adaptive equipment such as electronic switches, communication aids, adaptive feeding equipment, including built up spoons and plates with raised edges, positioning equipment and equipment for mobility are available at LLH & TS. Tr. 11/2/89 at 158-159, 162-85 (Donovan); Tr. 11/16/89, Vol. II at 87 (Spencer); Tr. 4/19/90 at 223, 242-43 (Reid). Adaptive equipment is also available in the library to be checked out to residents. Different equipment can be sampled by residents before a determination is made as to what equipment is most useful and meets the

---

**28.** Plaintiffs' expert found that the speech and language pathologist at LLH & TS are competent. Tr. 12/12/89 at 145 (Beckman). Plaintiffs and intervenors presented no evidence that the number of speech and language pathologists at LLH & TS is insufficient to adequately meet the needs of the residents.

**29.** Plaintiffs' expert found that the speech and language pathologists at FSH & TS are competent. Tr. 12/12/89 at 145 (Beckman). Plaintiffs and intervenors presented no evidence that the number of speech and language pathologists at FSH & TS is insufficient to adequately meet the needs of the residents.

needs of the particular resident. Tr. 12/13/89 at 151 (Hacker).

Plaintiffs' experts found that little adaptive equipment is in use at LLH & TS. Residents of LLH & TS are not provided with adequate individualized adaptations, such as head pointers, electric correlators, and feeding devices. Tr. 10/18/89 at 169–170 (Brown); Tr. 11/16/89, Vol. I at 108–111 (Spencer). Adaptive equipment, such as switching devices, that is used for training in the classroom are not available in the living units, where they could be used to control radios, doorways, locks or wheelchairs. Tr. 11/16/89, Vol. I at 110–112 (Spencer). Defendants' expert also found that LLH & TS needed a wider use and availability of adaptive devices. Tr. 4/20/90 at 126 (Reid).

In 1989, the HCFA surveyors observed that a resident was to use a communication board, but the board was not with him during outdoor activities. The surveyors also noted that a resident's records indicated that the resident would benefit from a language board; however, there was no language board available in the resident's cottage. In another instance the surveyors noted that a resident's IDT recommended that he be assessed for a communication board. There was no indication in the records that the assessment had been conducted and there was no communication board in the resident's cottage setting. Def.Exh. F at 29, ¶ 5; Pl.Exh. 5 at 24, ¶ E, G.

In addition, no resident at LLH & TS has an electric wheelchair. Pl.Exh. 316 at 106–107. An occupational therapist at LLH & TS testified that in her three years at LLH & TS she has never evaluated a resident for whom she thought an electric wheelchair was appropriate. It was unclear from her testimony whether she had never performed such evaluations or whether her evaluations indicated that an electric wheelchair was inappropriate for any of the residents she considered. She also testified, in a somewhat flippant manner, that wheelchairs "do not hold up well at all in an institutional setting. They require almost constant maintenance and are out of service almost as much as they are in service." Pl.Exh. 316 at 106–107.

### K. *Education*

#### 1. School–Age Programs

Every school-age resident, i.e. a resident under the age of twenty-two, at LLH & TS and FSH & TS is evaluated by an Educational Appraisal and Review Committee ("EAR"). That committee determines, much like an IDT does, what the educational needs are of an individual resident and whether, based on those needs, the individual should attend public school in the community or a special education program at the facility. Pl.Exh. 310 at 76–77; Tr. 4/27/90 at 196 (LaCourt); Tr. 4/19/90 at 224–226 (Reid).

There are five or six residents at FSH & TS who are of school age. They all attend the Capitan Municipal Public Schools for a full school day. Tr. 11/3/89 at 89 (Aldaz); Pl.Exh. 327 at 184 (Aldaz). This lawsuit was among the catalysts that led to full-time public school education for the school-age residents of FSH & TS. Pl.Exh. 327 at 185 (Aldaz).

LLH & TS currently has approximately 67 school-age residents. Tr. 4/27/90 at 195 (LaCourt); Tr. 11/2/90 at 114 (Donovan). Of these 67 residents, eight attend public school in the City of Los Lunas. Tr. 4/27/90 at 195 (LaCourt). The remaining fifty-nine attend the special education program at the facility. Tr. 4/27/90 at 161 (LaCourt). When asked whether many of these individuals could receive services at least as effective in the public school system, the administrator of LLH & TS testified that "[f]or many of [these] individuals ... there are equivalent services in the public schools." Tr. 4/27/90 at 161 (LaCourt).

##### a. *Public Schools*

There is coordination of services between the institutions and the public schools. For example, LLH & TS trains public school teachers in the IPPs of the LLH & TS residents attending the public schools and invites representatives of the public schools to participate in the IDT process. Staff at

LLH & TS visit the public schools to monitor residents in their public school programs and public school teachers are invited to attend EAR committee meetings. Occasionally, psychologists and other professionals accompany residents to the public schools. Tr. 11/2/90 at 135–136 (Donovan); Tr. 10/30/89 at 48–49 (Nunn).

The administrator of FSH & TS attends all EAR committee meetings. FSH & TS also assigns a liaison to the Capitan public schools. The liaison attends EAR committee meetings and FSH & TS invites school representatives, including teachers and counselors, to attend the residents' IDT meetings. The Capitan schools receive copies of the residents' IPPs; and FSH & TS receives copies of the residents' Individual Education Plans which are drafted by the school. Tr. 11/3/89 at 89–90 (Aldaz); Pl. Exh. 310 at 75–76, 78–81.

### b. *Special Education Program at LLH & TS*

LLH & TS has a special education program which is accredited by the New Mexico Department of Education. Accreditation requires that the special education unit of the Department of Education review LLH & TS' special education program to ensure compliance with both federal laws and state regulations governing appropriate education. Tr. 11/2/89 at 115 (Donovan).

FSH & TS has not had a special education program since 1986. During the summer months, when the Capitan public schools are not in session, school-age residents of FSH & TS receive habilitation services at the facility in accordance with their IPPs. Currently, at FSH & TS there are two teachers certified in special education and two teachers who are one course short of being certified in special education. Pl.Exh. 310 at 70–74.

### 2. Adult Services Programs

LLH & TS and FSH & TS both provide adult services programming. LLH & TS offers both a full-day of programs in the adult services area ("full-day program") and a program which is conducted half-time in the adult services area and half-time in living units or other areas throughout the facility ("half-day program"). The decision of whether to place a resident in the full-day program or half-day program is made by the adult service program staff and members of the IDT. Often a formal recommendation will be made by the team. The adult services program at LLH & TS currently serves approximately 280 adults. Approximately 104 residents are in the full-day program. Tr. 11/2/89 at 41–43, 47–48, 214 (Donovan).

The Work Activity Center ("WAC") is part of the LLH & TS adult services program. It is certified by the Department of Labor on an annual basis. To receive certification, LLH & TS is required to demonstrate that it follows all federal rules and regulations regarding employment for persons with handicaps, complies with the Fair Labor Standards Act, and pays residents a fair and commensurate wage rate. Tr. 11/2/89 at 49–50 (Donovan). The WAC offers a variety of employment activities including refinishing furniture, janitorial work, constructing pizza boxes for Pizza Hut, paper and can recycling, paper shredding, arts and crafts work, and assembling mud mats. Tr. 11/2/89 at 50–51, 54 (Donovan). Approximately 55 to 60 residents in the adult services program at LLH & TS participate in the WAC. *Id.* at 49.

At the time of trial, LLH & TS had a newly designated position for a full-time employee whose primary job is the development of employment opportunities both within the facility and in the community. In the past, the staff person responsible for obtaining off-campus employment for residents of LLH & TS devoted little time to this activity because she had many other job responsibilities. Tr. 11/2/89 at 245–246 (Donovan).

Prior to authorizing the new position, LLH & TS had never made a systematic attempt to develop employment opportunities for the residents. Tr. 4/27/90 at 194–195 (LaCourt). Of the approximately 280 residents in the Adult Services Program, only four worked within the campus community, in the barber shop, canteen, laundry, the dining areas, or in classrooms as developmental disabilities technicians. Tr. 11/2/89 at 51, 229 (Donovan); Pl.Exh. 311

at 39. Since April 1988, LLH & TS has only placed seven residents into work positions in the community. These job placements include Pizza Hut, a hardware store and a thrift shop. Tr. 11/2/89 at 64 (Donovan).

FSH & TS provides every resident with a day program in at least one of the following areas: activities of daily living, attention span, fine motor skills, and discrimination skills in Curry School and Lea School; independent living skills and socialization skills in the Transitional Program; greenhouse, gardening, and working with animals in the Farm Program; academic skills and computers in Otero School; attention span, pre-vocational skills, vocational skills, socialization skills and fine motor skills in ceramics and wood shop; and gross motor skills, endurance, and flexibility in physical education. Pl.Exh. 310 at 82–88.

No residents of FSH & TS have paying jobs at the facility. Four residents of FSH & TS have on-the-job training programs. Two individuals are working in the canteen, one works in the dietary program and one works in maintenance. Pl.Exh. 310 at 91. No residents of FSH & TS have jobs in the community. Pl.Exh. 320 at 89.

Lincoln House at FSH & TS is a transitional program for a small group of higher functioning men who live together in a house on the campus. It offers opportunities to develop independent living skills. The residents prepare meals and do household chores. FSH & TS has no plan for an equivalent transitional living program for females. Pl.Exh. 310 at 97–98. FSH & TS does offer a transitional day program with similar opportunities for developing independent living skills. *Id.* at 88.

### 3. Adequacy of the Facilities' Programs [30]

#### a. *Functional and Chronologically Age Appropriate Programs*

The experts agreed that the education and training programs at LLH & TS and FSH & TS have adequate staff ratios. Tr. 10/18/89 at 181–182 (Brown); Tr. 4/19/90 at 227 (Reid). Plaintiffs' and defendants' experts also agreed that it is especially difficult for developmentally disabled persons to learn how to do things from simulated activities. The more disabled an individual is, the more problems the individual has generalizing or transferring skills. Developmentally disabled persons learn best within the context of the actual activities themselves and not in a simulated way. They require concrete and tangible situations. Tr. 10/31/89 at 182 (Haywood); Tr. 10/18/89 at 106–108, 160–65 (Brown). Defendants' expert, Dr. Haywood, therefore recommended that more training take place in the settings in which the behavior being developed is normally appropriate. Aggregating residents in school rooms and adult activity rooms can provide one kind of training; however, this does not satisfy the need for training in relevant settings. Tr. 10/31/89 at 182 (Haywood).

Plaintiffs' expert, Dr. Brown, found that the education and training programs at FSH & TS do not adequately teach functional skills. Tr. 10/18/89 at 167–168 (Brown). Defendants' expert, Dennis Reid, agreed that the instructional strategies at FSH & TS needed to have a more functional approach. Tr. 4/20/90 at 127 (Reid). The curriculum of the education program at FSH & TS includes learning to open and close artificial zippers on a board; placing nuts on bolts and taking them off; working on form boards by inserting and removing figured shapes; sorting objects by shape, color, and size; lacing shoe laces on a board and buttoning buttons on a board. Tr. 10/18/89 at 104–105 (Brown); Pl.Exh. 320 at 23, 31 (Kearns). Residents also stack plastic bowls, sort them by color, put loops on pegs, sort toy silverware, and fold washcloths that are then immediately un-

---

**30.** Defendants' expert testified that the education programs at FSH & TS and LLH & TS overall "compared favorably" to other programs across the country, although improvements were warranted in certain specific areas. Tr. 4/19/90 at 219 (Reid). The institutions selected for comparison included some that were not ICF/MR certified and some that were the subjects of suits for civil rights violations, such as Fairview Hospital. Tr. 4/26/90 at 108–109 (Reid).

folded by the instructor. Tr. 11/16/89, Vol. I at 122–123 (Spencer).

An observer described a resident's program at FSH & TS as follows:

> On both days of the observation she was stringing beads in the cottage both in the early morning when I came to see her and in the evening before dinner and then after dinner. That was the majority of the habilitation that I saw. I didn't see the implementation of the behavior plan because, I guess, because they didn't have the jumpsuit as the staff person indicated so even though she has a plan and the staff are aware of what to do, I did not observe that piece of habilitation.
>
> I didn't observe anything to do with trimming her nails or washing her hands or any of those things, I, or shaving her legs, although I was there during the time that she was getting ready for bed and when she woke up in the morning, but I just saw her stringing beads, and I saw her do that independently for literally hours on end without any staff intervention that I saw by staff and it's documented in the record is once she completed a necklace, the staff person came over, undid it, emptied all the beads out and told her to start again.

Ogle Depos. at 63–64.

In 1989, defendants began the process of revising the curriculum in one of the schools at FSH & TS to incorporate more functional programming. Pl.Exh. 310 at 61–62, 85 (Kearns).

Similarly, Dr. Brown found that the education and training programs at LLH & TS do not adequately teach functional skills and are not chronologically age appropriate. Tr. 10/18/89 at 167–168 (Brown). Defendants' expert, Dennis Reid believed that LLH & TS needed improvement in the use of functional teaching activities. Tr. 4/20/90 at 125 (Reid). The curriculum of the education program at LLH & TS utilizes preschool materials such as pegboards, blocks, colored puzzles and simulated materials such as flashcards or audio tapes of a telephone ringing, doors opening and closing, and people playing the drums.

Even in the cottages, residents use simulated training materials, such as silverware. Tr. 4/13/90 at 201–201 (Baca). Residents also use nuts and bolts and pegboards. Tr. 10/18/89 at 142–143, 145–147 (Brown); Tr. 4/13/90 at 191–194 (Baca). In 1989, the HCFA surveyors noted that one adult services program required residents with many behavioral problems to watch a movie for 90 minutes. Def.Exh. F at 31, ¶ 9.

When asked by the court to identify nonfunctional materials, the Adult Service Program Specialist at LLH & TS testified that one of the most nonfunctional training materials is a pegboard. She also identified simulated telephones, sorting boxes, form boards, zipper boards, and blocks as nonfunctional materials. Tr. 11/2/89 at 18, 107–108 (Donovan). In 1989, LLH & TS began working on substituting materials used in the education programs. Tr. 11/2/89 at 104 (Donovan). Nonfunctional equipment is no longer being ordered although this type of equipment had been ordered in the past. Tr. 11/2/89 at 106 (Donovan).

b. *Coordination between Cottage and Education Programs*

Defendants testified that cottage staff are made aware of the content of the adult services programs. Cottage staff assist teachers and technicians in carrying out the programs. Tr. 11/2/89 at 94 (Donovan). The professional staff person responsible for drafting a training program trains direct care providers on the program plan. In addition, there is ongoing in-service training for people in the residential living units. Tr. 11/2/89 at 95 (Donovan); Tr. 10/30/89 at 77 (Nunn).

Plaintiffs' expert determined that there is little communication and coordination between the educational programs and the cottages at both LLH & TS and FSH & TS. Tr. 10/18/89 at 114, 121–122, 141, 176 (Brown). For example, some of the residents were learning as part of their educational programs to set a table, but during meals in the cottages the staff provided the residents with utensils instead of allowing the residents to do this. Residents of the institutions who received training in activi-

ties of daily living such as tooth brushing, cannot practice those skills in the cottages because materials such as toothbrushes and toothpaste are not consistently available to the residents in their cottages. Tr. 10/18/89 at 110–112 (Brown); Pl.Exh. 14 at 3 ¶ A; Pl.Exh. 5 at 9 ¶ B. Residents who are taught to cook in the day program, are not encouraged to cook in their cottage settings. Pl.Exh. 5 at 32 ¶ A.

### c. *Space*

Defendants' expert expressed concerns about the limited space for the education programs at FSH & TS and LLH & TS. Tr. 4/20/90 at 127–129 (Reid); Pl.Exh. 368. Plaintiffs' expert, Dottie Rowe, also testified that the physical space available for adult education and training activities at FSH & TS was overcrowded and inadequate for habilitation or active treatment. Tr. 10/17/89 at 12 (Rowe).

### L. *Choice, Privacy, Access to Personal Property*

#### 1. Choice

Defendants' experts testified that residents of LLH & TS and FSH & TS who are able to exercise choices, are permitted to choose their own clothing, their own bedtime provided their health is not jeopardized, leisure-time activities, food at the canteen provided it is consistent with their dietary requirements, roommates, and programmatic activities. Tr. 4/26/90 at 183–185 (Nunn); Tr. 4/24/90 at 100–101 (Miller); Tr. 11/2/89 at 54 (Donovan). In addition, the parent of a resident of Lincoln House, the transitional living house at FSH & TS, testified that her son's preferences are taken into consideration and that he has both freedom to choose and privacy. Tr. 4/17/90 at 141–142 (Hammond). Nonetheless, the HCFA surveyors found that the residents of Lincoln House did not have free access to money or the freedom to go shopping for items they wanted. Pl.Exh. 14 at 3. The surveyors also concluded that residents of LLH & TS are not encouraged to choose activities in the living units, to choose foods or to visit with residents in other cottages. Pl.Exh. 5 at 33.

#### 2. Privacy

The staff at LLH & TS and FSH & TS have failed to safeguard the privacy of the residents. In February 1989, the HCFA surveyors observed LLH & TS residents while their clothes were being changed. Although screens had been placed around the residents, the residents were in full view through openings under the screens. The screens did not effectively provide privacy. Throughout the survey, the surveyors also observed that staff did not knock on doors before entering a resident's room and staff were not teaching residents to respect the rights of other residents. Pl. Exh. 5 at 6. In May 1989, the surveyors observed staff toileting residents with the door propped open with a trash can. In another instance, residents were being bathed and privacy curtains were not being used although they were available. Pl. Exh. 5 at 7. At FSH & TS, the surveyors observed residents using the toilet facility when the door was left open and the residents could be seen. Pl.Exh. 14 at 1–2.

#### 3. Access to Personal Property

The HCFA surveyors observed that the residents of FSH & TS did not have access to their personal hygiene items in the living units. Pl.Exh. 14 at 3 ¶ A. The facility's plan of correction provides that a resident's ability to maintain personal hygiene items such as toothbrushes, toothpaste, combs, razors and shampoo will be addressed in the resident's IPP. *Id.*

#### 4. Respect

The HCFA surveyors have observed that the staff at LLH & TS fail to treat residents with dignity and respect. Rather, the interaction pattern between the staff and the residents is that of adults to children. Staff refer to residents as "child" or "baby." In one cottage, blue and pink paper teddy bears were used to mark adult clients' rooms. Pl.Exh. 5 at 33–34.

#### 5. Access to the Community

Residents of FSH & TS often leave the facility to go on picnics, shopping trips, and

various field trips and to visit family and friends. Tr. 4/17/90 at 140 (Hammond); Pl.Exh. 310 at 99. FSH & TS also offers residents opportunities to participate in community activities such as the Special Olympics, the ski program, the farm program's community clean-up efforts, the Bureau of Land Management's contract to maintain picnic sites, the county fair, the state fair, football games, and picnics and campouts at local state parks. Pl.Exh. 327 at 46–47, 49–51.

Residents of LLH & TS go on planned community trips at least twice a month as part of the adult services department program. These trips are usually half-day outings and include such activities as going to restaurants, movies, grocery stores, and clothing stores. Tr. 11/2/89 at 58 (Donovan). Teachers are encouraged, as part of the program, to take one or two residents into the community. A community trip might entail going to church with staff members and their families, going out to dinner or on a shopping trip, going to a museum, or going hiking. Tr. 11/2/89 at 59 (Donovan).

### M. *Placements*

The Community Services Team ("CST") is employed by HED. CST accepts applications from persons interested in services for developmentally disabled persons. CST consists of a social worker, a psychologist and a registered nurse. The team begins the review process by collecting any prior documentation pertaining to the resident, for example, medical and social work records. A member of the team then visits the resident to conduct a formal interview. On the basis of its evaluation, CST recommends that the resident pursue placement in one of a number of settings, including LLH & TS, FSH & TS and various community programs across the state. In some instances, CST may decide not to recommend a person for services. Tr. 4/23/90 at 64–66 (Brown); Tr. 4/4/90 at 286–88 (Beauregard).

### 1. LLH & TS

If CST concludes that LLH & TS may be an appropriate placement, it refers the case to the Screening Committee on Admissions and Releases ("SCAR"). SCAR consists of the medical director, the director of nursing, a psychologist and a social worker, and is chaired by the deputy administrator of the facility. Tr. 4/23/90 at 66–67 (Brown). The committee determines whether the person meets the definition of developmental disabilities in the New Mexico Developmental Disabilities Code and whether the facility is able to provide an appropriate program for that person. Tr. 4/23/90 at 68 (Brown). SCAR frequently declines to admit persons referred for admission to LLH & TS. Tr. 4/23/90 at 67–68 (Brown). Approximately three quarters of those who initially seek admission to LLH & TS are referred to another setting. Tr. 4/27/90 at 22 (LaCourt).

### 2. FSH & TS

The Clinic Committee is responsible for determining the appropriateness of the placement for referrals to FSH & TS. Tr. 4/24/90 at 96 (Miller). The committee consists of division and department heads in the clinical services area, including the director of education, the director of residential services, the medical director, the nursing director, the chief psychologist and a social worker. Tr. 4/24/90 at 92–93 (Miller); Pl.Exh. 315 at 80; Tr. 4/4/90 at 258, 260 (Beechie). The committee gathers information on the individual, including the individual's current educational program, medical status and social history, to determine whether the individual would be appropriate for placement at FSH & TS. In addition, a social worker, a psychologist and a nurse from FSH & TS or the CST conduct an on-site interview of the individual. The committee takes into account the individual's needs, the reason for the referral and whether the facility has the appropriate services to meet the individual's needs. Tr. 4/23/90 at 94–96 (Miller); Tr. 4/4/90 at 259 (Beechie).

If the committee concludes that admission to FSH & TS would not be appropriate, it refers the individual to the CST or provides counseling about other services in

the community that might be appropriate for the individual. Tr. 4/24/90 at 96–97 (Miller). In the last four years, 107 individuals who sought admission to FSH & TS were not admitted. Tr. 4/24/90 at 95–96 (Miller).

### 3. Commitment Process

All admissions to both LLH & TS and FSH & TS are processed in accordance with the New Mexico Mental Health/Developmental Disabilities Code Def.Exh. F at 35; Pl.Exh. 327 at 124. The code requires a judicial determination that placement would be in the resident's best interest. N.M.S.A. § 43–1–13(E). A few residents at FSH & TS are admitted through the criminal justice system. Pl.Exh. 327 at 60–61, 63–65.

### N. *Implementation of Recommendations for Community Placement*

#### 1. IDT Recommendations

The IDT makes the decision whether to seek a discharge for a resident of LLH & TS or FSH & TS. The IDT evaluates the appropriateness of discharging a resident to an alternative placement at least once a year. Tr. 4/24/90 at 97 (Miller); *See also* Pl.Exh. 16 at 16, Pl.Exh. 18 at 16, Pl.Exh. 19 at 18. In considering the appropriateness of a discharge, the IDT takes into account a number of factors, including the degree to which the client has progressed, adaptive and maladaptive behaviors and any medical conditions that may present a problem. Tr. 4/24/90 at 97–98 (Miller). The IDT has recommended many of the residents of LLH & TS and FSH & TS for appropriate placement and treatment in residential settings, including group homes. These recommendations, made in the exercise of professional judgment by state-employed professionals, including doctors, social workers, psychologists, and occupational therapists are incorporated into the treatment plans. The placement recommendations, however, have not in many instances been implemented and many named plaintiffs and class members who have been recommended for community placement remain at the institutions.[31]

The IDT for plaintiff Steven Nunez recommended that he be placed in the community. In August 1988, the IDT stated that "[i]f a community placement facility becomes available, Steven has been recommended for placement." Pl.Exh. 19, IPP 9/20/88 at 17. Again in August 1989, his IDT stated that "Steven has been referred to the ARCA,[32] and the IDT agreed to continue that referral. The guardian is also looking into other placement possibilities, both in- and out-of-state." Pl.Exh. 19, IPP 8/22/89 at 18 (footnote not in original). Mr. Nunez remains at LLH & TS, despite this recommendation by his treating professionals. Def.Exh. FK–1.

Plaintiff Andra Martinez has also been recommended for community placement. In 1988, her IDT referred her to two community programs for waiting list placement. Pl.Exh. 27, IPP 7/21/88 at 6. In 1989, the IDT continued the recommendation for community placement. Pl.Exh. 27, IPP 6/13/89 at 8. Ms. Martinez was discharged from LLH & TS on August 27, 1990 after a trial placement at El Mirador, a community program.

Plaintiff Mary Katherine Nowak has also been recommended for community placement. In August 1988 her IDT noted that there were no vacancies at community facilities that it believed were appropriate for her. The IDT, however, developed a transition program that would enable Ms. Nowak to overcome her apprehension of community placement. Recognizing that the deinstitutionalization process would be lengthy, the IDT decided not to refer Ms. Nowak for placements. Pl.Exh. 20, IPP 8/2/88 at

---

**31.** Plaintiffs did not provide specific evidence as to when the first recommendation for community placement was made for each resident by the resident's IDT, but it would appear from reviewing the evidence that in most instances the recommendations for community placement were made much earlier than one year ago.

**32.** The Association for Retarded Citizens of Albuquerque ("ARCA") is a community service provider.

18. In 1989, her IDT determined that Ms. Nowak is "capable of doing very well in a group home." Pl.Exh. 20, IPP 7/24/89 at 13. She continues to reside at LLH & TS.

Plaintiff Joe Gonzales has been referred for community placement to three residential community programs. His IPP indicates that he presently is on a waiting list for two of the three community programs. A determination is pending on the third community program. Pl.Exh. 24 at 3d. Mr. Gonzales remains at FSH & TS, despite the recommendation by his IDT that Mr. Gonzales be placed in the community and despite the IDT referrals to community programs. Def.Exh. EQ–1.

Defendants maintain no records of persons at LLH & TS and FSH & TS who have been recommended for community placement by their IDT. Pl.Exh. 324 at 40. At trial, defendants identified at least sixty-four residents of LLH & TS and twenty-four residents of FSH & TS whose IDTs have recommended community placement, but who continue to reside at the institutions. Def.Exh. FK–1; Def.Exh. EQ–1.

The administrator of LLH & TS testified that the fact that a resident has been referred for community placement does not indicate that the resident is receiving inappropriate services at the institution. Tr. 4/27/90 at 25 (LaCourt). The administrator interpreted the IDT recommendation to mean that a different kind of service provider might be able to provide longer lasting benefits for the resident. Tr. 4/27/90 at 25 (LaCourt).

The administrator further testified that placement decisions need to be made on an individualized basis, weighing the individual's strengths and needs, and determining what a particular placement would have to offer to accommodate those strengths and needs. Placement determinations cannot be made on a generalized basis. Tr. 4/27/90 at 106 (LaCourt). Nor can the determination be that of any individual person, but rather must be a team decision based on the IDT referral process, which reviews the appropriateness of each of the persons referred for placement against the available resources in that setting. Tr. 4/27/90 at 107 (LaCourt). Nonetheless, the administrator rendered a general opinion that those residents who were recommended for community placement were receiving appropriate care and services at LLH & TS. Tr. 4/27/90 at 25 (LaCourt).

Defendants did not offer similar testimony for those residents of FSH & TS whose IDTs have recommended community placement.

### 2. Recommendations Based on Availability

ICF/MR standards require that assessments identify the residents' needs for services without regard to the actual availability of the services needed. Pl.Exh. 315, Tag # 215. The IDTs do not recommend many of the residents of the institutions for community placement because of the unavailability of proper community services for those residents. Plaintiff Walter Stephen Jackson's IDT has advised his family that because no suitable alternative exists, it has recommended that he remain at LLH & TS. Tr. 4/2/90 at 78–79 (Jackson).

In August 1988, plaintiff Mildred Tsosie's IDT determined that there were no community programs available to meet her needs at the time. The professional team stated that Ms. Tsosie needed a program which:

> provides ICF/MR residential treatment with a day care program. This program must provide medical, self-care and developmentally oriented treatment. At this time no such program exists outside [LLH & TS]. If and when such a program does exist, [Ms. Tsosie] will be considered for referral to them. It appears that Chavez West at [LLH & TS] is the most appropriate placement for [Ms. Tsosie] at this time.

Consequently, the IDT concluded that it could make no community referrals. Pl. Exh. 21, IPP 8/17/88 at 6. In 1989, the IDT for Mildred Tsosie recommended that her social worker "explore other placement possibilities for [Ms. Tsosie] which meet her overall developmental and medical needs." Pl.Exh. 21 IPP 7/26/89 at 10.

**1294**

Similarly, plaintiff Clinton Heath's IDT has determined that Mr. Heath "requires an ICF/MR facility that can meet his medical, self-care and active treatment needs and one that also accepts clients who are in wheelchairs and are profoundly retarded." However, the IDT has also determined that there currently are "no facilities available in New Mexico to meet his. needs. If and when one should become available, [Mr. Heath] would be considered for referral." Pl.Exh. 16, IPP 1/5/89 at 16.

The IDT has made a virtually identical determination for plaintiff Shawn Heath, Clinton Heath's brother. The interdisciplinary team has determined that Shawn Heath "requires an ICF/MR facility that can meet his medical, self-care and active treatment needs and one that also accepts clients who are in wheelchair and are profoundly retarded. At present, there is no facility available in New Mexico. If and when one should become available, [Mr. Heath] would be available for referral." Pl.Exh. 17, IPP 1/5/89 at 7, 17.

Plaintiff Lillian Willmon is seventy-one years old and has lived at LLH & TS for the last fifty years. Pl.Exh. 22, IPP 1/25/89 at 7–8. The IDT believes that because of Ms. Willmon's "age, health status and length of stay" at LLH & TS, "she is not a viable candidate for community placement." Pl.Exh. 22, IPP 1/25/89 at 15. Her IDT has reviewed her current placement at LLH & TS and determined that it is "the most appropriate *available at this time*." Pl.Exh. 22, IPP 7/12/89 at 17. (Emphasis Added). *See also* Def.Exh. AW, IPP 7/25/89 at 9.

### 3. State Court Orders for Community Placement

Residents of the institutions frequently are referred for community placement irrespective of the IDT recommendation and, in some instances, notwithstanding an IDT determination that community placement is not recommended. Tr. 4/25/90 at 94–96 (Miller); Pl.Exh. 366; Pl.Exh. 385. A resident may be referred for community placement at the request of a resident's guardian. Tr. 4/25/90 at 94 (Miller); Tr. 4/27/90

at 26 (LaCourt). More often, however, referrals are made pursuant to state court orders. Tr. 4/25/90 at 94; Tr. 4/27/90 at 26–27 (LaCourt). In this instance, the commitment lawyers negotiate an agreement with the Health and Environment Department to refer the resident for community placement. The court order is entered and the referral is made. However, residents who are the subjects of court orders remain in the institutions. Tr. 4/25/90 at 94, 96 (Miller).

Plaintiff Betty Young has been referred to community residential programs in accordance with a state court order. Pl.Exh. 28, IPP 6/1/89 at 6. Her IDT, however, has determined that FSH & TS best meets the conditions for treatment and habilitation. *Id.* "The criteria for discharge to a less restrictive setting for treatment or habilitation is that she meet her goals for controlling inappropriate behavior, refining ADL skills, improving attention span, socialization skills, gross motor skills, communication skills, pre-academic skills, improve ILS and RLS, the guardian approve of the placement, and the program meets the needs as listed above." Pl.Exh. 28, IPP 6/1/89 at 6.

Similarly, plaintiff Alfred Shirley has been referred to two community residential programs in accordance with the terms of a state court order. Pl.Exh. 26, IPP 11/17/88 at 7. His IDT has also determined that FSH & TS can best meet the conditions for treatment and habilitation. *Id.* "The criteria for [Mr. Shirley's] release to a less restrictive setting for treatment or habilitation is that [Mr. Shirley] meet his goals for reducing aggressive behavior, developing attention span, activities of daily living, discrimination skills, improving socialization, developing residential living skills, the guardian approve of the placement, and the program meet the needs as listed above." Pl.Exh. 26, IPP 11/17/88 at 7.

### 4. Lack of Available Alternatives to Institutionalization

Continued institutionalization of plaintiffs is the product of many factors. Place-

ment in the institutions often results because the state has not made appropriate alternatives available. There are few community based programs to accommodate individuals with behavior problems or with complex needs. Jimerson Depos. 9/29/89 at 19; Tr. 10/16/89 at 150, 156, 245 (Rowe); Tr. 10/17/89 at 37–38 (Rowe); Pl.Exh. 324 at 34–35. When consideration is given to the possibility of discharging a resident to a community setting, the availability of appropriate alternatives then existing in the community is taken into account. Tr. 4/10/90 at 114–115 (Sandler). An IDT will not discharge residents of the institutions unless there are programs available which can adequately meet residents' needs. Tr. 10/16/89 at 245 (Rowe).

Defendants lack control over existing community providers with whom they contract to serve the developmentally disabled. Community providers determine whether to accept or reject an individual. There is no systematic community placement process in which defendants can participate to influence the decision to accept or reject an applicant for community placement. Pl. Exh. 324 at 25, 27, 29–30 (Boyd); Jimerson Depos. 9/29/89 at 22–23. In such a system, there is no incentive for a community provider to want to serve persons with more challenging and complex needs. In fact, community programs are reluctant to accept certain individuals with challenging behavior. Tr. 4/25/90 at 103–104 (Miller). Community providers do not want to accept challenging cases without adequate reimbursement. Pl.Exh. 324 at 27 (Boyd); Jimerson Depos. 9/29/89 at 27. Instead, community providers tend to serve persons who have the least challenging needs with the implicit understanding that the state-operated institutions serve as a reserve, and will readmit those individuals who manifest behavioral problems while in community placement. Tr. 4/11/90 at 262–264 (Bergman). Of ninety-five residents discharged from FSH & TS since July 1, 1983, twenty-nine percent have been returned to the facility because of behavioral problems in community settings. Pl.Exh. 335 at 11.

Other contributing factors include the absence of an infrastructure to deliver the services recommended by professional judgment and the lack of funding. In New Mexico, there is no single point of entry coordinated by the state to enable developmentally disabled individuals easily to access the service system; no independent case management to coordinate and monitor the services delivered; no training or technical assistance by the state to private service providers; and no mechanism for holding service providers accountable for delivering quality services with measurable outcomes that can be tracked through a management information service. Tr. 4/11/90 at 261–264 (Bergman); Tr. 4/2/90 at 99 (Foley); Tr. 4/9/90 at 129–130, 134 (Dossey); Pl.Exh. 324 at 26 (Boyd); *see also* Pl.Exh. 324 at 18 (Boyd).

These are essential components of an effective community service delivery system. Tr. 4/11/90 at 217–220 (Bergman); Tr. 4/4/9 at 214–216, 227 (Sandler); Tr. 4/12/90 at 141–142 (Conroy); Tr. 4/13/90 at 63–65 (Conroy). Defendant Boyd testified that a centralized placement system for developmentally disabled individuals in the state was to be in place by July 1, 1990. Pl.Exh. 324 at 29–31, 126.

There was also testimony that New Mexico has not made maximum use of available medicaid funds to expand community alternatives for the residents of LLH & TS and FSH & TS. Jimerson Depos. 9/29/89 at 24–26. The Human Services Department of New Mexico is responsible for the administration and oversight of the Medicaid Waiver Program which allows medicaid funds to be used to support a variety of community-based alternatives for developmentally disabled individuals in institutions. Tr. 4/9/90 at 154–155 (Dossey).

In 1987, defendants submitted a waiver application requesting financing for 170 beds, increasing to 290 beds over a three year period. Approximately twelve percent of those beds were to be used for individuals transferred from FSH & TS and LLH & TS. Tr. 4/10/90 at 33–34 (Sandler); Pl. Exh. 235 at 6–7. The other eighty-eight percent of the beds were to be used for individuals coming directly from their communities instead of from the institutions.

Pl.Exh. 235 at 7. The per capita cost of the services for which defendants requested financing was approximately $11,000.00, compared to a per capita cost of approximately $30,000.00 to provide the services in the institutions. The reason for the low per capita non-institutional cost was that 120 of the individuals to be served under the waiver would receive only respite care, a low cost service, instead of residential and day care programs which are more expensive. Under the Medicaid Waiver Program, medicaid funds match 71 cents for every 29 cents of state monies.[33] By funding low cost services under New Mexico's Waiver Program, federal participation was minimized. Tr. 4/10/90 at 35–36 (Sandler).[34]

The Health Care Financing Administration approved New Mexico's waiver application in 1988. However, only 174 beds were approved over a three year period. One reason for approval of a lower caseload than New Mexico requested was that New Mexico had not filled all beds allowed under the Waiver Program. Another reason was that New Mexico has not only failed to reduce the number of institutional beds it operates, but has actually increased the number of its institutional beds. Jimerson Depos. 9/29/89 at 26; Tr. 4/10/90 at 37–39 (Sandler); Tr. 4/9/90 at 155–158 (Dossey). Defendant Boyd testified, however, that he expected to fill all beds available under the Waiver Program. Pl.Exh. 324 at 37 (Boyd).

The absence of a unified organizational structure for all developmental disabilities services impedes the effective delivery of services. There is a lack of coordination between agencies, particularly the Health and Environment Department and the Human Services Department, that share responsibility for serving persons with developmental disabilities. Pl.Exh. 324 at 17,

88, 92–94 (Boyd). The HED monitors community-based programs funded by state dollars. For example, HED, provides group homes, companion homes, supported living environments, supported employment and sheltered work shops. Def.Exh. CCC at 4. However, the medicaid waiver program is the responsibility of the Human Services Department. In addition, the Developmental Disabilities Division of the HED has no director and there are no current plans to appoint one. Tr. 4/9/90 at 101, 103–114 (Dossey); *See also* Tr. 4/10/90 at 5–7 (Sandler).

Moreover, defendants maintain two separate data collection systems to determine the service needs of New Mexicans with developmental disabilities and to conduct systematic planning. The Client Option Oriented Profile ("Co-op") assesses the needs of persons living both outside the institutions and persons living in hospitals and institutions. According to the Co-op data, 133 persons in New Mexico were on the waiting list for group home placement one year ago and approximately 490 were being served in group homes. However, residents of LLH & TS and FSH & TS who have been referred for community placement are not included in the data. Tr. 10/16/89 at 151–152 (Rowe); *See also* Tr. 10/16/89 at 153–154 (Rowe). In fact, FSH & TS and LLH & TS do not maintain a list of those residents referred for community placement by an IDT or otherwise. *See* Def.Exh. EQ, EQ–1, FK, FK–1; Pl.Exh. 364, 365, 366.

## VI. Conclusions of Law

### A. *Statutory Claims*

#### 1. Rehabilitation Act

■ Section 504 of the Rehabilitation Act prohibits discrimination against the handicapped by federal grant recipients.

---

**33.** This ratio applies to New Mexico. The ratio of medicaid funds to state funds varies among the states. New Mexico has one of the most favorable ratios. By comparison, the neighbor state of Colorado uses the medicaid waiver program to the maximum extent permitted even though it must fund 50 cents of every dollar spent under its waiver program. Tr. 4/9/90 at 194–195 (Sandler); Tr. 4/10/90 at 15 (Sandler).

**34.** There was also testimony that there are at least ten million dollars of state funds for programs for persons with developmental disabilities which could serve as a potential match for the Waiver Program. 4/10/89 at 13 (Dossey).

To establish a Section 504 cause of action a plaintiff must show that (1) the plaintiff is a handicapped individual; (2) the plaintiff is "otherwise qualified" to receive the benefit or participate in the activity at issue; (3) the plaintiff was excluded from the benefit or program solely because of the plaintiff's handicap, and (4) the program receives federal funding. *Plummer v. Branstad,* 731 F.2d 574, 577 (8th Cir.1984) (citing *Doe v. New York University,* 666 F.2d 761, 774–775 (2d Cir.1981)). Section 504 provides in pertinent part:

> No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794.

The purpose of the act was "to develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living, for individuals with handicaps in order to maximize their employability, independence, and integration into the work place and the community." 29 U.S.C. § 701; *Consolidated Rail Corporation v. Darrone,* 465 U.S. 624, 626, 104 S.Ct. 1248, 1250, 79 L.Ed.2d 568 (1984).

■ However, Section 504 does not impose an affirmative obligation on states to furnish services. *Clark v. Cohen,* 794 F.2d 79, 84 n. 3 (3rd Cir.1986), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). For example, "educational institutions [are not required] to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate." *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). An "otherwise qualified" person is one who is able to meet all of a program's requirements in spite of the person's handicap. *Id.* at 406, 99 S.Ct. at 2367. The legislation encourages state agencies to adopt and implement policies for the hiring, placement and advancement of handicapped individuals, but does not compel them to establish affirmative action programs. *Id.* at 410, 99 S.Ct. at 2369; *Knutzen v. Eben Ezer Lutheran Housing Center,* 815 F.2d 1343, 1354 (10th Cir.1987) (§ 504 does not require a program sponsor to modify the essential purpose of its program or undergo undue financial burdens to accommodate all handicapped persons).

■ Section 504 does not afford a mentally retarded individual an affirmative right to placement in a residential, non-institutional facility. *Sabo v. O'Bannon,* 586 F.Supp. 1132, 1137 (E.D.Pa.1984). The regulations promulgated under Section 504 contemplate that institutions may continue to house handicapped persons. *See* 45 C.F.R. § 85.54.[35] Accordingly, courts have held that Section 504 does not prohibit all institutionalization. *Kentucky, Ass'n for Retarded Citizens, Inc. v. Conn.,* 674 F.2d 582, 585 (6th Cir.1982), *cert. denied,* 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1982) ("The least restrictive alternative for some severely and profoundly retarded persons may be institutionalization"). *See also Garrity v. Gallen,* 522 F.Supp. 171, 213 (D.N.H.1981).

■ In addition, medical treatment decisions are generally immune from scrutiny under Section 504. *Bowen v. American Hospital Association,* 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) ("The legislative history of the Rehabilitation Act does not support the notion that Congress intended intervention by federal officials into treatment decisions traditionally left

**35.** § 84.54 **Education of institutionalized persons.**
A recipient to which this subpart applies and that operates or supervises a program or activity for **persons who are institutionalized because of handicap** shall ensure that each qualified handicapped person, as defined in § 84.3(k)(2), in its program or activity is provided an appropriate education, as defined in § 84.33(b). Nothing in this section shall be interpreted as altering in any way the obligations of recipients under Subpart D.

by state law to concerned parents and the attending physicians or, in exceptional cases, to state agencies charged with protecting the welfare of the infant."); *U.S. v. University Hosp., State U. of New York,* 729 F.2d 144, 161 (2d Cir.1984).

### a. *Discrimination*

■ The record reflects that New Mexico's community service system discriminates against persons with severe handicaps. Residents at LLH & TS and FSH & TS are denied access to community programs on the basis of physical as well as mental handicaps. HED and HSD provide a wide variety of community services under contract with private agencies. For example, HED provides group homes, companion homes, supported living environments, supported employment and sheltered work shops. HSD is responsible for the community based services funded by the Title XIX waiver. The community programs provided by these agencies are generally not available to persons with severe handicaps.

Discharge plans in plaintiffs' individual program plans show that severely and multiple handicapped residents experience discrimination in opportunities for community placement. Residents are not recommended for community placement, not because their individual needs require institutionalization or because community placement is inappropriate, but rather because community programs are not available in New Mexico for persons who have challenging behavior, physical handicaps or special medical needs. This has been illustrated by experiences of three plaintiffs. Plaintiff Mildred Tsosie's interdisciplinary team determined that there were no community programs available to meet her needs which include medical, self-care and developmentally oriented treatment. Similarly, the interdisciplinary teams for Clinton and Shawn Heath concluded that there are no facilities available in New Mexico to meet their needs. The IDTs believed that the Heath brothers need facilities that can meet their medical, self-care and active treatment needs and that accept residents who are in wheelchairs and are profoundly retarded. These interdisciplinary teams

have determined, based on individualized assessments of the strengths and needs of each resident, that with appropriate services, these severely handicapped residents can reside in community settings.

Interpreting *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court stated:

Davis addressed that portion of section 504 which requires that a handicapped individual be "otherwise qualified" before the nondiscrimination principle of section 504 becomes relevant. However, the question of who is "otherwise qualified" and what actions constitute "discrimination" under the section would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of the handicapped.

*Alexander v. Choate,* 469 U.S. 287, 299 n. 19, 105 S.Ct. 712, 719 n. 19, 83 L.Ed.2d 661 (1985). The Supreme Court "struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of [recipients of federal assistance] in preserving the integrity of their programs: while a [recipient] need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones." *Alexander,* 469 U.S. at 300, 105 S.Ct. at 720.

The balance struck in *Davis* thus requires that otherwise qualified handicapped residents of LLH & TS and FSH & TS be provided with meaningful access to community programs operated under the direction or control of defendants. Community programs should not be designed in a way that effectively denies otherwise qualified handicapped residents of LLH & TS and FSH & TS the meaningful access to which they are entitled. To assure meaningful access, reasonable accommodations in the community programs have to be made.

The evidence in this case established that various residents' interdisciplinary teams have determined, based on individualized

assessments of the strengths and needs of each resident, that with appropriate services, these severely handicapped residents should reside in a community setting. Nonetheless, severely handicapped residents are precluded from living in community settings because the programs lack amenities, that could reasonably be furnished without substantial program changes, necessary to accommodate the needs of the severely handicapped. The severity of plaintiffs' handicaps is itself a handicap which, under § 504, cannot be the sole reason for denying plaintiffs access to community programs. *Plummer,* 731 F.2d at 576; *Garrity v. Gallen,* 522 F.Supp. 171, 214–215 (D.N.H.1981); *Lynch v. Maher,* 507 F.Supp. 1268, 1278–1279 and n. 15 (D.Conn.1981).[36] Defendants' failure to accommodate the severely handicapped in existing community programs while serving less severely handicapped peers is unreasonable and discriminatory.

The experience of Nebraska and Colorado in serving persons with severe handicaps shows that modification of the existing community service system in New Mexico would not require an excessive financial burden and that the accommodations would enable severely handicapped residents of LLH & TS and FSH & TS to realize the benefits of community settings. Accordingly, the defendants should require those community programs that receive federal assistance funds[37] to make reasonable accommodations for those severely handicapped residents of LLH & TS and FSH & TS whose IDTs have determined that a community program could be appropriate, if reasonably modified.

### b. *Segregation*

Recipients of federal assistance are further required to provide federally assisted services "in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2). Regulations implementing Section 504 provide that:

> A recipient, in providing any aid, benefit, or service may not ... [p]rovide different or separate aid, benefits or services to handicapped persons or any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aids, benefits or services that are as effective as those provided to others.

45 C.F.R. § 84.4(b)(1)(iv) (emphasis added); *accord* 45 C.F.R. § 84.52(a)(5).

While Section 504 does not prohibit the existence of separate services, the law is violated when certain residents of LLH & TS and FSH & TS are excluded from qualitatively different facilities which are being provided to their less severely handicapped peers, despite IDT determinations that particular severely handicapped residents can live in community settings if defendants make reasonable accommodations in those settings. Where reasonable accommodations in community programs can be made, defendants' failure to integrate severely handicapped residents into community programs which presently serve less severely handicapped residents violates § 504.

### 2. Social Security Act

Title XIX of the Social Security Act appropriates grants to states for medical assistance programs for the purpose of enabling each state to furnish:

---

**36.** In *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), the Supreme Court denied an extension of the 10–year delimiting period for educational assistance benefits following military service, in accordance with 38 U.S.C. § 1662(a)(1), to veterans whose alcoholism was the result of willful misconduct. The Court distinguished between those veterans whose alcoholism was the result of an underlying psychiatric disorder and those whose condition arose from "willful misconduct." The Court reasoned that veterans in this second category "... are not, in the words of § 504, denied benefits 'solely by reason of [their] handicap,'

but because they engaged with some degree of willfulness in the conduct that caused them to become disabled." *Id.* at 549–50, 108 S.Ct. at 1382. This reasoning does not encompass the severely handicapped plaintiffs in this case, who cannot be faulted for the occurrence of their conditions.

**37.** Although the parties did not present any specific evidence on which community programs receive federal assistance, the parties acknowledge that some community providers receive both federal and state funds.

(1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care ...

42 U.S.C. § 1396 (Supp.1990). Each state is required to submit for approval to the Secretary of Health and Human Resources plans for medical assistance that meet the substantive requirements of 42 U.S.C. § 1396a(a), and to designate a single state agency to administer or supervise the administration of the plan. 42 U.S.C. § 1396a(a)(5). The state agency is responsible for establishing and maintaining health standards for institutions that provide care and services to recipients of medical assistance under the plan. 42 U.S.C. § 1396a(a)(9)(A).

The state plan must include a regular program of independent professional review and evaluation of each patient's need for medical care. 42 U.S.C. § 1396a(a)(31)(A). An independent professional review team must conduct periodic onsite inspections and assessments of the care being provided to each person, including (1) "the adequacy of the services available to meet his current health needs and promote his maximum physical well being; (2) the necessity and desirability of his continued placement in the facility, and (3) the feasibility of meeting his health care needs through alternative institutional or noninstitutional services." 42 U.S.C. § 1396a(a)(31)(B). The review team is required to submit written reports to the state agency of the findings of each inspection with recommendations. 42 U.S.C. § 1396a(a)(31)(C).

Each state which has a plan approved under 42 U.S.C. § 1396a(a) is paid a specified percentage of medical assistance. 42 U.S.C. § 1396b. Payments may be terminated if the Secretary determines that a plan has been changed so that it no longer complies with section 1396a(a) or if the administration of the plan fails to comply with the requirements of that section. 42 U.S.C. § 1396c.

Regulations promulgated pursuant to the statute set forth standards for the care to be provided at intermediate care facilities for the mentally retarded. The regulations require that each client receive "a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services ... that is directed toward the acquisition of the behaviors necessary for the client to function with as much self-determination and independence as possible and the prevention or deceleration of regression or loss of current optimal functional status." 42 C.F.R. § 483.440(a) (Condition of Participation: Active Treatment Services). Each client must have an individual program plan developed by an interdisciplinary team that represents the professions, disciplines or service areas that are relevant to identifying the client's needs and designing programs that meet those needs. 42 C.F.R. § 483.440(c). The facility must not segregate clients solely on the basis of their physical disabilities. 42 C.F.R. § 483.470(a)(2). The regulations also contain standards for the provision of dental services, 42 C.F.R. § 483.460, food and nutrition services, 42 C.F.R. § 483.480, medical services, 42 C.F.R. § 483.460(a), and nursing services, 42 C.F.R. § 483.460(c).

### a. *Deficiencies*

The evidence presented at trial demonstrates that LLH & TS and FSH & TS have remained certified under Title XIX and have received funding in accordance with the Act. However, in the Spring of 1989, the surveyors determined that LLH & TS was out of compliance with two conditions of participation in active treatment and facility staffing. *See* 42 C.F.R. § 483.440. Because the surveyors determined that the health and safety of the residents were not in jeopardy, LLH & TS retained its certification for a discrete period of time during which the facility worked to achieve compliance with the conditions in order to avoid decertification. LLH & TS was found to be

in compliance with all conditions of participation in December, 1989.

Although the surveyors found temporary noncompliance with only two conditions of participation, numerous deficiencies in ICF/MR standards were identified at both LLH & TS and FSH & TS over the course of this litigation. The following deficiencies are supported by the record: failing adequately to document residents' health care, active treatment, and other information as required by 42 C.F.R. §§ 483.-410(c)(1), 483.440(c)(4), 483.440(c)(5); failing to enable residents to retain and use appropriate personal possessions, as required by 42 C.F.R. § 483.420(a)(12); failing to implement procedures that prohibit physical, verbal, sexual and psychological abuse or punishment, as required by 42 C.F.R. § 483.420(d)(1)(i); failing to provide an active treatment program that is integrated, coordinated and monitored by a qualified mental retardation professional, as required by 42 C.F.R. § 483.430(a); failing to provide sufficient professional staff and adequate professional program services to implement the active treatment program defined by each resident's individual program plan, as required by 42 C.F.R. § 483.430(b)(1); failing to provide direct care staff with initial and continuing training that enables each employee to perform his or her duties effectively, efficiently and competently, as required by 42 C.F.R. § 483.430(e); failing to provide residents with a continuous active treatment program, consisting of needed interventions and services in sufficient number and frequency to enable residents to attain as much self-determination, independence and optimal functional status as possible, as required by 42 C.F.R. § 483.440(a); failing to provide residents with accurate, comprehensive functional assessments identifying their need for services, without regard to the availability of services, as required by 42 C.F.R. § 483.440(c)(3); failing to provide residents with adequate individual program plans setting forth the specific objectives necessary to meet the residents' needs and a planned sequence of dealing with the objectives, as required by 42 C.F.R. § 483.440(c)(4); failing to ensure that residents' individual program plans identify the mechanical supports needed to achieve proper body position, balance or alignment and specify the reason for each support, the situations in which it is to be applied, and a schedule for its use, as required by 42 C.F.R. § 483.440(c)(6)(iv); failing to ensure that residents' individual program plans include opportunities for resident choice and self-management, as required by 42 C.F.R. § 483.440(c)(6)(iv); failing to ensure that each resident's individual program plan is implemented by all staff who work with that person, as required by 42 C.F.R. § 483.440(d)(3); failing to ensure adequate privacy for residents, as required by 42 C.F.R. § 483.420(a)(7); and failing to ensure that interventions for managing challenging behavior of residents are employed with sufficient safeguards and supervision to protect their safety, welfare and civil and human rights, as required by 42 C.F.R. § 483.450(b).

Defendants note that as of the spring of 1990, when the last evidence was presented, both LLH & TS and FSH & TS had undergone substantial changes, in part as a result of this litigation. Surveys of the institutions during the spring of 1990 reflected fewer deficiencies than had previously been noted. However, the record demonstrates that numerous deficiencies have been identified in various surveys throughout the course of this litigation. In addition, as the parties agree, ICF/MR regulations are subject to varying interpretations. Responsible professionals can and do reach different conclusions as to whether a particular regulation or standard has been met as of a particular date. Thus, there is no assurance that deficiencies previously identified will not reoccur in the future. Even the last survey reports described deficiencies occurring in many of the same areas in which deficiencies had been noted previously. The existence of these numerous standard-level deficiencies, and for a temporary period condition level deficiencies, underscores the constitutional violations identified below.

b. *Application of Title XIX*

■ I ruled previously that a private party may invoke 42 U.S.C. § 1983 to en-

force the provisions of the Medicaid Act and its implementing regulations against participating states. That ruling was made in connection with a motion to dismiss for failure to state a claim, under Rule 12(b)(6), and was necessarily based on allegations in the pleadings. *Jackson, et al. v. Fort Stanton, et al.*, No. 87–839, Memorandum, Opinion and Order at 14 (D.N.M. Oct. 5, 1988). The availability of such a private cause of action, however, is limited. Defendants maintain that Title XIX does not require absolute compliance with each specific standard enumerated in the statute's implementing regulations, but rather demands substantial compliance only with the eight general "conditions of participation" under which the various individual "standards" are included.[38] The regulations break down the eight conditions into a number of discrete standards, all of which are then divided into even more detailed standards or sub-parts. 42 C.F.R. §§ 483.-400–480. HCFA's operators manual, for surveyors of intermediate care facilities for the mentally retarded, identifies each specific standard, including sub-parts, by an independent tag number, totalling nearly 500 in all.

Although the eight basic conditions of participation are elaborated on by numerous standards, the question of compliance revolves around whether the conditions themselves have been satisfied. 42 C.F.R. § 442.101. It appears that Congress did not intend to create a private cause of action for non-compliance with one, some,

or many of the nearly 500 hundred standards.[39] Instead, the standards are designed to guide the surveyors in making the basic eight-part conditions of participation assessment. So long as a facility is in compliance with each overall condition, the existence of a number of outstanding deficiencies would ordinarily not preclude the facility's certification and eligibility to receive federal funds.[40] The evidence at trial showed that two successive surveys had concluded that there was, at the time of the surveys, two condition-level deficiencies at LLH & TS; but a most recent third survey prior to the conclusion of the trial found the deficiencies had been corrected. Certainly the history of standard-level deficiencies at both institutions is far from enviable; nonetheless, plaintiffs may not assert a private cause of action based on just that.

### 3. Education of the Handicapped Act [41]

◼ The Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1400 *et seq.* enacted a comprehensive scheme to assure that handicapped children receive a free public education appropriate to their needs. 20 U.S.C. § 1412(1). *See Johnson v. Independent School District*, 921 F.2d 1022, 1026 (10th Cir.1990). To achieve this end, the Act sets forth specific procedural safeguards that must be guaranteed by the participating state and local educational agencies seeking funds under the Act. The Act directs the state to develop a plan

**38.** Plaintiffs, in their Post Trial Memorandum, did not comment on this issue.

**39.** By this I do not suggest that no conceivable scenario of standards violations would give rise to a private cause of action, even if all eight conditions of participation were met.

**40.** An exception will be made if, as has never been the case at LLH & TS and FSH & TS, the surveyors find that the safety or health of the clients are in immediate jeopardy as a result of any outstanding deficiency. 42 C.F.R. § 442.105. Additionally, the regulations require that, where a facility is found to be in compliance with all conditions of participation, but not with all standards, the facility must submit for approval a plan of correction to address each deficient standard prior to being certified. 42 C.F.R. §§ 442.101, 442.105.

**41.** In the Memorandum Opinion and Order entered October 5, 1988, I found that Congress had abrogated the states' Eleventh Amendment immunity in the Education of the Handicapped Act. Subsequently, the Supreme Court held that the Education of the Handicapped Act did not abrogate the states' Eleventh Amendment immunity from suit in federal court. *Dellmuth v. Muth*, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). Accordingly, the New Mexico Health and Environment Department, the New Mexico Department of Education, the New Mexico Human Services Department, LLH & TS and FSH & TS are immune from suit under the EHA and the claims against them based on the EHA should be dismissed on that ground.

setting forth a detailed timetable for and a description of its program to provide all children between the ages of three and twenty-one full educational opportunity. The state must establish procedures to assure that "to the **maximum extent appropriate**, handicapped children ... are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. §§ 1412(2)(A), 1412(5)(B) (emphasis added).

Each child who falls within the provisions of the act is to be provided with an "individualized education program" ("IEP") reflecting the child's unique needs. 20 U.S.C. §§ 1401(19), 1412(4). Participation in the formulation of the IEP is to be afforded to the local education agency, the parents or guardian of the child, the child's teacher and the child where appropriate. 20 U.S.C. § 1401(19). The Act guarantees parents the right to obtain an independent educational evaluation of the child and the right to challenge the appropriateness of the child's evaluation, educational placement or IEP in an administrative hearing with subsequent judicial review. 20 U.S.C. §§ 1415(b)(1), 1415(b)(2), 1415(e)(2). *See Johnson* at 1026–27.

### a. *Exhaustion of Remedies*

■ Exhaustion of administrative remedies is required before relief can be sought under the EHA in federal court. *Hayes v. Unified School Dist.*, 877 F.2d 809, 812 (10th Cir.1989); 20 U.S.C. § 1415(f).[42] " 'This exhaustion rule serves a number of important purposes including (1) permitting the exercise of agency discretion and ex-

pertise on issues requiring these characteristics; (2) allowing the full development of technical issues and a factual record prior to court review; (3) preventing deliberate disregard and circumvention of agency procedures established by Congress; and (4) avoiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error.' " *Hayes*, 877 F.2d at 814 (quoting *Association for Retarded Citizens, Inc. v. Teague*, 830 F.2d 158, 160 (11th Cir.1987) (citations omitted)). *See also Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975).

■ However, the rule that administrative remedies under the EHA must be exhausted before judicial review is sought should not be applied inflexibly. *Hayes*, 877 F.2d at 814. Exhaustion of administrative remedies may not be required if pursuing those remedies would be "futile or inadequate." *Smith v. Robinson*, 468 U.S. 992, 1014 n. 17, 104 S.Ct. 3457, 3469 n. 17, 82 L.Ed.2d 746 (1984); *Hayes*, 877 F.2d at 814.[43]

■ Plaintiffs Ronald Fuller and Sean McHenry have exhausted their administrative remedies with regard to their personal claims, but made no similar allegations with respect to other members of the class. Plaintiffs argue that exhaustion of administrative remedies for class members is not required because plaintiffs Ronald Fuller and Sean McHenry have exhausted their administrative remedies on behalf of the class. *See* Third Amended Complaint ¶ 29a, 65a. Plaintiffs contend that it is not necessary for each member of the alleged class to exhaust administrative remedies. *Barela v. United Nuclear Corp.*, 462 F.2d 149, 153 (10th Cir.1972); *Swain v. Hoffman*, 547 F.2d 921, 924 (5th Cir.1977). *See also Olivares v. Martin*, 555 F.2d 1192,

---

**42.** Section 1415(f) provides in relevant part:
[B]efore the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

**43.** The legislative history of the EHA supports this view. During the debate on the Senate

Conference Report, Senator Harrison Williams, the principal author of the EHA, explained that "exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter." 121 Cong.Rec. 37416 (1975).

1196–1197 (5th Cir.1977) ("at least one of the purported representatives of a class must have exhausted his administrative remedies"); *Williams v. Tennessee Valley Authority*, 552 F.2d 691, 697 (6th Cir.1977) ("there is no requirement that each member of the potential class demonstrate exhaustion of administrative remedies"); *Phillips v. Klassen*, 502 F.2d 362, 369 (D.C. Cir.1974) *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974) ("exhaustion by at least one member of the class is a necessary prerequisite for a class action").

 However, when exhaustion of administrative remedies is a prerequisite to suit, each member of the class must exhaust administrative remedies. *See e.g. Weinberger*, 422 U.S. at 764–765, 95 S.Ct. at 2466. In particular, when an exhaustion requirement is jurisdictional, as in this case, it is necessary that every member of the proposed class exhaust his or her administrative remedies. *Bowen v. New York*, 476 U.S. 467, 482–483, 106 S.Ct. 2022, 2031, 90 L.Ed.2d 462 (1986).

Plaintiffs maintain that, even if each member of the class is required to exhaust administrative remedies, exhaustion is not necessary because it would be futile in this case. I conclude, however, that plaintiffs would not be engaged in an exercise of futility if they were required to exhaust administrative remedies. Plaintiffs alleged that the state failed to provide adequate notice and failed to appoint surrogate parents where required and that the state's funding scheme creates a financial disincentive to referring LLH & TS residents to the public schools. *See* Plaintiffs' Reply Memorandum in Support of Class Certification at 23–24. However, plaintiffs adduced no evidence to support these allegations.

Instead, plaintiffs' main contention is that defendants have failed to provide residents of LLH & TS an appropriate education in the most integrated environment, to the maximum extent appropriate. The procedural safeguards in the Act are de-signed specifically to afford an opportunity to present complaints with respect to the evaluation or educational placement of a child, or the provision of a free appropriate public education to a child. 20 U.S.C. § 1415(b)(1)(E). These procedural guarantees include the right to a due process hearing before either a local, state or intermediate educational agency and the right to appeal the hearing decision. 20 U.S.C. §§ 1415(b)(2), 1415(e)(2). Plaintiffs have not taken advantage of these procedural safeguards and have not given defendants an opportunity to exercise administrative reform addressing their complaints.

#### b. *LLH & TS*

The Act's requirement that "mainstreaming" be provided to the maximum extent appropriate indicates a very strong congressional preference. *See* 20 U.S.C. 1412(5)(B). Furthermore, the Comment to the implementing regulations states that "[r]egardless of other reasons for institutional placement, no child in an institution who is capable of education in a regular public school setting may be denied access to an education in that setting." 34 C.F.R. § 300.554 (Comment). The administrator of LLH & TS testified, when asked whether many of these individuals could receive services at least as effective in the public school system, that "[f]or many of [these] individuals ... there are equivalent services in the public schools." Although I am not in a position to afford relief before plaintiffs exhaust their administrative remedies, in light of the clear mandate expressed in the EHA, defendants should be called upon, in the administrative review process, to fully explain their efforts in assuring an "appropriate education" for those residents at LLH & TS who receive their educational services at the institution.

#### c. *FSH & TS*

As I noted in the findings of fact, all school age residents of FSH & TS attend the local public school.

### B. *Constitutional Claims* [44]

---

**44.** Counts V and VI of the Third Amended Complaint allege that defendants have violated the rights of plaintiffs to freedom of expression and association secured by the First Amendment

## 1. Substantive Due Process [45]

■ In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court considered for the first time the substantive rights of involuntarily committed mentally retarded persons. The Court recognized substantive rights under the Due Process Clause of the Fourteenth Amendment to (i) safe conditions of confinement; (ii) freedom from bodily restraints; and (iii) training or habilitation.

With respect to training and habilitation, the Court held that although a state is under no constitutional duty to provide substantive services for those within its border, when a person is institutionalized the state has a duty to provide certain services and care. *Id.* at 317, 102 S.Ct. at 2458. Specifically, a state is required to provide food, shelter, clothing, medical care, reasonable safety for all residents and personnel within the institution, and minimally adequate or reasonable training to ensure safety and freedom from undue restraint. *Id.* at 319, 102 S.Ct. at 2459.

■ In determining what is reasonable, a court must show deference to the judgment exercised by a qualified professional. *Id.* at 322, 102 S.Ct. at 2461. A decision made by a professional is presumptively valid. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* at 323, 102 S.Ct. at 2462. Under this standard, plaintiffs' expert testimony is relevant in determining whether the treating professionals' decisions substantially departed from accepted standards. *Id.* at 323 n. 31, 102 S.Ct. at 2462 n. 31.

The Court reasoned that by so limiting review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions would be minimized. *Id.* The Supreme Court instructed that a trial court should not weigh the decisions of the treating professionals against the testimony of the class members' professionals to decide which of several acceptable standards should apply. *Id.* "There certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions."

With these principles in mind, I now turn to a review of the evidence pertaining to the conditions at LLH & TS and FSH & TS. Although there have been substantial improvements at both facilities during the course of this litigation, constitutional deficiencies remain in certain conditions and treatment.

### a. *Food, Shelter & Clothing*

The residents at LLH & TS and FSH & TS are receiving appropriate food, shelter and clothing. The quality of the food served and the quantity provided to the residents of LLH & TS and FSH & TS is adequate. Residents are consistently provided with clean, adequate and appropriate clothing.

The facilities are clean and well maintained. Both facilities are licensed by the

---

and to privacy, dignity and family integrity and association secured by the First, Fourth, Ninth and Fourteenth Amendments, respectively. However, Plaintiffs' Post Trial Memorandum does not seek relief for these claims. Specifically, although I believe the institutions' sensitivity to and protection of residents' privacy and dignity are problematic, as reflected in my findings of fact, plaintiffs did not brief or submit authorities supporting a constitutional basis for these claims. *See* Plaintiffs' Post Trial Memorandum at 60. Accordingly, these claims will be deemed to have been abandoned.

Count VIII of the Third Amended Complaint alleges that "[d]efendants have violated the right of [p]laintiffs and the class to freedom from the imposition of unconstitutional conditions ... as a condition for the receipt of services provided by the State." Federal Rule of Civil Procedure 8(a)(2) requires that plaintiffs set forth a short and plain statement of the claim showing that plaintiffs are entitled to relief. Count VIII of the Third Amended Complaint fails to meet the requirements of Rule 8(a)(2).

**45.** Although traditionally courts should consider statutory claims first before proceeding to constitutional claims, in this instance it is appropriate to consider the constitutional issues because the law is more developed in that area. *See Society for Good Will to Retarded Children, Inc. v. Cuomo,* 902 F.2d 1085, 1091 (2nd Cir.1990).

relevant regulatory authorities to house the number of residents who actually reside there. The size of the bedrooms is adequate and an appropriate number of residents reside in each bedroom. The facilities have undertaken efforts to personalize the living areas.

The physical environment at LLH & TS and FSH & TS is clean, safe and appropriate. Specifically, fire safety, pest control, sanitation practices, lighting, ventilation and the fixtures at the institutions are adequate. In addition, those items that contained asbestos at FSH & TS were "abated."

### b. *Medical Care*

▆ The medical and dental services at LLH & TS and FSH & TS generally address the needs of the residents. The staffing and nature of care provided is more than minimally adequate.[46] However, because of inadequate medical records, I am unable to conclude that medical care generally is minimally adequate.

There are significant lapses in the medical records of the residents of FSH & TS and LLH & TS. The medical records demonstrate an incomplete medical analysis and understanding of the residents. The records lack broad descriptions of a resident's clinical status. Instead, the records contain repetitive listings which reflect a lack of individualized analysis. These matters may affect a resident's health and long-range outlook. They may lead to the loss of necessary interventions. The inadequacy of the medical records at both facilities is unacceptable.

### c. *Reasonable Conditions of Safety*

▆ The Supreme Court recognized that "an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement. The question then is not simply whether a liberty interest has been infringed but whether the ... lack of absolute safety is such as to violate due process." *Youngberg*, 457 U.S. at 320, 102 S.Ct. at 2460. In the instant case the evidence showed that defendants failed, in various ways, to provide reasonable conditions of safety for the residents of LLH & TS and FSH & TS.

### i. Abuse

Regrettably, residents of LLH & TS have been subjected to abuse. Although the evidence indicated that the frequency and severity of abuse was greater prior to the initiation of this litigation, there was some evidence from which it could reasonably be inferred that abuse has continued as recently as 1989, prior to the arrival of Administrator LaCourt. In 1986, four residents of LLH & TS received abrasions and puncture wounds which a state court found to constitute abuse and neglect. Another resident of LLH & TS was sexually assaulted and died two days later. These acts of violence were unexplained and unaccounted for by the facility. More recently during 1989, a staff member of LLH & TS repeatedly kicked a resident and only received a suspension, although in the opinion of the acting administrator, the abusive staff member should have been terminated.

### ii. Accident and Injury

LLH & TS and FSH & TS have established policies and procedures for documenting accidents and injuries. The records show that residents of LLH & TS and FSH & TS frequently sustain injuries. Although it is not uncommon for developmentally disabled persons such as the residents of FSH & TS and LLH & TS to

---

**46.** The development of hyperpigmentation in some residents at LLH & TS as a result of the use of thorazine is distressing. The medical staff, although aware of the side effects, continued to administer thorazine, after discussing the issue with the consulting psychiatrist. It was not until Dr. Gualtieri recommended that LLH & TS discontinue use of thorazine that LLH & TS did so. Although there has been a marked improvement, the condition has not completely reversed on all the affected residents.

I am mindful of the Supreme Court's admonition that courts should not "second guess" the "presumptively valid" treatment decisions of the treating professionals. *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462. In this instance, although I recognize the unfortunate consequences of the use of thorazine, I cannot say that medical staff failed to exercise professional judgment when they decided to continue to administer the drug.

sustain injuries, the evidence showed that there are a number of injuries occurring repeatedly with no attempted pattern analysis and no intervention by the inter-disciplinary teams to make changes in the plans to prevent further accidents or injuries. In addition, reports of a number of accidents indicate that the accidents had been witnessed by staff but no known causes are cited.

#### d. *Freedom from Unreasonable Restraints*

 The Supreme Court acknowledged that "there are occasions in which it is necessary for the state to restrain the movement of residents—for example, to protect them as well as others from violence." *Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460. However, restraints must be applied pursuant to the exercise of professional judgment.

##### i. Chemical Restraints

The evidence presented at trial showed that the use of psychoactive medications at LLH & TS and FSH & TS comports with professional standards. Psychoactive medications are prescribed in consultation with a psychiatrist, regularly reviewed by the resident's IDT, and subjected to further review by various committees. Psychoactive medications are administered pursuant to the exercise of professional judgment.

##### ii. Physical Restraints

There is no evidence in the record that the residents of FSH & TS are subject to inappropriate physical restraints. The evidence showed that aversive programming and time out rooms are not used at FSH & TS. Physical restraints have never been used as part of a behavioral program and are only used on an emergency basis.

By contrast, LLH & TS used physical restraints such as time out rooms, the papoose board and aversive stimuli as recently as 1988. Defendants' expert, Dr. Haywood, found that time out was used as punishment rather than as a training mechanism, and that papoose boards were an unnecessary restraint in most instances. With one exception LLH & TS has eliminated the use of these physical restraints.

The papoose board now is only employed in the context of dental procedures pursuant to an individualized determination by the dentist that the restraint is necessary to insure the safety of the resident; and that decision is reviewed by the IDT. Time out rooms have been dismantled and there are no residents subject to aversive stimuli or four point restraints. One resident has a camisole as part of the resident's behavior program but a professional determination has been made that it is appropriate.

However, residents of LLH & TS have been subjected to physical restraints as a result of insufficient staffing. On two separate occasions, residents were observed restrained to toilets. The restraints were not applied pursuant to the exercise of professional judgment to assure safety or to provide needed training. They were not part of a toilet training program in the IPPs. Rather, the residents were restrained because only one staff member was available to assist six residents. Physical restraints, such as those observed by the state surveyors, that necessarily result from understaffing violate the residents' liberty interest in freedom from undue physical restraints.

#### e. *Minimally Adequate Training*

 The Supreme Court defined minimally adequate training to mean "such training as an appropriate professional would consider reasonable to ensure ... safety and to facilitate [the residents'] ability to function free from bodily restraint." *Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462. The residents at FSH & TS and LLH & TS are not being provided minimally adequate training.

##### i. IDT Process

The processes through which the current IPPs are derived at LLH & TS and FSH & TS comport with professional standards. Each resident's IDT develops an individual program plan at least annually and revises it as needed throughout the year. Prior to each resident's annual meeting, the appropriate professionals at each facility assess the resident's strengths and needs. The

assessments are current and the assessment instruments now in use at the facilities comply with professional standards.

### ii. IPPs

LLH & TS fails to provide its residents with individual program plans that meet professionally acceptable minimum standards. IPPs are insufficiently resident specific to address the resident's individual needs. IPP objectives for the residents of LLH & TS are not individualized. IPPs fail to specify needed interventions or mechanical supports and lack adequate criteria for determining success or failure.

### iii. Training Programs

The programming at LLH & TS and FSH & TS is professionally unacceptable. The physical space available for training activities at LLH & TS and FSH & TS is inadequate. The training programs do not adequately teach functional skills and are age inappropriate. For example, training materials include peg boards and form boards and residents work with artificial zippers and simulated telephones. Although nonfunctional materials are no longer being ordered, existing nonfunctional materials continue to be used. Where the programming is functional and age appropriate, there is so little carryover from the classroom to daily life that the training program is largely rendered meaningless. Carryover from the classroom to the living units is an enforcement technique that is particularly necessary for the developmentally disabled.

### iv. Implementation of IPPs

Both LLH & TS and FSH & TS fail to implement adequately individual program plans and professional recommendations. The root cause for this deficiency is that direct care staff at LLH & TS and FSH & TS lack adequate training and supervision. The lack of adequate training and supervision of direct care staff falls substantially below professionally acceptable minimum standards. Direct care staff also lack adequate supervision by professional staff such as QMRPs who need to monitor better the delivery of services to residents.

As a result, direct care staff are unfamiliar with basic requirements of a resident's needs. Consequently, direct care staff undertake duties as to which they lack training exposing residents to considerable risk of harm. For example, staff members are not adequately trained in proper feeding techniques before they begin working with residents with complex needs. Improper feeding techniques can place residents in danger of choking on food.

Direct care staff are also unaware of the goals and methods contained in the residents' IPPs. Most of the programming at LLH & TS and FSH & TS is designed by clinicians—doctors, psychologists, physical and occupational therapists. Implementation of this programming falls to direct care staff. Unless direct care staff have sufficient familiarity with the residents and have requisite skills to implement professionally required programming, the programming cannot succeed.

### v. Rehabilitation Services

The record clearly establishes that for many years LLH & TS and FSH & TS afforded few rehabilitation services to the residents. Residents were denied direct therapy services because of a lack of adequate staff. As to the adequacy of the rehabilitation services presently provided at LLH & TS and FSH & TS, plaintiffs' and defendants' experts offered diametrically opposed opinions. For example, on the question of whether physical therapy actually has any therapeutic benefit defendants' expert testified that physical therapy cannot affect the natural progression of many contractures. On the other hand, plaintiffs' expert maintained that therapeutic equipment can be used to correct deformities.

Although my personal belief is that the truth lies somewhere between those views expressed by the parties' experts, I am constrained by the *Youngberg* standard and must therefore conclude that the number of therapists providing rehabilitation services, the rehabilitation assessments being made, and the quality of programming currently being provided at LLH & TS and FSH & TS comport with minimal profes-

sional standards. However, LLH & TS lacks the necessary adaptive equipment to render professionally acceptable rehabilitation services. Residents are not provided with adequate individualized adaptations. Adaptive equipment that is used for training in the classroom is not available in the living units.

### vi. Professional Staff

The psychology department at LLH & TS is understaffed. At the time of trial there were a number of professional staff positions in the psychology department at LLH & TS which had been authorized but had not been filled. Most importantly, LLH & TS lacks a chief psychologist who defendants' expert testified is necessary for the supervision and training of the existing staff in assessment and treatment strategies.

The existing vacancies, particularly that for the chief psychologist, take on greater importance in light of the fact that the psychology staff at LLH & TS is not sufficiently trained. Psychologists on staff are not capable of sophisticated psychoeducational and behavioral pediatric assessments, and are not competent in psychological treatment modes beyond behaviorism.

### vii. Behavior Management

LLH & TS and FSH & TS have failed to provide adequate behavior management programming designed to treat maladaptive behaviors. Behavior management programs at FSH & TS are not state of the art. At LLH & TS, behavioral data collection methods often are unspecified; and where methods are specified the categories of maladaptive behaviors are so broadly defined that useful data are not recorded. Behavioral programs are not changed as conditions require.

Direct care staff at LLH & TS are unaware of the contents or existence of the required programs for dealing with this behavior. Even when staff are familiar with the programs, they do not consistently and effectively intervene in instances of inappropriate behavior. Nor are direct care staff able to accomplish a long-term generalization of acceptable behavior. The failure to implement adequately behavior management programs can result in harm both to the resident who exhibits improper behavior and to others, and may result in the use of otherwise unnecessary chemical or physical restraints.

### f. Regression

Justice Blackmun, in a concurring opinion, expanded the minimally adequate training required by the Constitution to include "such training as is reasonably necessary to prevent a person's preexisting self-care skills from *deteriorating* because of his commitment." *Youngberg*, 457 U.S. at 327, 102 S.Ct. at 2464. Liability may be imposed where a person can demonstrate that he or she entered a state institution with minimal self-care skills, but lost those skills after commitment because of the state's refusal to provide training. The concurring justices reasoned that "for many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs, is as much liberty as they ever will know." *Id.* A court should also defer to the judgment of qualified professionals as to whether or not, and to what extent, institutional training would preserve a person's pre-existing skills. *Id.*[47]

Defendants correctly note that plaintiffs presented no credible evidence that any resident at either facility has regressed as a result of any inadequacy in the resident's

---

**47.** Courts have adopted the reasoning of Justice Blackmun's concurrence. For example, the Second Circuit has held that an individual has a due process right to training sufficient to prevent basic self-care skills from deteriorating. *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1250 (2d Cir.1984).

The Second Circuit carefully limited its holding to those skills with which a mentally retarded individual entered the institution. Moreover,

the court ruled that the right did not encompass such training as will improve a resident's basic self-care skills or skills that are not basic to self-care. *Id.* ("Where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no constitutional obligation to grant").

training program. However, the defendants' failure to maintain adequate documentation has rendered that task virtually impossible. The evidence presented at trial demonstrated that the program plans do not specify the type of data and frequency of data collection necessary to assess regression or progress, and that the plan objectives are not expressed in terms that provide measurable indices of performance. Even when the data collection procedures are in place, direct care staff are unsure of how to collect the data, or the data recorded varies with the person collecting the data. Because of inadequate documentation and the absence of baseline data it is impossible to determine whether, as a result of omissions or commissions by the institutions, a resident's basic self-care skills had deteriorated after entering one of the institutions.

### g. Community Placement

#### i. IDT Recommendations for Community Placement

 It is well settled that there is no substantive due process right to habilitation in the least restrictive environment and there is no constitutional right to placement in a community setting. This position is supported by the conclusions reached in a number of cases. *See e.g. Lelsz v. Kavanagh*, 815 F.2d 1034, 1035 (5th Cir.1987) (denying rehearing en banc), *cert. dismissed* 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987); *Thomas S. v. Morrow*, 781 F.2d 367, 375 (4th Cir.1986), *cert. denied*, 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986); *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir.1984); *Phillips v. Thompson*, 715 F.2d 365 (7th Cir.1983); *Doe v. Public Health Trust*, 696 F.2d 901 (11th Cir.1983); *Johnson v. Brelje*, 701 F.2d 1201, 1210 (7th Cir.1983). However, these decisions did not involve a discrete recommendation for treatment made by qualified professionals to meet the needs of an individual, as contemplated by *Youngberg*. For example, in *Society for Good Will*, the district court ordered that 400 residents be placed in the community, finding that by failing to provide enough com-

munity placements defendants had "unduly restrained many residents for whom institutional life precludes the exercise of basic liberties." 572 F.Supp. 1300, 1347 (E.D.N.Y.1983). The Second Circuit reversed, holding that mere residence at an institution, without more, does not violate due process. 737 F.2d at 1247. The Second Circuit faulted the district court for assuming that the *Youngberg* professional judgment standard is not met if experts at trial disagree with care or treatment decisions that were actually made, or think another course of conduct would have been better. 737 F.2d at 1248. ("'professional judgment' has nothing to do with what course of action would make patients 'safer, happier and more productive'").

In *Thomas S. v. Flaherty*, 699 F.Supp. 1178 (W.D.N.C.1988), *aff'd* 902 F.2d 250 (4th Cir. May 9, 1990) *cert. denied,* —— U.S. ——, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990), a group of mentally retarded adults filed a class action alleging that they were being inappropriately housed in public psychiatric institutions in North Carolina under conditions violative of their constitutional rights. As required by *Youngberg*, the district court presumed that the decisions of the treating professionals were valid, but found that many of these decisions had not been implemented. *Id.* at 1191.

The court also found areas in which the decisions of the treating professionals substantially departed from accepted standards. Specifically, the court found that the Secretary's decision "to ignore the community placement recommendations of the state's treating professionals" substantially departed from accepted professional standards. *Id.* The court further found that the lack of adequate community services resulted in the unnecessary confinement of class members in highly restrictive settings for lack of another place to go. The court recognized a tendency among human service professionals in the institutions to conform their recommendations for treatment or habilitation of class members to the constraints imposed by the state's "inadequate service delivery system, rather than to exercise true professional judg-

ment." *Id.* at 1196. The court addressed the issue of behavioral problems and found that the presence of such problems did not excuse the state from providing appropriate placement services. *Id.* at 1194.

Based on the foregoing findings, the court ordered habilitation in "a training setting which approximates the more normal environment against which their increasing independence will be measured," "the development of individual plans for moving class members to more normal settings," and "the provision of alternative habilitation settings where professional recommendations can be carried out." 699 F.Supp. at 1204. The Fourth Circuit affirmed, interpreting the district court's order not to require community placement of all class members, but rather merely to establish a process by which the needs of each class member would be evaluated by professionals on a case-by-case basis. At 1252.

Similarly, in *Clark v. Cohen,* 794 F.2d 79 (3rd Cir.1986), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986) the court held that the plaintiff's substantive right to treatment under *Romeo* was violated where despite several years of expressions of unanimous professional judgment that plaintiff be placed in the community, she remained at the institution. 794 F.2d at 87. *See also Thomas S. v. Morrow,* 781 F.2d 367, 375 (4th Cir.1986) (court ordered transfer from hospital to community group home based on recommendations of professionals).

█ The instant case is not one in which professionals have disagreed on community placement decisions or have concluded merely that community placement would be "better." In this case the state's own treating professionals have made community placement recommendations which the defendants have failed to implement. There are at least sixty-four residents at LLH & TS and twenty-four residents at FSH & TS, including many named plaintiffs, for whom placement in community settings such as group homes has been recommended by the state's treating professionals; and the recommendations have been incorporated into the residents' treatment plans, but have not been implemented. These recommendations were made by qualified professionals who were familiar with the treatment needs of the residents and were acting within their respective areas of expertise; the recommendations are therefore accorded a presumption of validity. Despite these recommendations the residents remain at the institutions because of a severe lack of community-based services in New Mexico. However, lack of available alternatives does not excuse defendants from providing care in community settings for those individuals whose IDTs have, in the exercise of their professional judgments, recommended community care.

Dr. LaCourt, the administrator of LLH & TS, rendered a general opinion that the residents of LLH & TS who have been recommended for community placement by their IDTs are appropriately placed at LLH & TS. However, he acknowledged that placement decisions cannot be made on a generalized basis. He agreed that the decisions have to be made on an individualized basis, weighing the strengths and needs of a resident and whether a particular placement can accommodate those strengths and needs. Also, he acknowledged that the decision cannot be that of any individual, but rather must be a collective decision based on the IDT's referral process.

In interpreting the IDT recommendations for community placement, Dr. LaCourt testified that the fact that a resident has been referred for community placement by the resident's IDT does not indicate that the resident is receiving inappropriate services at LLH & TS, but rather that a different kind of service provider might be able to offer longer lasting benefits for the resident. There is no evidence, however, that Dr. LaCourt was a member of any of the IDTs or that he otherwise participated in the IDTs' exercise of professional judgment as to the placement recommendations for these residents when collective professional decisions were made. The defendants did not present specific evidence, based on individualized assessments, as to whether the services provided at LLH & TS

were appropriate to the needs of these individual residents.

Accordingly, it cannot be said that the professional recommendations made by the IDTs are merely statements of a course of action that "might be able to provide longer lasting benefits for the resident," as was the case in *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir.1984). What can be said is that individualized determinations were made by IDTs consisting of qualified professionals, who after assessing the strengths and needs of the individual residents against the available resources in a particular setting, determined that in their professional judgment a particular resident should be recommended for community placement. Accordingly, defendants' failure to implement the recommendations of their own treating professionals violates due process.

### ii. IDT Determinations Based on Unavailability of Community Services

▪ Professional judgment must be based on what is appropriate, not upon what resources are available. Deference to professional judgment requires "the decision be one based on medical or psychological criteria and not on exigency, administrative convenience, or other nonmedical criteria." *Clark v. Cohen*, 613 F.Supp. 684, 704 and n. 13 (E.D.Pa.1985) *aff'd*, 794 F.2d 79 (3rd Cir.1986), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986); *Lelsz v. Kavanagh*, 673 F.Supp. 828, 835 (N.D.Tex.1987). Institutional confinement which results from an absence of appropriate alternatives is not based on professional judgment.

Many residents of LLH & TS and FSH & TS are not recommended for community placement because of the unavailability of proper community services for those residents. Residents' records demonstrate that treating professionals conform their recommendations to the constraints imposed by the limited nature of existing community resources. Professionals have modified their judgments by focusing on available treatment rather than appropriate treatment, a human reaction. The lack of minimally adequate community based services has prevented the exercise of professional judgment by the treating professionals. Records contain statements to the effect that community placement will be considered for a particular resident when adequate community services become available; such statements do not reflect the unrestrained exercise of professional judgment as to the appropriateness of community placement for a particular resident. The residents are entitled to treatment recommended by qualified professionals whose judgment is unsullied by consideration of the fact that the state does not provide funding for appropriate service in community settings.

### iii. No IDT Recommendation for Community Placement

▪ Many residents of the institutions have been referred for community placement pursuant to state court orders,[48] or at the request of a resident's parent or guardian, notwithstanding an interdisciplinary team determination not to recommend community placement. Plaintiffs assert that community placement of all residents is necessary to effectuate their right to safety, freedom from restraint and adequate habilitation.[49]

The state's treating professionals have exercised professional judgment and have determined that community placement would not be appropriate for these residents. Although experts on both sides endorsed the general concept of the desirability of community placement for most developmentally disabled people given appropriate resources, the experts disagreed on the appropriateness of community placement for all residents and on whether institu-

---

**48.** Of course, reliance on the state law as grounds for ordering community placement would be impermissible under *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984).

**49.** Plaintiffs claim of a constitutional right to community placement or to placement in the least restrictive environment was dismissed. *Jackson, et al. v. Fort Stanton, et al.*, Civ. No. 87–839, slip op. at 19 (D.N.M. Oct. 5, 1988).

tions can provide adequate care and habilitation.[50] *See* Tr. 10/17/89 at 126–130 (Rowe); Tr. 1/5/90 at 180–183 (Klein); Tr. 4/3/90 at 167 (Franczak); Tr. 10/31/89 at 62–63, 73–77 (Haywood); Tr. 4/20/90 at 121–122 (Reid); Tr. 4/4/90 at 153–157, 164–165 (Crocker); Tr. 4/13/90 at 77 (Conroy). In this situation, I am unable to require under the applicable law that defendants provide community residential settings for all residents of LLH & TS and FSH & TS, regardless of their circumstances. "[M]ere residence in an institution or school for the mentally retarded, without more, does not violate due process." *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1247 (2d Cir.1984). While I personally am convinced that there is no substitute for community placement if assimilation of the developmentally disabled into the mainstream of society is the ultimate goal, the value of community placement does not necessarily translate into a legal entitlement. For whatever reason, as regards its developmentally disabled citizens, New Mexico has failed to follow the lead of other states or the directives of its own Developmental Disabilities Community Services Act. However, the fact that the state of New Mexico has not fulfilled its legislated goals for its developmentally disabled citizens, does not mandate a conclusion that the plaintiffs have been deprived of a constitutional right.

### 2. Procedural Due Process

Procedural due process is a guarantee that a state will not deprive individuals of an identified liberty or property interest without the benefit of certain procedures, such as notice and an opportunity to be heard. The interest may derive from state law. A state statute confers a right when it uses "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed." *Hewitt v. Helms,* 459 U.S. 460, 471–472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983).

Plaintiffs' Fourth Amended Complaint by Interlineation alleges that defendants have violated all the due process rights to which plaintiffs are entitled under the New Mexico Mental Health and Developmental Disabilities Act, § 43–1–1 *et seq.* NMSA 1978 (1989 Repl.), and the Developmental Disabilities Community Services Act, § 28–16–1 *et seq.* NMSA 1978 (1987 Repl.).[51]

Section 28–16–8 of the Developmental Disabilities Community Services Act requires that the Health and Environment Department "establish minimum requirements for admission, and withdrawal of residents from services funded by the department." Section 43–1–13 establishes the procedures for residential placement if, upon evaluation, a facility decides to recommend such services. The statute requires that the facility file a petition for residential placement in state court. The court must then appoint an attorney to represent the resident at the hearing. Plaintiffs raised a question as to whether the residents at FSH & TS who are not represented by Protection and Advocacy System are being afforded due process at the commitment hearings. However, plaintiffs failed to present any specific evidence from which

---

**50.** For example, plaintiffs' expert Dr. Franczak testified that adequate care and habilitation can be provided in institutions given the right kind of administration, staff and organization. *See* Tr. 4/3/90 at 167 (Franczak).

**51.** Specifically, plaintiffs' allege violations of the rights to legal representation, § 43–1–4; personal rights as provided by § 43–1–6; prompt treatment, § 43–1–7; prompt habilitation services, § 43–1–8; an individualized treatment or habilitation plan, § 43–1–9; an involuntary commitment proceeding, § 43–1–13; consent to or refuse treatment, § 43–1–15; an education in regular classes with non-handicapped minors whenever appropriate, § 43–1–18; confidentiali-

ty, § 43–1–19; an assessment of the needs of the state's developmentally disabled population, § 28–16–4; planning for community services for developmentally disabled persons, § 28–16–5; appropriate standards for services, § 28–16–7; minimum requirements for admission, discharge and withdrawal of clients from services, § 28–16–8; effective monitoring of compliance with regulations and other state imposed requirements, § 28–16–9; a system to pay for services which accurately estimates funding requirements, § 28–16–10; and all other procedural due process rights due citizens when their liberty is restrained by the state of New Mexico.

I could conclude that a due process violation has occurred.

■ Plaintiffs did show that LLH & TS and FSH & TS have failed to establish minimum criteria for discharge of a resident. Until recently, the individual program plans at LLH & TS had no formalized criteria for discharge. At FSH & TS each resident's IPP contained a formal discharge plan. However, a typical discharge plan at FSH & TS set forth numerous goals that a resident had to achieve to qualify for discharge. Yet, despite the lengthy stated requirements, testimony at trial showed that FSH & TS does not in fact expect a resident to meet all the programmatic goals listed in the resident's discharge plan, but rather showed that these are merely "suggested" criteria.

■ Plaintiffs' remaining allegations involve substantive provisions, such as the right to prompt treatment, § 43–1–7, and habilitation services, § 43–1–8, which cannot form the basis of a federal court order. It is well established that the Eleventh Amendment prohibits a federal court from ordering a state or its officials to conform their conduct to substantive state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984).

### 3. Equal Protection Clause

■ In *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985), the Supreme Court held that the rational basis standard of equal protection analysis applied to a challenge to zoning laws under which a city denied a special use permit for the operation of a group home for the mentally retarded. Therefore, "[t]o withstand equal protection review, legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose." *Id.* at 446, 105 S.Ct. at 3258.

Plaintiffs contend that defendants have failed to identify any legitimate justification for their continued "segregation" of persons with retardation.[52] The evidence adduced at trial showed that placements at LLH & TS and FSH & TS are made pursuant to a highly individualized process that focuses on the particular needs and attributes of each person. That process includes a review by professionals as well as a judicial determination that the individual would receive appropriate services in that setting.

The evidence also showed that some physicians and psychologists believe that the best setting for the care of persons with severe disabilities is a state residential facility. A number of professionals, including some of plaintiffs experts, testified that congregate care facilities are appropriate and should continue to occupy a place in the continuum of services for the developmentally disabled. Some of these professionals went even further by testifying that institutional services may be of significantly better quality than those available in home or community facilities. In light of this evidence, I cannot accept the contention that placement of developmentally disabled persons at LLH & TS and FSH & TS lacks any rational basis.

### C. *Claims for Attorneys' Fees*

Plaintiffs have made a general request for an award of attorneys' fees and costs. Third Amended Class Action Complaint, page 75, paragraph 4 of prayer for relief. However, plaintiffs have not stated anywhere in their Third Amended Class Action Complaint a statutory or other basis for an award of attorneys' fees. Since plaintiffs alleged jurisdiction under 42 U.S.C. § 1983 (Third Amended Class Action Complaint, page 5), presumably one basis for an award of attorneys' fees that will be advanced by plaintiffs is 42 U.S.C. § 1988. Intervenors, in their Complaint in Intervention, made no

---

**52.** Specifically, Count IV of the Third Amended Complaint alleges that "Defendants have violated the rights of Plaintiffs and the class secured by the Equal Protection Clause of the Fourteenth Amendment by establishing, encouraging, subsidizing, and otherwise sanctioning in *de jure* fashion enactments, programs, policies and practices that have excluded, separated and segregated persons with retardation."

request for attorneys' fees. The parties were not requested to brief the issue of attorneys' fees post trial or to submit requested findings and conclusions as to attorneys' fees. Since the parties have not had an opportunity to present their positions on claims for attorneys' fees, they should be permitted to submit supplemental proposed findings of fact and conclusions of law and briefs in regard to those claims. However, in view of the extensive factual findings and legal conclusions set forth above, I am, without the need of further briefing, in a position to reach certain general findings and conclusions regarding the claims for attorneys' fees that will not foreclose the parties from arguing the legal bases for such claims, the scope of the claims as to which attorneys' fees may be awarded, or the reasonableness of rates requested or amount of time for which fees are requested. Nevertheless, in the hope that the parties will undertake, in good faith, to reach agreement on awards of attorneys' fees, I make the following general findings and conclusions:

1. As a result of the evidence presented by the plaintiffs, although they did not achieve their ultimate goal of having LLH & TS and FSH & TS closed, plaintiffs obtained substantial court ordered relief for the residents in the nature of mandated correction of multiple deficiencies at the institutions.

2. In addition to gaining significant court ordered improvements to the institutions, by filing and pursuing this lawsuit plaintiffs have helped bring about important changes in the institutions of great benefit to the residents, which have occurred during the course of this litigation; this lawsuit clearly has been a catalyst prompting those changes.

3. In addition, plaintiffs succeeded in obtaining court ordered release to community settings of many residents whose IDTs long ago had recommended their placement in the community and court ordered professional reconsideration by IDTs of recommendations against community placement that may have been improperly influenced by taking into account the lack of available community services.

4. Moreover, plaintiffs were successful in gaining prospective injunctive relief as to future IDT recommendations of community placements and as to a time limit for placement following recommendation of community placement by an IDT.

## VII. Relief

Because of their intimate familiarity with the residents of the institutions for whom I am ordering relief and with the operations of LLH & TS and FSH & TS, the parties, in the first instance, shall attempt to formulate by agreement a plan to correct the deficiencies that have been identified in this Memorandum Opinion and Order. I contemplate adopting such an agreed plan of correction as part of my order for relief. However, it is also appropriate to establish some guidelines to be followed by the parties in their effort jointly to formulate a plan of correction and I will attempt to do so without getting too deeply involved in detail.

Based on my findings of fact and conclusions of law set forth above, the parties are to address correction of deficiencies in the following areas:

1. Individual program plans,
2. Medical records,
3. Discharge plans,
4. Data collection,
5. Qualified mental retardation professional services,
6. Behavior management,
7. Use of physical restraints,
8. Prevention of abuse of residents,
9. Reduction of accidents and injuries to residents,
10. Reports of abuse, accidents and injuries,
11. Staff supervision,
12. Preservice training of staff,
13. In-service training of staff,
14. Sufficiency of professional staff,
15. Adaptive equipment,
16. Functional and chronologically age appropriate programming,

17. Coordination between residential areas and training program areas,

18. Inadequate space in training program areas.

The plan of correction to be developed by the parties as to each of these deficient areas should address, at a minimum, the following:

1. Formulation of a detailed written policy to be adopted by and followed at each institution,

2. Designation of a representative or representatives of each institution who will be primarily responsible for assuring implementation of the policy,

3. A description of strategies to be adopted by each institution to achieve the goals of the correction plans,

4. A detailed timetable establishing deadlines by which specific components of the correction plan for each deficiency will be achieved;

5. Means of assuring continued compliance with appropriate standards after correction of the deficiencies has been achieved.

The parties should confer as expeditiously and frequently as practicable for the purpose of attempting to agree to a plan of correction as suggested above, contemplating submission of a detailed plan of correction to the court by not later than April 1, 1991. The plan of correction should establish a timetable that will lead to complete correction of all deficiencies by not later than September 10, 1991.

In regard to each resident of LLH & TS and FSH & TS whose IDT has recommended placement in a community setting, defendants should forthwith prepare a written plan for the orderly transfer of the resident to an appropriate community setting. By not later than March 1, 1991, defendants should provide copies of all of the plans to plaintiffs and should provide to intervenors copies of the plans for those residents whose transfers affect interests of the intervenors. Each plan should describe (1) the activities and interventions to be conducted prior to community placement to assure an orderly transition from LLH &

TS or FSH & TS to the community setting; (2) the specific objectives of the activities and interventions, stated in measurable terms with realistic deadlines by which they are to be achieved, which will prepare the resident for transfer, assure availability of appropriate care in the community setting and involve participation by family members and/or guardians in the process; (3) the representatives of LLH & TS or FSH & TS who will be responsible for assuring accomplishment of the plan's goals; (4) the outside date of final placement in the community setting, which shall be not later than 200 days after implementation of the plan begins; (5) the full scope of community programs and services to be provided to support an effective community placement; and (6) any other subjects the resident's IDT believes, in the exercise of professional judgment, should be included in the plan. If plaintiffs or intervenors have concerns about any plans, they should confer with defendants immediately after receiving the plans in a good faith effort to resolve their concerns, which may be by amendments to plans, if appropriate. By not later than April 1, 1991 plaintiffs and/or intervenors should file with the court and serve on defendants a statement of any remaining objections they may have to, and their proposals for amending, any particular plan.

In regard to those residents of LLH & TS and FSH & TS whose IDTs have made decisions against community placement that were influenced by the unavailability of adequate community services, defendants should convene IDT meetings to reconsider and to make recommendations about community placement that do not take into account the present availability or unavailability of community services. The IDT meetings should be held in time to complete all such written recommendations and have them made a part of the residents' IPPs by April 1, 1991.

By not later than June 10, 1991 defendants should prepare transfer plans (as described above for residents whose IDTs have already recommended community placement) for all residents whose IDTs,

after reconsideration without taking into account availability of community services, make new recommendations of community placement. By June 10, 1991 copies of these transfer and placement plans should be provided to plaintiffs and copies of plans affecting interests of intervenors should be provided to them. Plaintiffs and intervenors should immediately thereafter confer with defendants in a good faith effort to resolve their concerns with any of the plans. By not later than July 1, 1991 plaintiffs and/or intervenors should file with the court and serve on defendants a statement of any remaining objections they may have to, and their proposals for amending, any particular plan.

IDTs, when considering whether to recommend community placement for a resident, should not be influenced by the availability or unavailability of then existing community services. Consequently, the defendants should be enjoined from permitting IDTs in the future to take into account availability or lack of availability of community services in reaching a recommendation as to whether a resident should be served in the community.

Since many residents of LLH & TS and FSH & TS have not been placed in community settings despite recommendations for community placement having been made by their IDTs long ago, a general deadline for transfer from an institution to a community setting should be set. Two hundred days is a reasonable time within which LLH & TS and FSH & TS should be able to accomplish transfer of a resident to a community setting following a community placement decision by the resident's IDT, in the absence of extraordinary circumstances warranting an extended period.

By not later than April 1, 1991, the parties should confer, in good faith, in an attempt to reach agreement on the claims for attorneys fees. In the event agreement is not reached, plaintiffs and intervenors should file by April 15, 1991 supplemental proposed findings of fact and conclusions of law and briefs relating to their claims for attorneys' fees; defendants should file by May 1, 1991 their supplemental proposed findings of fact and conclusions of law and briefs on the claims for attorneys' fees.

IT IS THEREFORE ORDERED that:

1. The parties shall confer as expeditiously and frequently as practicable for the purpose of submitting to the court by not later than April 1, 1991 an agreed plan for correction of deficiencies consistent with the directions set forth above.

2. In the event the parties are unable to reach agreement on all aspects of the relief ordered as to correction of deficiencies, and fail to complete an agreed plan by April 1, 1991, the parties shall:

a. By not later than April 1, 1991 file with the court those parts of a plan of correction to which the parties have been able to agree; and

b. By not later than April 10, 1991, file with the court detailed statements setting forth the reasons the parties have been unable to agree on specific points in a plan of correction, with each party's proposal for each part of the plan of correction as to which there is disagreement. (Following review of the proposals, a hearing may be scheduled, if appropriate.)

3. If any party is in any manner recalcitrant in promptly complying with this Order, a monitor or special master may be appointed; however, as of this time, trusting that the parties will in good faith attempt to resolve any minor differences that may exist among them with reference to the implementation of the relief ordered regarding correction of deficiencies at LLH & TS and FSH & TS, appointment of either a monitor or a special master appears to be unnecessary.

4. Defendants shall, by not later than March 1, 1991, prepare a written plan of transfer to an appropriate community setting for each resident whose IDT has recommended placement in a community setting and shall provide copies of the plans to plaintiffs and/or intervenors, as appropriate, containing the information above described; plaintiffs and/or intervenors shall, by not later than April 1, 1991, file and

serve objections to, and proposals for amending, any particular plan.

5. Defendants shall convene IDT meetings for those residents whose IDTs have made decisions against community placement that were influenced by the unavailability of adequate community services for the purpose of making new written recommendations regarding community placement that do not take into account the availability of community services; and by not later than June 10, 1991, defendant shall prepare appropriate transfer plans for all residents whose IDTs, after reconsideration, make new recommendations of community placement and shall provide copies of those plans to plaintiffs and/or intervenors, as appropriate; plaintiffs and/or intervenors shall by not later than July 1, 1991, file and serve objections to, and proposals for amending, any particular plan.

6. Defendants are hereby permanently enjoined from permitting IDTs to take into account the availability or lack of availability of community services in reaching a recommendation as to whether a resident should be served in the community.

7. Defendants shall accomplish transfer of a resident to a community setting within 200 days following a community placement recommendation by the resident's IDT, in the absence of extraordinary circumstances warranting an extended period.

8. By not later than April 15, 1991, the parties shall submit an agreed order as to claims for attorneys fees or, if agreement has not been reached, plaintiffs and intervenors shall file supplemental proposed findings of fact and conclusions of law relating to their claims for attorneys fees; and defendants shall file by not later than May 1, 1991 their supplemental proposed findings of fact and conclusions of law and briefs on the claims for attorneys fees.